Page 1

1    DARIUS QUEEN, #305-181      *   IN THE UNTIED STATES

2             Plaintiff         *   DISTRICT COURT

3          vs.                  *   FOR

4    H.D. WARD                  *   THE DISTRICT OF MARYLAND

5             Defendant         *   Civil Action

                                    #1:02 CV 03885-WDQ

6    ---------------------------/

7                 The deposition of SANDRA THOMAS was

8    held on August 19, 2004, commencing at 3:11 p.m., at

9    the Eastern Correctional Institution, Westover,

10   Maryland, before Connie E. Bennett, Notary Public.

11

12

13

14

15

16

17

18

19

20

21   REPORTED BY:  CONNIE E. BENNETT, NOTARY PUBLIC

```
 1     APPEARANCES:

 2

 3               KEVIN P. SULLIVAN, ESQUIRE

 4                  On behalf of Plaintiff

 5

 6               PHIL M. PICKUS, ESQUIRE

 7                  On behalf of Defendant

 8

 9     ALSO PRESENT:

10

11               PAUL B. CAIOLA, ESQUIRE

12

13

14

15

16

17

18

19

20

21
```

1          THE WITNESS:  No.  Is that the request

2    slip he sent in?

3          BY MR. SULLIVAN:

4     Q.    Have you ever seen that document before,

5    Sergeant?

6     A.    No, I see it's a request slip.

7     Q.    And the request slip states?

8     A.    Okay.  Yes, it would probably have been

9    the same day that he did the interview.  I would have

10   probably seen it then.  I know he put in a request

11   slip, because I have seen the request slip.  This is

12   probably the same thing.

13    Q.    And the request slip states that his cell

14   buddy told him there would be trouble if he didn't

15   move out of his cell, correct?

16    A.    It does say that, yes.

17    Q.    But he never told you or Officer Pedersen,

18   that was your testimony?

19    A.     No, he just said that he wasn't getting

20   along with his cell buddy, and he wanted to move

21   several cells down.

1    Q.    And you didn't take that to mean that

2    there was a threat from his cell buddy, but just that

3    they weren't getting along?

4    A.    Well, if it's a threat, why would you want

5    to move a few doors down?  I would want to get off of

6    that tier, wouldn't you?

7    Q.    The language in the slip says that there

8    would be trouble if he didn't move out, is that

9    correct?

10    A.    That's what it says, yes.

11    Q.    Did you have any other interaction with

12    Mr. Queen prior to the January 4th interview, other

13    than that one conversation where he told you he

14    wanted to move out of his cell?

15    A.    No, I don't believe there was any other

16    time.

17    Q.    Do you recall whether he complained to

18    Officer Pedersen any other time about having problems

19    with his cell buddy?

20    A.    I not that I know of, no.

21    Q.    Prior to the interview on January 4th,

1    2002, had you seen that request form, which is dated

2    December 28th, 2001?

3         A.    I could very well have seen it.  I don't

4    know.  Most of the time, request slips, I just put

5    them in the lieutenant's box until he returns.  That

6    is the way I do.  Unless it is something that I can

7    help him with.  If he was told to put it in there, I

8    probably put it in Lt. Ward's box, unless he mailed

9    it to him, which he has that option.

10        Q.    If you were to receive a request slip such

11   as the one in front of you in Exhibit 17, would you

12   have the authority to conduct the interview?

13        A.    Yeah, I could do an interview.

14        Q.    Is there a reason if you saw that request

15   slip, while Lt. Ward was on vacation, that you would

16   not do that particular interview?

17        A.    Because I told him if he was in fear of

18   his life, or if he wanted to move, I could move him

19   to 4.  But I cannot.  So that's basically the same

20   thing.

21              But I could have.  He went back in the

QUEEN V. WARD                                    SANDRA THOMAS 8/19/04

Page 35

1    cell.  There weren't problems after that, until the

2    fight.  But that was in the day room.  That wasn't in

3    the cell.

4        Q.    Do you specifically recall asking Mr. Ward

5    if he was in fear for his life?

6        A.    Asking?

7        Q.    Mr. Queen, I am sorry.  Asking Mr. Queen

8    if he was in fear for his life?

9        A.    I didn't ask him, no.  I simply stated, he

10   said he wanted a cell move.  And I stated to him, I

11   don't have the authority.  Unless he is in fear of

12   his life or refusing housing, I can take him, pack

13   him up and take him to 4.  Otherwise, I am not

14   authorized.

15       Q.    Isn't it true, Sergeant, that there are

16   other circumstances that would give you authority to

17   move an inmate, other than being in fear of his life

18   or refusing housing?  Such as any general threats,

19   physical threats?

20       A.    Upon inmates?  Yes, you would have to move

21   them.  Fights, you move them.  But I have to go

QUEEN V. WARD

SANDRA THOMAS 8/19/04

Page 36

1  through the lieutenant, still.  I mean, it's not my

2  final decision.

3      Q.    If an inmate were to come to you and say

4  he was being threatened by his cell buddy, at that

5  moment, would you not have the authority to remove

6  him to segregated housing?

7      A.    Only if he refused housing and was in fear

8  of his life, yes, I could.  He never told me that.

9      Q.    Let me direct your attention back to what

10 has previously been marked as Exhibit 13.  I believe

11 there are three questions on that form.  Is that

12 correct?

13     A.    Yes.

14     Q.    The first one says:  Have you ever been

15 threatened?  And that would be cause, if the inmate

16 answered yes to that question, that would be cause to

17 remove them to administrative segregation?

18     A.    If they sign that form saying that, yes.

19     Q.    You would have the authority to do that

20 without a lieutenant, correct?

21     A.    Through a lieutenant, yes.  I would simply

Page 37

1    call a lieutenant and say, I have a person here who

2    says he has been threatened, I have to separate him.

3    She say fine.  Or he, whoever the lieutenant would be

4    that day.

5         Q.    Would you have the authority to do that

6    without seeking approval from a lieutenant?

7         A.    No.  I mean, I can separate him right

8    then, and make sure they aren't both in the same

9    cell, or in the same area.  But he never gave that

10   impression.  He went back in the cell.

11        Q.    If you read the request slip submitted by

12   Mr. Queen, which says that there will be trouble,

13   would you then have the authority to remove him at

14   that point, from his cell?

15        A.    Un-unh.

16        Q.    Why not?

17        A.    Because you would have to figure out why.

18   He is saying trouble.  All right.  Was he threatened?

19   Are you in fear of your life?  Or do you want

20   protective custody?  Do you want out of this unit

21   away from this person?

Page 38

1      Q.    But he wasn't asked that, at that point.

2   Is that correct?  You never asked Mr. Queen if he was

3   threatened, did you?

4      A.    No.

5      Q.    Could you tell me everything that you

6   remember about that January 4th, 2002, interview?

7      A.    Basically, he was upset because the

8   lieutenant wouldn't move him, and he refused to sign

9   the form.

10     Q.    When you say he?

11     A.    I am sorry, Mr. Queen.  When Mr. Queen, he

12  wouldn't move him.  He was upset and then refused to

13  sign the form.

14     Q.    Mr. Queen?

15     A.    Mr. Queen, I'm sorry, again.  That's

16  basically it, when I came in.  That was what was

17  going on.

18     Q.    When you walked into the room, who was

19  speaking, do you recall?

20     A.    I can't remember.  It was so brief, I

21  don't remember, no.  I am sorry.

1        Q.      How long was the interview, or at least

2    the portion that you witnessed?

3        A.      Not very long.   It doesn't take long.

4        Q.      Two minutes, 30 seconds, 10 minutes?

5        A.      Maybe five minutes, at the most.   I can't

6    even remember what Mr. Queen said at the time.   I

7    know he was upset because he wouldn't move, and he

8    was demanding he move him.

9        Q.      Do you recall why he was demanding that he

10   be moved, Mr. Queen?

11       A.      Because he wasn't getting along with his

12   cell buddy, and there was this fella he knew or

13   something, in Cell 45, that he wanted to move in

14   with, but at the time, I don't believe, if I recall

15   that that cell was available for him to move into.

16   So that would have meant a switch, and you can't do

17   that without getting everybody's approval.   It don't

18   work like that.

19       Q.      So to your recollection, Cell 45, which I

20   believe --

21       A.      Was not empty for him to move into, no.

1      Q.     So it's your recollection of that

2  interview that it was Lt. Ward's decision not to move

3  Mr. Queen?

4      A.     Yes.

5      Q.     Do you know why he made that decision?

6      A.     He said he had nothing to base it on.  And

7  for one thing, he wouldn't have moved him anyway,

8  until he talked to the guy in 45, if they wanted to

9  do a switch.  So he probably said no at that time.

10     Q.     Do you know if Lt. Ward ever spoke to the

11  individual in Cell 45?

12     A.     I would say he probably did.  He usually

13  follows through on things.  I don't remember, but I

14  would say he probably did.

15     Q.     If Lt. Ward did follow through with that

16  individual, would there be another cell change

17  request form?

18     A.     No.

19     Q.     Were you aware whether Lt. Ward spoke with

20  Mr. Barnes, who was Mr. Queen's cellmate at the time,

21  regarding the trouble?

QUEEN V. WARD                                        SANDRA THOMAS  8/19/04

Page 41

1      A.     No, not that I remember.  --  Yes!

2      Q.     So then you can only testify to what you

3  specifically remember, I understand that.

4      A.     I can't remember, because it was so many

5  there waiting that day to talk to him.  It seems like

6  to me he was talking to him, too, to see what the

7  problem was.  But I won't swear to that, because I

8  don't really remember.  I can't do that.

9      Q.     In reading Mr. Queen's request slip, does,

10  would you consider that a threat?

11      A.     No.

12      Q.     What does that mean to you, there will be

13  trouble?

14      A.     Could mean a lot of things.  He's not

15  going to make his life easy while he is in the same

16  cell with him, for some reason or another.  I don't

17  know, it could mean a lot of things.

18      Q.     Have you ever had the opportunity to meet

19  Mr. Barnes?

20      A.     Yes.

21      Q.     Do you regard Mr. Barnes as a violent

Page 42

1    individual?

2        A.    No.

3        Q.    Do you know if Mr. Barnes had any other

4    incidents, or if he was ever accused of assault while

5    housed at ECI?

6        A.    It's a possibility.  I don't get to see

7    the records.

8        Q.    So you weren't specifically involved with

9    any incident where Mr. Barnes assaulted him?

10       A.    I was there the day, but he never said

11   Mr. Barnes assaulted him.

12       Q.    When you're referring to the day?

13       A.    When he got hurt in the day room.

14       Q.    The January 12th incident?

15       A.    Yes.

16       Q.    Are you aware of any other occasions where

17   Mr. Queen was complaining about his cellmate, other

18   than the alleged interview on January 4th and the

19   meeting you had with him when he was new?

20       A.    No.  As a matter of fact, after that, he

21   went back in the cell, and as far as I knew, they got

QUEEN V. WARD                                           SANDRA THOMAS 8/19/04

Page 43

1    along.  I never heard nothing else out of it.

2        Q.    Other than the assault on January 12th?

3        A.    And how many days later was that?

4        Q.    If my math is correct, it would be eight.

5        A.    Oh, yeah.  No, he never said nothing else

6    after that.

7        Q.    Do you know how Mr. Queen got to

8    Lt. Ward's office?

9        A.    He would have to walk.

10       Q.    Would he have to be escorted to Lt. Ward's

11   office?

12       A.    Oh, no, no.

13       Q.    He would have access to Lt. Ward's office?

14       A.    Oh, yes, yes.  I'm sorry.  I wasn't being

15   smart.

16       Q.    I should have asked more precisely.  Did

17   you take notes of the interview?

18       A.    No.

19       Q.    You didn't record the interview?

20       A.    Can't do that.

21       Q.    Is there anything else you specifically

Page 44

1    recall about the meeting, what was said from either

2    Mr. Queen or Mr. Ward?

3         A.    No, I can't think of anything that was

4    significant, no.

5         Q.    Was it your decision to deny Mr. Queen's

6    request for a cell change?

7         A.    No, it isn't my decision.  I don't have

8    that.

9         Q.    Did you have any say in that decision at

10   all?

11        A.    No, I can just simply tell him that

12   somebody is requesting a cell move and has been told

13   to put in a request slip.  But no, I don't have any

14   say.

15        Q.    But you do conduct these interviews?

16        A.    Uh-huh.

17        Q.    So in that situation, you do have a say.

18   You make a determination whether someone should be

19   moved to administrative segregation.

20        A.    Yes.

21        Q.    But in this particular incident it wasn't

1    your decision, is that correct?

2         A.    No.

3         Q.    It was Lt. Ward?

4         A.    It's always the lieutenant's decision.  A

5    sergeant or a CO-2 cannot do that.

6         Q.    You keep referring to it as a cell move,

7    as opposed to the request for administrative

8    segregation.  Why is that?

9         A.    Oh, you're talking about the request for

10   administrative segregation?

11        Q.    I am talking about during the interview.

12        A.    He didn't want it.  He didn't want to go

13   to 4.  He made that very clear.

14        Q.    He made that clear the first time you

15   spoke with him?

16        A.    Uh-huh.

17        Q.    Did he also make that clear in the

18   interview?

19        A.    Yes.

20        Q.    He made clear, he told Mr. Ward that he

21   did not want to move to administrative segregation?

Page 46

1        A.      He said he wasn't in fear of his life, he

2    just wanted out of that cell.

3        Q.      Were you there when Mr. Ward asked him the

4    first question on that sheet, which is, Have you been

5    threatened?

6        A.      I don't believe I was.  I walked in.  No,

7    I don't think I was.  If he, you know, wasn't, if he

8    was, he would have checked yes.  It would have been

9    no problem.  There is no problem, I mean, that's no

10   problem to move him to 4.

11              But to move him to a cell simply because

12   he wants to move, because he doesn't get along with

13   his cell buddy, you can't always do that.  You're

14   talking 96 inmates on this tier.  You just can't do

15   it all the time.

16              Now, we could, yes, if he was in fear of

17   his life, or if he wanted P-C, there would have been

18   no problem.  Lt. Ward would have had him back and out

19   of there in no time.  That wouldn't have been a

20   problem.  But he never questioned any of that.  He

21   said no.

1      Q.    You did you hear Mr. Queen specifically

2  say no during that January 4th interview that he did

3  not want to be moved to the administrative

4  segregation?

5      A.    He wasn't asked if he wanted to be moved

6  to administrative segregation.

7      Q.    What exactly was he asked?

8      A.    In other words, are you in fear of your

9  life?  We can move you, is basically what this form

10  is.

11      Q.    There are other reasons on that form,

12  other than just being in fear of your life?

13      A.    That's right.

14      Q.    You don't recall Mr. Ward asking Mr. Queen

15  any of the other questions on that?

16      A.    Yes, he asked.  You have to ask all of

17  them.  You check them off as you ask them.

18      Q.    But you weren't there while he was asking

19  the questions, is that correct?

20      A.    Yeah, I probably was there for most of it.

21  Maybe not all of it, but yes, and I signed it, yes.

Page 48

1        Q.     You seem to qualify that a little bit,

2   saying you probably --

3        A.     I was standing outside the door.  I

4   remember when he was in there, I was standing outside

5   the door, because there was such a line.

6              Then I got in there and, no, he never

7   said, he never answered yes to either one when I was

8   there.

9        Q.     Did you draw any conclusions about why

10  Mr. Queen was in fear or was threatened?

11       A.     What do you mean, conclusion?

12       Q.     Were you under the impression that

13  Mr. Queen was ever threatened?

14       A.     No.

15       Q.     In reading the portion of Exhibit 17 in

16  front of you now, if you would have read that when it

17  was submitted on December 28th, 2001, would that

18  have, would you have been under the impression that

19  he was in fear of his safety, or was threatened at

20  that time?

21       A.     No.  Because he would have told, I have

1    been threatened, I am in fear of my life.  I want out

2    of this cell.   It's that simple.  That's all he had

3    to do.  He would have been moved out of the cell.

4    But that does not say that.

5          Q.    If there was any documented threat, would

6    an inmate be moved immediately?

7          A.    What do you mean, documented?

8          Q.    If an inmate were to write a note and say,

9    I am being threatened, and hand it to an officer,

10   would he be moved immediately?

11         A.    You would take him out of the cell and do

12   an interview and you would interview his cell buddy.

13         Q.    Would you always interview the cell buddy?

14         A.    In that case, yes, because he is accusing

15   that, that is an infraction.  He is accusing that

16   inmate of threatening his life.

17         Q.    And you would use the same form when you

18   interviewed the inmate, as well?

19         A.    Yes.

20         Q.    Would you interview anybody else?  Would

21   you interview any of the officers on the tier that

Page 50

1    may have overheard something or anything like that?

2         A.    They will tell you.  You wouldn't have to

3    interview them, they would tell you.

4         Q.    You mean the officers would come and tell

5    you if there was a problem?

6         A.    Yeah.

7         Q.    Would you consider, would the temperament

8    of the person allegedly making the threat ever be

9    considered in whether --

10        A.    We're not psychologists, no.

11        Q.    No, if you had an inmate that was known to

12   be particularly violent?

13        A.    Well, he wouldn't be there.  What do you

14   mean by violent?  Violent is not housed with general

15   population.

16        Q.    If there is an incident and an inmate is

17   violent toward another inmate, what would happen into

18   that inmate?

19        A.    If he is violent?

20        Q.    Yes.

21        A.    He would get locked up.

Page 51

1      Q.     For how long?

2      A.     For however long the hearing officer

3   determines.

4      Q.     And then at the end of that period of

5   time, he would be put back in general population,

6   correct?

7      A.     Probably not in the same side, or the same

8   compound.  He would either go to West, East, or up

9   the road.  He wouldn't be housed in the same

10  compound, no.

11     Q.     Why did you sign Mr. Queen's cell change

12  interview form?

13     A.     Because he refused to sign it.

14     Q.     And Lt. Ward signed it, is that correct?

15     A.     Uh-huh.

16     Q.     So why would you also have to sign it?

17     A.     Because he refused to sign it.

18     Q.     Is that a policy?

19     A.     It used to always be, any time, like when

20  we do pack-ups.  They refuse to sign them, it

21  requires two officers' signatures.  A lot of things,

Page 52

1    give them a ticket.  They refuse sign it, two

2    officers' signatures.

3         Q.    What do you mean by pack-ups?  You said

4    when you do pack-ups.

5         A.    Okay.  Say it's a fight.  I'm packing this

6    guy up, and we inventory his stuff on an inventory

7    form.  Down to the bottom it requires two officers'

8    signatures and the inmate's.  If the inmate refuses

9    to sign, of course the two officers sign it anyway.

10            Same way with a ticket.  There is a place

11   for the inmate to sign.  If he refuses to sign, two

12   officers sign that he was given the ticket.

13        Q.    Does that happen often with the cell

14   change interview forms?

15        A.    No.  Most of the time if they say no, no,

16   no, that's the end of the story, you know.

17        Q.    When you say that's end of story, what

18   happens?

19        A.    Then you keep them on file.

20        Q.    Is the interview with Darius Queen the

21   only time you have ever witnessed an inmate refusing

Page 53

1    to sign?

2         A.     Oh, no.  I have done it before.  Oh, no.

3         Q.     You have had another officer?

4         A.     Usually if they say no, no, no, and the

5    inmate isn't, is persistent on still moving into the

6    cell, or what have you, why, different circumstances,

7    yes.  You will have two officers sign it.

8         Q.     And you said earlier that it get filed.

9    Where exactly does it get filed?

10        A.     Lieutenant's office.

11        Q.     Does it get filed anywhere else?

12        A.     Not that I know of.  Well, it says base

13   file, so I guess he gets a copy.

14        Q.     You say, he, you mean it goes in the

15   inmate's base file?

16        A.     I guess.  It says so, unless they don't

17   that no more.  I don't know, because they've done

18   away with so much.  As far as I know, the lieutenant

19   just files it.

20        Q.     In the file in his office?

21        A.     Yes, he has the file just for him.

Page 54

1     Q.    Did Lt. Ward ask you to sign that?

2     A.    Yes.

3     Q.    Do you have a specific recollection of him

4  asking you to sign this?

5     A.    Yes.

6     Q.    Was Mr. Queen there?

7     A.    Yes.

8     Q.    And do you recall Mr. Queen refusing to

9  sign the document?

10    A.    Yes.

11    Q.    Did he give a reason why he refused to

12  sign?

13    A.    He didn't get his cell moved, that's about

14  -- they have that right.  They don't have to sign

15  them.

16    Q.    I understand.  Did Mr. Queen seem angry?

17    A.    Yes.  Mr. Queen was angry because he

18  didn't get his cell moved.

19    Q.    And he just refused to sign it and walked

20  out of the room?  I am just trying to figure out

21  exactly what happened.

Page 55

1      A.     Yes.

2          Q.     Mr. Queen walked out of the office?

3      A.     Yeah.  He had a few things to say, if I

4   remember correctly.  I don't know, something about

5   his cell move, and he had a buddy, and I don't

6   remember exact words, so it is no need for me even

7   quote what I thought he said.

8          Q.     A derogatory comment?

9      A.     Yeah.

10         Q.     If Mr. Queen submitted his request slip on

11  December 28th, why would he not be interviewed until

12  January 4th?

13         A.     Because the lieutenant wasn't there and we

14  don't, I can't do cell moves.  So request slips for

15  cell moves goes to the lieutenant's box.  Now, if he

16  was in fear, I could have called another lieutenant,

17  if he was in fear of his life.

18         Q.     What if he was just --

19         A.     And they would have done the same thing.

20  They would have moved him to 4.

21         Q.     What if he was not in fear of his life,

Page 56

1    but was just threatened?  I mean, it seems to me

2    there is a difference, would you agree?

3         A.    Yes, there is a difference.

4         Q.    And you keep using the phrase, in fear of

5    your life.  But under the cell change interview form

6    there are three categories, as we have gone over

7    them.  One of them doesn't say, Are you in fear of

8    your life, does it?  If you're threatened.

9         A.    Well, no.  Not to move a few doors down

10   from where the problem is.  That's, I mean, he eats

11   with him.  He will go to chow with him.  He will rec

12   with him.  He will go to courtyard with him.  So,

13   threatened, he could get him any time he wanted.

14             The only way you relieve that situation is

15   to get him out of general population.

16        Q.    What if the situation --

17        A.    And he was told that.

18        Q.    I am sorry?

19        A.    He was told that.

20        Q.    Mr. Queen was told that?

21        A.    Yes.  That he would have to be moved to

Page 57

1    Housing Unit 4 to get out of the general population.

2    He knew that.

3         Q.    What if the only reason an inmate is being

4    threatened is because he refuses to move out of the

5    cell?

6         A.    That don't make good sense.

7         Q.    If one inmate did not want --

8         A.    He can't move out of a cell.  All inmates

9    know they can't just move out of a cell.  They can

10    refuse housing, but they can't move out.  They don't

11    have a choice of where they are going to sleep.

12        Q.    If they are being threatened by their cell

13    buddy, is it your responsibility to make sure that

14    they're not in fear and they're not threatened by

15    their cell buddy?

16        A.    I can't stop his cell buddy from

17    threatening him, or so he says.  His cell buddy might

18    not have said that.  His cell buddy probably denied

19    the whole thing, so --

20        Q.    Did you interview Mr. Barnes?

21        A.    I didn't interview him, no.