IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DARIUS F. QUEEN #305-181 | * | |
| Plaintiff | * | |
| v. | * | Civil No. |
| H.D. WARD | * | WDQ-02-3885 |
| Defendant | * | |

* * * * *

DEPOSITION OF DARIUS QUEEN

The deposition of Darius Queen was taken via videoconferencing in the above-captioned case on Thursday, September 9th, 2004, commencing at 9:30 a.m., in the Office of Administrative Hearings, 11101 Gilroy Road, Hunt Valley, Maryland, and was reported by Dawn M. Hyde, a Notary Public.

EVANS REPORTING SERVICES

2 North Charles Street, Suite 950

Baltimore, Maryland 21201

(410) 727 7100

APPEARANCES:

PAUL S. CAIOLA, ESQ.
Gallagher Evelius & Jones
218 North Charles Street, Suite 400
Baltimore, MD 21201
On behalf of Plaintiff Queen

PHILIP M. PICKUS, ESQ.
Assistant Attorney General
St. Paul Plaza
200 St. Paul Place
Baltimore, MD 21202
On behalf of Defendant

There's three meals a day?

A Oh, yes, sir.

Q And it sounds like you had snacks or you were allowed food in your cell; is that correct?

A Oh, yes, we allowed to go to the commissary where you can buy food and stuff.

Q Were the meals served at the same time each day?

A Basically, yes, sir.

Q Do you recall what those times were?

A No, sir.

Q And how was it done? Did the entire housing unit one eat at the same time?

A No. They go on different tiers. They call different tiers in the housing unit and they call them at separate times.

Q How many tiers are there in housing unit one, if you know?

A I believe it was four tiers in all of the units, I believe.

Q And which tier were you in while you were

in housing unit one?

A C tier.

Q So each meal, everybody on C tier ate together?

A Yes, sir.

Q And where would you eat?

A We sat in the dining room.

Q And where was the dining room in relationship to C tier?

A I would say maybe -- I'm not sure, not the distance. I mean, it's not too far from the unit.

Q Would there be any other inmates other than your tier eating with you?

A I'm not sure. I'm not sure who ate with -- I know that the rest of the tiers in the unit would all share the same dining room together. But I'm not sure if any other units ate with their housing unit. I'm not sure.

Q How was the food served to you?

A You walked through a line.

Q Buffet-style?

Q Did everyone in housing unit one have the same rec time?

A I believe so.

Q And would they use the same rec hall that you played cards in or would they be in a different rec hall?

A Everybody in housing unit one?

Q Yes.

A Everybody in housing unit one, they got their own rec halls. Everybody had individual rec halls for their particular tier.

Q Each tier had a rec hall. Is that what you're telling me?

A Yes, sir.

Q And could people from other tiers come to your rec hall if they wanted to play cards with you one day, or did they not have any access at all?

A No, they don't have access to walk in and out of the tiers.

Q So no one from other tiers could come and have rec with you at all?

A No, sir.

Q Is the same true for the gym and the outdoor rec area?

A No, that's different. For the gym and outdoors you all together.

Q And when you say "all together," you mean housing unit one?

A Housing unit one, yes, sir.

Q You mentioned that you could get a job. Have you had a job during your time at ECI?

A Have I -- can you repeat that? I didn't understand.

Q Have you had a job at ECI since you've been there?

A Yes, sir.

Q What was that?

A In the kitchen and education. They consider that a job, education, going to school.

Q Education. You going to classes as a student was considered a job?

A Yes, sir.

BY MR. PICKUS:

Q Did he actually threaten to physically hurt you prior to the assault?

A Did he actually -- repeat that again.

Q Did he actually threaten you with physical harm prior to the assault? I know he said, "There's going to be trouble," but I'm talking about a specific threat.

A That is a threat.

Q I agree that's a threat. I'm talking about more specific threats.

A I mean, not that I recall. Only thing I recall is him saying, "If you don't move out of the cell, there's going to be some trouble."

(Recess taken from 10:28 a.m. until 10:30 a.m.)

(Queen Deposition Exhibit Nos. 1 and 2 were marked for identification.)

BY MR. PICKUS:

Q There eventually came a time where you decided to complain to the staff about Mr. Barnes;

assault?

A It was a constant thing, anyway. It was just every day it was, you know, a little bickering and saying, you know, trouble.

It was like, "You got to get up out of here or there's going to be some trouble if you don't move out of the cell, I'm telling you." Things like that. That was a daily -- that was a constant thing.

Q If the cell change request had been granted, where did you want to go?

A If it had been granted?

MR. CAIOLA: Objection.

A It wouldn't have made any difference.

MR. CAIOLA: Wait a minute, Mr. Queen. Objection. Do you mean did he have a specific cell in mind that he wanted to be transferred to or do you mean a tier?

MR. PICKUS: Cell, tier, unit, anything.

MR. CAIOLA: Could you ask him that specific question because I think your question was

vague.

A It wouldn't have made any difference where.

BY MR. PICKUS:

Q You didn't have a specific place you wanted to go in mind? Did you have a specific place you wanted to go when you made your request?

A When I made the request, I noticed that that cell was open because the older guy had told me, a friend had told me. He was like, "There's a specific cell open, why don't you try to get in that cell." I'm going to move into that cell because it's open.

Because the guy told me. He was like, "The only thing that's going to happen is the guy will end up jumping you or something, so why don't you try to get on out of there?"

Q Well, what specific cell are you talking about?

A Cell 45.

Q Same tier?

A That was -- yes, it was on the same tier.

Q When you say "open," does that mean there was no one in it or there was only one person in it?

A There was only one person in it.

Q Did you know the person in cell 45 when you made the transfer?

A No, sir. When I made the transfer? I don't understand what you just said. You said, "When you made the transfer."

Q You testified when you made the transfer you knew --

MR. CAIOLA: You mean the transfer request.

MR. PICKUS: Transfer request.

BY MR. PICKUS:

Q When you made a transfer request --

A Oh, okay.

Q -- you knew that there was an opening in cell 45. Did you know the inmate who was in there at that time?

A No, I didn't know the inmate that was in

cell 45 when I filled out the request slip to be moved.

Q Did you ever communicate your desire to go to cell 45 to any staff in housing unit one?

A No, sir. Nothing but -- just this request slip. Just the request slip that I filled out to the lieutenant.

Q How about your oral conversations with Officer Peterson?

A Just -- because he's the one that told me to go through the lieutenant. So I did what I was told to do. I wrote to the lieutenant to try to be moved.

Q And same thing with Sergeant Thomas?

MR. CAIOLA: Objection. I believe his testimony is that he didn't converse with Sergeant Thomas other than the first day, which was before he made the request.

MR. PICKUS: I'll ask him.

BY MR. PICKUS:

Q Did you speak to Sergeant Thomas after the

first day when you were talking to her about the shoes?

A No, I never spoke with her again.

Q Are you aware of any institutional policy that inmates who request a cell transfer have to be placed in segregation for a certain amount of time?

A No, sir.

MR. CAIOLA: Well, do you mean aware based on what's occurred in the litigation or prior to that?

MR. PICKUS: I'll rephrase.

BY MR. PICKUS:

Q When a cell transfer occurs due to possible safety issues, are you aware of any institutional policy where either of the inmates may go in that situation?

A I mean, what you saying, at this particular time? Are you asking me that now am I aware, or are you asking me before this took place?

Q Actually, I'll ask you both. When you put the request in, the January of '02, were you aware

of an institutional policy?

MR. CAIOLA: It was December 28th of '01.

A No, sir.

BY MR. PICKUS:

Q Your answer was "no"?

A Yes, I was following procedure. He said, "Put a request in, a request slip."

That's the only thing I was aware of at that time was to put a request in, right.

Q Are you aware of any policy at this time?

A I mean, I see -- I'm only aware that if you want to be moved, right, you have to put in a request.

Q But you don't have any idea where you go if you're moved for safety issues?

A No. I mean, I'm not sure -- right, I can't say for sure.

Q Have you ever served any time in administrative segregation?

A No, sir.

Q I'm talking about your entire DOC history,

not just ECI.

A None that I'm aware of, no. Never been on it.

Q Have you heard what administrative segregation is like from other inmates?

A No.

Q Well, do you view administrative segregation as something that's desirable?

A No. I wouldn't think it's desirable because you're not entitled to the same privileges. I mean, when you say "desirable," what do you mean? Would I like to go?

Q Exactly, yes.

A No, I wouldn't want that.

Q And --

A I would like to be in population.

Q That's why you didn't move on the first day because you would have had to go to administration segregation?

A Because I would have received an infraction, a ticket. Why would I want a ticket? I

would have had to receive an infraction. If I refused to go in that cell, I would have received a ticket and then placed -- right.

Q All right. Let's get --

A For disobeying an order. Basically, it's disobeying an order.

Q Right. I understand. I want to ask you about the day you were assaulted by Mr. Barnes. Where were you?

A I was in the rec hall, top rec hall, sitting at the card -- playing at the table, playing cards.

Q With the same group you usually play cards with?

A Yes.

Q And tell me what happened?

A I was sitting there, playing cards, and all of a sudden I felt an impact to the side of my face, and then I got up and he was standing there with something in his hand. I went to go like I was going towards him, at him, and another guy walked up

and he hit me to the side of the head. And I turned around to go at that one and another guy, he hit me to the side of the head.

By that time, I walked to the steps. I walked down the steps, and once I got down the steps, I called Officer Peterson. He came through the screen, which is a fence, and started asking me questions, what happened.

So that particular time I told him that I fell because he's asking me all -- he's questioning me in front of these guys that had just assaulted me, basically. I'm still locked in with these guys.

So I said, "Just let me go lock in my cell." So he said, "Oh, I know what happened. I already know it's between you and your celly, ain't it?"

So then he finally gets the door hit and let me out, and when he escorted me up the steps, I said, "Man, you know what's going on, you know what happened." And I'm bleeding and he says, "You're bleeding," so he walked me to the room and then he