IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DARIUS F. QUEEN, #305-181 | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil Action No. 1:02-cv-03885-WDQ |
| | * | |
| H. D. WARD | * | |
| | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S RESPONSE TO DEFENDANT H.D. WARD'S
MOTION TO DISMISS OR, IN THE ALTERNATIVE,
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, Darius F. Queen, through his undersigned counsel, hereby opposes Defendant Dennis Ward's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (the "Summary Judgment Motion"), and states:

## <u>INTRODUCTION</u>

This case involves a correctional officer's failure to protect an inmate from a threat of serious harm from another inmate. Mr. Queen's cellmate, Kevin Barnes ("Barnes"), began threatening Mr. Queen from the moment Mr. Queen was assigned to share a cell with him at the Eastern Correctional Institution ("ECI") in Westover, Maryland. During the period that Mr. Queen and Barnes lived together, Barnes continuously threatened Mr. Queen. Specifically, Barnes threatened that there would be "trouble" if Mr. Queen did not move out of their cell. Mr. Queen described his fear of Barnes to correctional officers at ECI, and requested verbally and in writing that Lt.

Dennis Ward, the correctional officer responsible for the housing unit on which Mr. Queen lived, transfer him to another cell because Barnes was threatening him. Lt. Ward knew that there was a substantial risk that Mr. Queen would be attacked by Barnes if Mr. Queen was not transferred to another cell, but took no action to prevent the attack. As a result of Lt. Ward's failure to protect Mr. Queen, Mr. Queen was attacked and seriously beaten and harmed by Barnes.

## STATEMENT OF RELEVANT FACTS

Mr. Queen arrived at ECI in November 2001 after being convicted of a burglary offense in Prince George's County, Maryland. Deposition of Darius Queen ("Queen Depo."), attached as **Exhibit 1**, at 9. At that time, Mr. Queen did not know any of the other inmates at ECI. Id. at 13. When Mr. Queen arrived at ECI, he was initially housed in Housing Unit #5. He resided there for approximately three weeks, at which time he was transferred to Housing Unit #2. Id. at 10. Approximately three-weeks later, on December 23, 2001, Mr. Queen was transferred to Housing Unit #1 and assigned to room with Barnes in cell C38. Id. at 10, 18. Mr. Queen did not know Barnes prior to that time. Id. at 11, 19.

Immediately upon Mr. Queen's transfer to cell C38, Barnes began threatening him. Id. at 34-36. Even before Mr. Queen entered the cell, Barnes acted in a hostile manner towards Mr. Queen, demanding that he take his shoes off before entering the cell. Id. at 33-37, 45-46. Mr. Queen informed Correctional Officer Kenneth Pederson and Sgt. Sandra Thomas of Barnes's confrontational behavior, but the officers told Mr. Queen that he would be placed on administrative segregation and given a citation for refusing

housing if he did not enter the cell. Id. at 46, 62-63; Deposition of Sandra Thomas ("Thomas Depo."), attached as **Exhibit 2**, at 35. Because Mr. Queen did not want to receive a citation for refusing housing or be placed on administrative segregation, he entered the cell. Queen Depo., **Exhibit 1**, at 46, 62-63.

Following Mr. Queen's initial confrontation with Barnes, Barnes continued to be hostile towards him and made it clear that he did not want Mr. Queen living in the cell. Id. at 32-39, 55-56. At one point, Barnes threatened that if Mr. Queen did not "move out" of the cell, there would be "trouble." Id. at 35-39. On many occasions, Mr. Queen told Officers Pederson and Thomas that he was afraid of Barnes. Id. at 44-47. Mr. Queen also asked these officers to move him to another cell because of the problems he was having with Barnes. Id. at 47; Thomas Depo., **Exhibit 2**, at 29-31.

Officer Pederson and Sgt. Thomas informed Mr. Queen that he needed to submit a written request to Lt. Ward if he wished to transfer to another cell. Queen Depo., **Exhibit 1**, at 45-47, 59-60. On December 28, 2001, Mr. Queen completed a cell change request form and submitted it to Lt. Ward. See Cell Change Request, attached as **Exhibit 3**; Queen Depo., **Exhibit 1**, at 48-49. On the form, Mr. Queen described the threat posted by Barnes. Specifically, Mr. Queen wrote:

> I am in [cell] 38 and would like to move to [cell] 45 because me and my celly are not getting along from the time I moved in. He has told me that there will be trouble unless I move out.

See **Exhibit 3**.[1]

---

[1] Mr. Queen requested cell C45 because a fellow inmate, Ellis Hickman, informed Mr. Queen that that cell had an open bed. Queen Depo., **Exhibit 1**, at 57. At the time he submitted

The next day, Lt. Ward denied the request without ever conducting an interview of Mr. Queen or Barnes.  Queen Depo., **Exhibit 1**, at 52-53.  Lt. Ward simply wrote "NO!" on Mr. Queen's request form and returned the form to Mr. Queen.  Id. at 50-52; **Exhibit 3**.

On January 12, 2002, Barnes, along with two other inmates, attacked and seriously injured Mr. Queen while he was playing cards in the recreation room.  Id. at 63-68; Record of Barnes's Adjustment Hearing, attached as **Exhibit 4**.  Barnes approached Mr. Queen from behind and struck him in the head with a metal object believed to be a padlock.  Queen Depo., **Exhibit 1**, at 63-66.  The other two inmates then punched Mr. Queen in the head and jaw.  Id. at 63-67.  No guards were in the recreation room at the time, and no one intervened to stop the assault.  Id. at 68.

Following the assault, Mr. Queen sought to exit the recreation room.  Id. at 64, 73.  Bleeding from the head, he walked down the stairs and approached Officer Pederson, who was on the other side of a locked door.  Id. at 73.  Mr. Queen told Officer Pederson that he fell in the shower.  Id. at 64, 73-74.  At that time, Mr. Queen did not want to inform Officer Pederson that he had been attacked since Mr. Queen was still locked in the recreation room with his attackers.  Id.  Officer Pederson responded by saying, "Oh, I know what happened. . . .  I already know it is between you and your celly, ain't it?"  Id.  When Officer Pederson let Mr. Queen out of the recreation room, Mr. Queen confirmed

---

his cell change request Mr. Queen did not know the inmate who resided in cell C45.  Id. at 58-59.

that he was assaulted by Barnes and the other two inmates. Id. at 64-65. Officer Pederson then escorted Mr. Queen to the medical facilities. Id. at 74. Later that day, Mr. Queen was transferred to another housing unit. Id. at 77. Barnes was found guilty of violating ECI Rule 102 (Assault) at his adjustment hearing on January 16, 2002. See **Exhibit 4**.

As a result of the assault, Mr. Queen suffered several facial lacerations and a broken jaw. See **Exhibit 4**; Queen Depo., **Exhibit 1**, at 75-77. Mr. Queen's jaw was wired shut for nearly two months as a result of the break. Id. at 77.

## ARGUMENT

### A.    Applicable Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. In Anderson v. Liberty Lobby, Inc., the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." Id. at 248. Thus, the question to be determined is whether the Court could return a verdict for Mr. Queen on the evidence presented. Id. at 252. In undertaking this inquiry, this Court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing

the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

  **B. Summary Judgment Should Not Be Granted On Mr. Queen's Failure To Protect Claim Because Lt. Ward Acted With "Deliberate Indifference" In Refusing To Transfer Mr. Queen To Another Cell After Becoming Aware That Mr. Queen's Cellmate Was Threatening Him.**

The Eighth Amendment's prohibition against "cruel and unusual punishment" imposes upon correctional officers the obligation to protect inmates from harm by other inmates. See Farmer v. Brennan, 511 U.S. 825, 832-33 (1994). As the Supreme Court has stated:

> '[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment.'

Helling v. McKinney, 509 U.S. 25, 32 (1993) (quoting DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989)) (emphasis added).

In order to prove a prima facie case of failure to protect under 42 U.S.C. § 1983, a Plaintiff must show that: (1) the harm he suffered was objectively, sufficiently serious; and

(2) the defendant acted with "deliberate indifference" to Plaintiff's safety. See Farmer, 511 U.S. at 832-33; Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir. 1991).[2]

In Farmer, the Supreme Court defined "deliberate indifference" in the context of a failure to protect claim to mean that the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. The Farmer court equated "deliberate indifference" to subjective recklessness. Id. at 839-40. Under the Farmer test, a "claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842.

### 1. Lt. Ward Was Aware of a Substantial Risk to Mr. Queen's Safety.

Viewed in the light most favorable to Mr. Queen, the evidence shows that Lt. Ward was made aware of a substantial risk to Mr. Queen's safety. From the moment Mr. Queen first arrived at cell C38, Barnes acted in a hostile manner towards him. Barnes also threatened Mr. Queen, stating that there would be "trouble" if he did not "move out" of the cell. Believing and fearing that Barnes would act on his threats, Mr. Queen told ECI officers that Barnes was threatening him, and asked to be transferred to another cell.

---

[2]   Lt. Ward has not moved for summary judgment as to the "serious harm" element of this tort. Broken bones have been held to be sufficiently serious to satisfy this element of the tort. See, e.g., Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978).

In addition, it is undisputed that Mr. Queen submitted a written request to Lt. Ward explaining that he needed to transfer cells because he was being threatened by his cellmate. The threat from Barnes was clearly described on the cell change request form, and Lt. Ward acknowledges that he received and wrote "NO!" on this form.[3]

Although Lt. Ward claims that he interviewed Mr. Queen and that Mr. Queen informed him that he was neither being threatened by Barnes nor in fear of him, these claims are disputed by Mr. Queen, who denies that this interview ever took place.[4] This dispute of fact is material and cannot be resolved on summary judgment.

Lt. Ward also alleges that Mr. Queen must not have felt threatened because he requested to be moved to a specific cell (i.e., cell C45), which was near Barnes's cell, and would have continued to eat and recreate with Barnes after the move.[5] However, the threats Barnes made to Mr. Queen derived from their experience sharing a cell. As he was meeting Mr. Queen for the first time, Barnes demanded that Mr. Queen take his shoes off before entering the cell. Moreover, Barnes's specific threat was that there would be "trouble" if

---

[3]   This was not the first time that Barnes assaulted another inmate at ECI. In fact, on at least two occasions prior to the assault upon Mr. Queen (and additional occasions since), Barnes was found guilty of assaulting other inmates at ECI. Barnes was placed on administrative segregation at ECI for each of these incidents. See Barnes's ECI Inmate Progress Reports, attached as **Exhibit 5**.

[4]   It is also worth noting that although Lt. Ward produced a copy of the cell change interview form that he allegedly used in conducting Mr. Queen's "interview," it is undisputed that a copy of the form is not in Mr. Queen's base file as is customary at ECI. Ward Depo., **Exhibit 6**, at 69-70.

[5]   As noted above, Mr. Queen only specifically requested cell C45 because he was told by a fellow inmate that there was an open bed there. Queen Depo., **Exhibit 1**, at 57-59.

Mr. Queen did not "move out." There is no basis for concluding that the danger Barnes posed to Mr. Queen would have lingered if Mr. Queen had moved to another cell.

Based on Lt. Ward's acknowledged review of the cell change request form, which on its face describes a threat, a finder of fact reasonably could determine that Lt. Ward had knowledge that Mr. Queen was in "substantial risk of serious harm." See Farmer, 511 U.S. at 842 ("[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, … and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

### 2. Lt. Ward disregarded this substantial risk to Mr. Queen's safety by not transferring Mr. Queen to another cell.

Viewed in a light most favorable to Mr. Queen, the evidence also demonstrates that Lt. Ward acted with "deliberate indifference" in refusing to transfer Mr. Queen out of cell C38. Lt. Ward testified that he regularly conducts interviews when a cell change request is submitted to him. Ward Depo., **Exhibit 6**, at 33-34. Moreover, Lt. Ward acknowledged that failure to interview an inmate who has been threatened by his cellmate and is requesting a cell change increases the risk of harm to that inmate:

> Q. If an inmate believes that they are threatened, and they submit a written request to you that they're in danger, you have testified that you would go the same day and interview them, because—
>
> A. Right, if they said that they were in danger.
>
> Q. And the reason you do that, I think you have testified is that you want to protect the inmate, protect their safety?

> A. Right.
>
> Q. So my question to you is, if you just decided, Forget it, I am not conducting interviews anymore, that would increase the risk to the inmate who has been threatened, wouldn't it?
>
> A. Yes.
>
> Q. And you recognize that, and that's why, in fact, you do conduct the interviews as soon as you get these written requests.
>
> A. Yes.

Id. at 141-142.

Nevertheless, when Mr. Queen reported on the cell change request form that he was in danger (i.e., that Barnes told him there would be trouble if Mr. Queen did not move out), Lt. Ward took no action. Lt. Ward acted with deliberate indifference in failing even to interview Mr. Queen.

Moreover, accepting as true Mr. Queen's testimony that no interview occurred, it is apparent that Lt. Ward falsified a cell change interview form so that others would believe an interview took place. See Queen Depo., **Exhibit 1**, at 52-54 (stating that Mr. Queen was never interviewed by Lt. Ward and that Mr. Queen never saw a cell change interview form prior to being assaulted by Barnes); Cell Change Interview Form, attached as **Exhibit 7**. Lt. Ward's falsification of the cell change interview form evidences his knowledge and understanding that he should have interviewed Mr. Queen, and that his failure to do so placed Mr. Queen in "substantial risk of serious harm." Such conduct constitutes subjective recklessness or "deliberate indifference" under Farmer. See Skeen v. Orr, 1996 WL

460761, at *2 (4th Cir. Aug, 15, 1996) (reversing trial judge's grant of summary judgment as to prisoner's failure to protect claim because trial judge necessarily believed defendant's version of the facts in granting summary judgment); see also Doles v. Smith, 1994 WL 526033, at *3 (4th Cir. Sept. 27, 1994) (reversing trial judge's grant of summary judgment as to prisoner's failure to protect claim where plaintiff alleged defendant stood by as he was assaulted by fellow inmate).

### C. Lt. Ward Is Not Entitled to Qualified Immunity.

Government officials who perform discretionary functions are only entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a government official is entitled to qualified immunity, a court must: (1) identify the specific right the plaintiff asserts was violated; and (2) determine whether it was clearly established at the time of the alleged violation. See Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999) (citing Anderson v. Creighton, 483 U.S. 635, 639 (1987) and Taylor v. Waters, 81 F.3d 429, 433 (4th Cir.1996)).

As described above, Lt. Ward violated Mr. Queen's constitutional rights when, knowing that Mr. Queen's cellmate was threatening him, he acted with deliberate indifference towards Mr. Queen's safety by refusing to transfer Mr. Queen to another cell. Further, it was well established prior to Lt. Ward's actions (or non-action) in this case that "prison officials must take reasonable measures to guarantee inmates' safety, and a component of that duty is the requirement to protect prisoners from violence at the hands of

other prisoners." <u>Randolf v. State</u>, 74 F. Supp.2d 537, 541 (D. Md. 1999) (citing <u>Winfield v. Bass</u>, 106 F.3d 525, 531 (4th Cir. 1997)); <u>see also</u> <u>Farmer</u>, 511 U.S. at 832-33. In fact, Lt. Ward's testimony evidences his understanding of this duty:

> Q. Do you see it as one of your responsibilities to protect inmates from other inmates?
>
> A. Yes
>
> Q. And in what manner do you exercise that responsibility? What do you do to insure that inmates are not abused by other inmates?
>
> A. That's a broad question.
>
> Q. If you receive a notice that an inmate is claiming another inmate is, has threatened him, what actions do you take?
>
> A. I would sit them down and discuss with them the problem. I would use a three part question that we use: Are you in fear? Are you in danger? Do you need protective custody?

Ward Depo., **Exhibit 6**, at 33.

This testimony shows that not only did he violate a clearly established law when he acted with deliberate indifference to a known risk of serious harm to Mr. Queen, but that he was aware of the law at the time of his actions. As such, Lt. Ward should not be protected by the doctrine of qualified immunity. <u>See</u> <u>Anderson</u>, 483 U.S. at 639; <u>Taylor,</u> 81 F.3d at 433.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Ward's Summary Judgment Motion.

Respectfully submitted,

/s/
Paul S. Caiola
Kevin P. Sullivan
Gallagher Evelius & Jones LLC
218 N. Charles Street, Suite 400
Baltimore, Maryland 21201
(410) 727-7702

*Attorneys for Plaintiff Darius F. Queen, #305-181*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of December, 2004, a copy of the foregoing Response to Defendant H.D. Ward's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment was mailed by first-class mail, postage prepaid to:

Phillip M. Pickus, Esq.
Office of the Attorney General
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202

/s/
Kevin P. Sullivan