Page 1

```
1    DARIUS QUEEN, #305-181    *   IN THE UNTIED STATES

2              Plaintiff       *   DISTRICT COURT

3         vs.                  *   FOR

4    H.D. WARD                 *   THE DISTRICT OF MARYLAND

5              Defendant       *   Civil Action

                                   #1:02 CV 03885-WDQ

6    ----------------------------/

7              The deposition of LT. H.D. WARD was

8    held on August 19, 2004, commencing at 10:35 a.m., at

9    the Eastern Correctional Institution, Westover,

10   Maryland, before Connie E. Bennett, Notary Public.

11

12

13

14

15

16

17

18

19

20

21   REPORTED BY: CONNIE E. BENNETT, NOTARY PUBLIC
```

EXHIBIT

6

Page 2

APPEARANCES:

1
2
3        PAUL S. CAIOLA, ESQUIRE
4            On behalf of Plaintiff
5
6        PHIL M. PICKUS, ESQUIRE
7            On behalf of Defendant
8
9    ALSO PRESENT:
10
11       KEVIN P. SULLIVAN, ESQUIRE
12
13
14
15
16
17
18
19
20
21

Page 3

1                - - - - - - -
2    Whereupon,
3            LT. H.D. WARD,
4    called as a witness, having been first duly sworn to
5    tell the truth, the whole truth, and nothing but the
6    truth, was examined and testified as follows:
7            EXAMINATION BY COUNSEL FOR PLAINTIFF
8            BY MR. CAIOLA:
9        Q.   Good morning, Lt. Ward. My name is Paul
10   Caiola, and together with Kevin Sullivan, we
11   represent Darius Queen in this matter. Today we're
12   going to ask you some questions and try to learn a
13   little more about the case. Have you ever been
14   deposed before, sir?
15       A.   Not that I remember, no.
16       Q.   Let me give you a few ground rules for the
17   deposition. As you can see, we have a court reporter
18   with us today, and she is going to be taking down
19   everything I say and everything you say. It's
20   important that we not speak at the same time.
21           I will try not to interrupt you, and I

Page 4

1    would appreciate it if you would wait until my
2    question is completed before you answer. Do you
3    understand?
4        A.   Yes, sir.
5        Q.   If you don't understand any of my
6    questions, please ask me to restate it. This is not
7    a game, I'm just trying to understand what occurred
8    in this case, so I am happy to be corrected if my
9    question is unclear. Do you understand?
10       A.   Yes, sir.
11       Q.   Because the court reporter is taking down
12   what we say verbally, it's important that we not
13   gesture our responses. Please try to give verbal
14   responses, yes, no, or explanations. Do you
15   understand that?
16       A.   Yes, sir.
17       Q.   Would you please state your name for the
18   record.
19       A.   Dennis Ward. Lt. Dennis Ward.
20       Q.   What is your business address, sir?
21       A.   I haven't --

Page 5

1        Q.   Where do you work?
2        A.   Eastern Correctional Institute, Westover,
3    Maryland. As far as the number and the zip code, I
4    don't know right offhand what it is.
5        Q.   What is your date of birth?
6        A.   12-17-54.
7        Q.   Please describe your education for me,
8    please.
9        A.   High school.
10       Q.   Where did you go to high school?
11       A.   Crisfield High.
12       Q.   How about your, did you have any training
13   beyond high school?
14       A.   As in?
15       Q.   Training for, on the job training courses
16   you took while working?
17       A.   The training academy.
18       Q.   What is that? What is the training
19   academy? Is that something that occurs before you
20   come to work here at ECI?
21       A.   It doesn't have to.

2 (Pages 2 to 5)

QUEEN V. WARD                                                H. D. WARD   8/19/04

Page 6

1    Q.   When did you go to the training academy?
2    A.   February 10th, 1988, I guess.  Well,
3   actually, that's not, that's when I was hired.
4   Sometime within February of '88.
5    Q.   How long did that last, that training?
6    A.   Four to six weeks.
7    Q.   What year did you graduate high school?
8    A.   '72.
9    Q.   Why don't you take me through your
10  employment history between 1972 and 1988 when you got
11  hired here at ECI.  What did you do before that?
12   A.   I worked with my father for several years
13  in the seafood business.  Then I worked as a
14  self-employed waterman prior to coming to work here.
15   Q.   Were you crabbing?
16   A.   Crabbing and oystering, yes.
17   Q.   And what were the years you worked for
18  your father?
19   A.   My father owned a seafood business, so
20  basically from the time that I was old enough to help
21  out, I helped him until he sold the business.  I want

Page 7

1   to say somewheres, '74, somewhere in that area.
2    Q.   Then you became a self employed waterman
3   in '74?
4    A.   I worked with somebody else, helped them a
5   little bit, then I actually started on my own.  It
6   was in the mid '70's, somewhere in the mid '70's.
7    Q.   Did you do that through the late '80's,
8   when you became a correctional officer?
9    A.   Right up until the time I come to work
10  here, just about.  I think the last day I worked in
11  the -- it was '88.  I come to work here in '88, it
12  was February.  So it was '87.
13   Q.   What is your job title currently here?
14   A.   Correctional officer, Lieutenant.
15   Q.   Is this the only job you hold currently?
16   A.   Yes.
17   Q.   What are your current job duties?
18   A.   As in?
19   Q.   What are your duties in your post as
20  lieutenant, correctional officer lieutenant?
21   A.   It's according what I am actually assigned

Page 8

1   to that day.
2    Q.   Who gives you your assignment?
3    A.   The duty lieutenant.
4    Q.   So do you have assignments that are
5   typically part of your job every day?
6    A.   Yes.
7    Q.   What are they?
8    A.   It varies, what I am doing for that
9   particular day.
10   Q.   Yeah, I understand that.  But I am trying
11  to get at is whether you have specific things that
12  you do most every day, that is going to be on that
13  list of items that you're responsible for on a
14  particular day.
15   A.   It's pretty much anything that occurs if I
16  am the supervisor that day in my area, I am pretty
17  much responsible.
18   Q.   Are you always the supervisor in your
19  area?
20   A.   No.
21   Q.   How often are you the supervisor in your

Page 9

1   area?
2    A.   It varies.  This summer a lot less than
3   ordinary.
4    Q.   Do you know why that is?
5    A.   Staff shortages.
6    Q.   Why would a staff shortage lead to your
7   being supervisor less often?
8    A.   Not necessarily supervisor less often, but
9   less time in my area.
10   Q.   I see.
11   A.   I may be the only supervisor here.
12   Q.   So then you're supervising more than just
13  your area?
14   A.   Absolutely.
15   Q.   And what's your area?
16   A.   Housing Unit 1.
17   Q.   Explain to me how ECI is laid out, please.
18  How many housing units are there?
19   A.   Eight.
20   Q.   How many on the west wing?
21   A.   Four.

3 (Pages 6 to 9)

Page 10

1    Q.    Four on the east wing, as well?
2    A.    Yes.
3    Q.    So typically, you are responsible for one
4    of the housing units in the west wing Housing Unit 1.
5    Is that right?
6    A.    Can you repeat that again?
7    Q.    Your typical job responsibility is to be
8    responsible for Housing Unit 1 on the west wing?
9    A.    Typically, meaning?
10   Q.    Well, is that what you normally do on your
11   job?
12   A.    That is one of my areas, yes.
13   Q.    When you don't do that, tell me some of
14   the other responsibilities you would have, if you are
15   not --
16   A.    I could have duty lieutenant, perimeter
17   lieutenant.
18   Q.    What does the perimeter lieutenant do?
19   A.    Takes care of the outer part of the
20   institution, as well as activities.
21   Q.    And how about the duty lieutenant?

Page 11

1    A.    Staffs the shift, responsible for
2    everybody's assignments, time cards, leave days,
3    vacation days.
4    Q.    Now at the time of the incident in
5    question here, December 2001, January 2002, that time
6    frame, what was your title at that time?
7    A.    Housing, still lieutenant at Housing
8    Unit 1.
9    Q.    What were your responsibilities at that
10   time?
11   A.    Take care of, I guess Housing Unit 1, you
12   know.
13   Q.    Was that more often just your sole
14   responsibility, Housing Unit 1? As opposed to now
15   where you're filling in these other roles?
16   A.    It varies, weekdays, weekends.
17   Q.    I am talking about at the time, December
18   '01 and January '02 time frame, was it, did it vary
19   back then as well?
20   A.    Not as much as now, but yes, it does vary.
21   Q.    Do you work full-time?

Page 12

1    A.    Yes, sir.
2    Q.    How many hours a week is that?
3    A.    We're a 40 hour, but they like for us to
4    be here a half hour earlier. But we're comp
5    employees, so we don't get any overtime.
6    Q.    Are you married?
7    A.    Yes.
8    Q.    Have any children?
9    A.    Yes.
10   Q.    How many?
11   A.    Two.
12   Q.    Have you ever been convicted of a crime in
13   the last 15 years, Lieutenant?
14   A.    No.
15         BY MR. CAIOLA: Let me mark this as
16   Exhibit 1, please.
17             (Exhibit No. 1
18             marked for identification.)
19         MR. PICKUS: Can I see it?
20         MR. CAIOLA: Yes. Why don't you take that
21   one and I'll give the witness the marked exhibit.

Page 13

1         MR. PICKUS: All right. Thanks.
2         BY MR. CAIOLA:
3    Q.    Can you identify what this document is,
4    Lieutenant?
5    A.    This is a performance planning and
6    evaluation.
7    Q.    Is this an annual evaluation?
8    A.    Actually, it's done every six months, if
9    you will see the front page.
10   Q.    Show me where on the front page it is
11   indicated it's every six months. Oh, I see,
12   Beginning Cycle, Mid Cycle, and End cycle?
13   A.    Yes, sir.
14   Q.    So the evaluation covers you a full year,
15   but there are some interim periods covered, as well
16   A.    Yes, sir.
17   Q.    Now this job description on Page 2,
18   "Performance Standards," is this a description that
19   applies to all correctional officer lieutenants?
20   A.    Where you at?
21   Q.    This description on Page 2 of Exhibit 1?

Page 14

1    A.   Yes, sir.
2    Q.   On the left side it says, Performance
3  Standards?
4    A.   Yes, sir.
5    Q.   Are these the standards, would these
6  standards be on every single review for all the
7  lieutenants?
8    A.   Yes, sir.
9    Q.   Would they be the same standards if the
10  officer was not a lieutenant?
11    A.   No.
12    Q.   So these are standards that apply to
13  lieutenants?
14    A.   Correct.
15    Q.   Do you fill out these reviews with respect
16  to your subordinate officers?
17    A.   No, sir.
18    Q.   So who is responsible for completing
19  evaluations?
20    A.   It would be a captain in my instance.
21    Q.   So down the left hand column on Page 2,

Page 15

1  are some Performance Standards. Would you take a
2  moment and just read through them to yourself.
3    A.   So what was your question again?
4    Q.   I didn't have a question pending. I was
5  giving you a moment to read through those.
6    A.   Okay.
7    Q.   Do you think that those performance
8  standards accurately reflect your job
9  responsibilities?
10    A.   This is what we're rated on.
11    Q.   The first listed responsibility or
12  standard is: Adherence to applicable orders,
13  directives, post orders, et cetera. Do you view that
14  as an important part of your job?
15    A.   Yes.
16    Q.   I guess the fifth one down provides that
17  you: Are responsible for insuring that necessary
18  investigations are completed in a timely, thorough,
19  and legal manner. Is that an important part of your
20  job?
21    A.   Conducting investigations? Yes.

Page 16

1    Q.   What sorts of investigations do you
2  conduct?
3    A.   All kinds.
4    Q.   Can you give me some examples?
5    A.   Sometimes fights, things that are sent
6  from the warden's office to be checked into.
7  Different things. Maybe something stolen.
8    Q.   Do you view protecting inmates' safety as
9  an important role and responsibility of yours?
10    A.   Yes.
11    Q.   I only have one of your reviews here, but
12  it's safe to say you have been reviewed very highly
13  through your, at least the last five years. Is that
14  right?
15    A.   Yes.
16    Q.   If you were to have a judgment against you
17  in this matter, would that affect the reviews that
18  you receive?
19    A.   No, but --
20    Q.   Go ahead and finish your answer.
21    A.   I don't do these ratings. These are done

Page 17

1  by people who rate me, so I guess that was an
2  assumption on my part to say what they would do.
3    MR. CAIOLA:  Please mark this as Exhibit
4  2. It's a 10-11.
5    (Exhibit No. 2
6    marked for identification.)
7    BY MR. CAIOLA:
8    Q.   Lieutenant, could you describe what this
9  document is for the record?
10    A.   It's a 10-11, says Organization Functions.
11    Q.   Have you reviewed this policy before, or
12  this directive before?
13    A.   We have 3,000 of these things.
14    Q.   Are you familiar with this particular
15  directive?
16    A.   I guess somewhere I have seen it.
17    Q.   What, I believe this directive lays out
18  the big picture of how ECI is organized. I
19  understand that there are medium security and minimum
20  security inmates at ECI. Is that correct?
21    A.   Yes.

5 (Pages 14 to 17)

Page 18

1    Q.   In what wing are the minimum security
2    inmates housed?
3    A.   They're housed with everyone else.
4    Q.   Throughout?
5    A.   Yes.
6    Q.   I see on Page 204 of the document, it
7    talks about functions.  It says, The functions of ECI
8    are categorized into three areas:  administration,
9    custody, and programs.
10        Is your job under one of those three, do
11   you know?
12   A.   I would say we're custody, so I guess
13   that's --
14   Q.   Custody?
15   A.   -- is the overlying part.
16   Q.   Okay.  Now if you would go to Page 4 of 4,
17   and then one more page.  It appears to be an
18   organizational chart, Appendix 1 to DCD 10-11.  It
19   looks like there are several organizational charts
20   that follow but, the best as I can tell, this one was
21   implemented in November of 2000, and was most likely

Page 19

1    the organizational chart in effect at the time of the
2    incidents in question.
3        Can you place where your job fits on this
4    organizational chart?
5    A.   Right under the assistant warden and next
6    to case management.
7    Q.   Under West Compound?
8    A.   Yes.
9    Q.   So it would be custody?
10   A.   That's what it says on this chart, yes,
11   sir.
12   Q.   Would your subordinates also be in that
13   same box?
14   A.   Subordinates, as in?
15   Q.   The officers you supervise?
16   A.   Yes, I assume so.  They are custody staff.
17   Q.   Okay.  I have nothing further on that
18   exhibit.
19        MR. CAIOLA:  Madame Court Reporter, if you
20   would mark that as Exhibit 3.
21        (Exhibit No. 3

Page 20

1            marked for identification.)
2        MR. PICKUS:  What are the dates there?
3        MR. CAIOLA:  There's two years covered.
4    And this is for Lt. Ward.  The first sheet, front and
5    back, covers December 27, 2000, to December 25, 2001.
6    Is that the other sheet?
7        The second sheet covers December 26, 2001,
8    to December 24, 2002.
9        BY MR. CAIOLA:
10   Q.   If you go to the second page, the page
11   that covers the '01 to '02 time frame, Lt. Ward?  I
12   note, I am focusing on this first box, the box
13   furtherest to left, December 26 to January 8.  And I
14   would just like you to go down through that column
15   and tell me what it is, what it is this tells me
16   about when you worked, how much you worked, where you
17   worked.  So the first day, I guess, the top box in
18   that column would be, says --
19   A.   You're talking about December 26.
20   Q.   2001 to December 24, 2002.  The column to
21   the left which covers December 26 '01 to January 8,

Page 21

1    '02.
2    A.   Right.
3    Q.   If you would go down that column and tell
4    me what these various letters and numbers mean.  So
5    the first box, I assume is December 26, and it has an
6    "A" in it?
7    A.   For "A-L."
8    Q.   For what?
9    A.   Annual leave.  I was on vacation.
10   Q.   Okay.  And the same for the 27th and the
11   28th?
12   A.   Correct.
13   Q.   How about the 29th?
14   A.   It says has a 3-20, 3-30, excuse me.
15   Q.   Do you know what that means?
16   A.   I was here for 3 hours and 30 minutes that
17   morning.
18   Q.   So you only worked half a day that day?
19   A.   Yep.
20   Q.   I guess completing annual leave.  It's now
21   the 26th.  That's the 29th.  The next day has a dash.

6 (Pages 18 to 21)

Page 22

1   What does that mean?

2      A.   Actually, the two dash, that's what it is.

3   There's a dash beside that 3-30. I was actually on

4   weekly leave for those two days, so I come in.

5   That's why I earned 3 hours and 30 minutes of comp.

6   So that's actually comp earned.

7      Q.   Oh, that's comp earned? That doesn't say

8   how much you worked?

9      A.   No. That means I come in and worked 3

10  hours and 30 minutes, because see the slash line?

11  It's actually a weekly leave on the schedule.

12     Q.   Yeah, I see a horizontal slash line and a

13  vertical slash line.

14     A.   Right. So that means I was on weekly

15  leave, slash --

16     Q.   Did the horizontal slash mean weekly

17  leave?

18     A.   Yeah.

19     Q.   What is up and down, the vertical?

20     A.   Just separating them.

21     Q.   Oh, I see. And then 3-30 means that you

Page 23

1   worked --

2      A.   3 hours and 30 minutes.

3      Q.   Of comp time? Meaning you have earned

4   comp time?

5      A.   I was off that day.

6      Q.   You had vacation, but you worked anyway.

7      A.   Well, I was actually, I was on weekly

8   leave.

9      Q.   What is the difference between the dash

10  and the "A"?

11     A.   Weekly leave, my regular two days. We

12  work 5 and 2. So they were regular weekly leave

13  days.

14     Q.   Oh, I see. Got it.

15     A.   Instead of writing it in, they used

16  dashes, whoever was the --

17     Q.   So that is basically your days off?

18     A.   Correct.

19     Q.   That occurred on 29th and 30th?

20     A.   Correct.

21     Q.   Then on the 31st, it looks like you had

Page 24

1   some more annual leave?

2      A.   Annual leave.

3      Q.   And then on January 1st, there's an "H",

4   what is that?

5      A.   Holiday.

6      Q.   Holiday? And then there's --

7      A.   Comp earned.

8      Q.   2nd, 3rd, and 4th.

9      A.   I worked those three days. I earned 35

10  minutes, 34 minutes, 34 minutes of comp time.

11     Q.   And that means you worked overtime? By

12  that amount of time?

13     A.   They like for us to come in a half hour

14  before a shift.

15     Q.   On a normal day, if you work a normal day,

16  because you came in half an hour early, you earned

17  some comp time. Is that the way it works?

18     A.   Yes.

19     Q.   Then I guess on the 5th and 6th, you had

20  your weekly leave?

21     A.   Right.

Page 25

1      Q.   Then 7th and 8th, you earned some more

2   comp time?

3      A.   Right.

4      Q.   And so on the days you earned comp time,

5   pretty much that all those days, that means you

6   worked a regular day, for you?

7      A.   Right. 7:30 to 4, probably 5 after 4, or

8   2 after 4.

9      Q.   This doesn't say what your duties were on

10  these particular days. It just says whether you

11  worked?

12     A.   Correct.

13     Q.   Where would we look, if we wanted to

14  understand what your duties were on these days?

15     A.   You would have to find the roster, and I

16  don't know if they have them going back to that

17  point.

18     MR. CAIOLA: Mark this as Exhibit 4,

19  please.

20     (Exhibit No. 4

21     marked for identification.)

7 (Pages 22 to 25)

Page 26

1      BY MR. CAIOLA:
2      Q.   You might want to refer back to that
3   Exhibit 3. You're on vacation, I guess, until the
4   2nd, so if we could go to January 2nd, '02.
5      A.   Okay.
6      Q.   What does this duty roster reflect were
7   your responsibilities on January 2nd, '02?
8      A.   Housing Unit 1.
9      Q.   And do you, when you're operating as
10  lieutenant on Housing Unit 1, have supervisory
11  responsibility for any of the officers listed under
12  the, on this duty roster?
13     A.   Housing Unit 1.
14     Q.   So in this instance, supervisory
15  responsibility over Sgt. Thomas, who is in Housing
16  Unit 1 control?
17     A.   Yes.
18     Q.   And Sergeant, I don't know, Pedersen,
19  Officer Pedersen, on Housing Unit 1, second?
20     A.   Yes.
21     Q.   What does that mean, Housing Unit 1,

Page 27

1   second?
2      A.   Control center, they worked in there.
3      Q.   So they are both in the control center?
4      A.   Well, not necessarily. They were who was
5   listed in the units that day.
6      Q.   Would you elaborate on what you meant by
7   they're just listed there?
8      A.   The OIC's is are listed in the proper
9   places, but OIC's have liberty to place the officers
10  on the tiers.
11     Q.   What's an OIC?
12     A.   The control, one listed under control, the
13  officer in charge for the day.
14     Q.   So that would be Sgt. Thomas in this case?
15     A.   Yes, sir.
16     Q.   So Sgt. Thomas, even though there were 1,
17  2, 3, 4, 5 officers listed in addition to Sgt. Thomas
18  as being on Housing Unit 1 that day, Sgt. Thomas
19  could have moved them around?
20     A.   Right.
21     Q.   And they wouldn't necessarily have worked

Page 28

1   as indicated here?
2      A.   Correct.
3      Q.   But Sgt. Thomas certainly would have been
4   in control in the control room?
5      A.   Correct.
6      Q.   If you go to the next page, 1-3, it looks
7   like Sgt. Thomas was again in control for Housing
8   Unit 1 and you were the lieutenant for that housing
9   unit?
10     A.   Correct.
11     Q.   And for the 4th, same arrangement?
12     A.   No. No, sir. On the 4th, I was in charge
13  of Housing Unit 1 and Housing Unit 2.
14     Q.   Oh. Tell me how you know that from this
15  roster.
16     A.   Because it was left underneath, line
17  underneath, I was in charge of 1 and 2.
18     Q.   I see.
19     MR. PICKUS:  Try not to remark the
20  exhibit.
21     THE WITNESS:  I didn't touch, it's light

Page 29

1   blue, I didn't.
2      MR. PICKUS:  Okay.
3      MR. CAIOLA:  You know what? I must have
4   given you my copy that I had already marked.
5      THE WITNESS:  That's fine.
6      MR. CAIOLA:  Why don't we do this? Why
7   don't we remark this copy, and I'll take --
8      THE WITNESS:  I am not marking anything.
9      MR. CAIOLA:  Yeah, I understand. Why
10  don't we mark this one as Exhibit 4, Madame Court
11  Reporter. I will take that one as my copy, since I
12  have marked it up.
13          (Exhibit No. 4-remarked
14          marked for identification.)
15     BY MR. CAIOLA:
16     Q.   So on a day where you worked both, where
17  you were responsible for both Housing Units 1 and 2,
18  how does a day like that differ from when you're only
19  responsible for one housing unit?
20     A.   You're responsible for both areas.
21     Q.   So do you split your day 50 percent in

8 (Pages 26 to 29)

Page 30

1    each area?
2        A.    We don't spend our days in the units, just
3    -- our responsibility is not solely, I mean, we are
4    responsible for the unit, but not to stay in the
5    unit.
6        Q.    So does your day differ substantially when
7    you're responsible for two housing units?
8        A.    You have half as much time to do your
9    work. There is 384 inmates that reside in each one
10   of those housing units.
11       Q.    How many inmates are there at ECI
12   altogether?
13       A.    Give or take, 2500, 2600 on both
14   compounds.
15       Q.    On each compound?
16       A.    No, on both. I'd say there is around 1260
17   on the west and 1300 on the east.
18       Q.    What did you say on the west?
19       A.    1260 something.
20       Q.    So you said 384 in each, Housing Unit 1
21   and 2?

Page 31

1        A.    There's a possibility. Because you have 4
2    wings with 96 guys, so 96 times 4 is --
3        Q.    384.
4        A.    Correct.
5        Q.    And each of the housing units has that
6    many cells?
7        A.    Except Housing Unit 4.
8        Q.    How many does that have?
9        A.    We have 48 and 48, which is 96. 96 and
10   96, 192. That's assuming that the buildings are
11   full.
12           MR. CAIOLA: Okay. Please mark this as
13   Exhibit 5.
14           (Exhibit No. 5
15           marked for identification.)
16           MR. CAIOLA: Do you have 200-1, Kevin?
17           MR. PICKUS: DCD or ECI?
18           MR. CAIOLA: DCD.
19           THE WITNESS: Are we done with these
20   rosters?
21           BY MR. CAIOLA:

Page 32

1        Q.    Yeah. Are you familiar with this DCD
2    directive, Lieutenant? Why don't you have a moment
3    and review it.
4        A.    Yes.
5        Q.    You are familiar with this directive?
6        A.    Yes.
7        Q.    Now under Policy 5, or Roman numeral V, it
8    has a policy. It says: Inmates committed to and
9    confined in the Division of Correction have the
10   following rights.
11           And then "A" is: Safety and security
12   within the institution.
13           What's your understanding of the inmate's
14   right to safety and security?
15       A.    This is drawn out here in the directive.
16       Q.    Under Sub 1, it describes: That inmates
17   shall not be subjected to corporal punishment,
18   personal abuse, personal injury, disease, property
19   damage, harassment, use of unnecessary force, or be
20   subject to medical, pharmaceutical, or cosmetic
21   experiments.

Page 33

1           Now to your understanding, does this
2    policy include abuse by one inmate on another?
3        A.    I'm not, I wouldn't, I don't know.
4        Q.    Would you, do you know whether an inmate
5    has a right not to be abused by another inmate?
6        A.    No one has the right to abuse anyone.
7        Q.    Do you see it as one of your
8    responsibilities to protect inmates from other
9    inmates?
10       A.    Yes.
11       Q.    And in what manner do you exercise that
12   responsibility? What do you do to insure that
13   inmates are not abused by other inmates?
14       A.    That's a broad question.
15       Q.    If you receive a notice that an inmate is
16   claiming another inmate is, has threatened him, what
17   actions do you take?
18       A.    I would sit them down and discuss with
19   them the problem. I would use a three part question
20   that we use: Are you in fear? Are you in danger?
21   Do you need protective custody?

9 (Pages 30 to 33)

c3032e16-1756-4a07-a1d0-432ad32faea2

Page 34

1    If at that time they answer yes to the
2  question, they are placed on administrative review, a
3  120 hour class case review, where they are seen by a
4  case management team, which would be a case manager,
5  a supervisor. And at that time, the case manager
6  would decide what happens with the person that you
7  put on administrative cite.
8    Q.  Who is responsible for conducting these
9  interviews that you just described?
10    A.  Anyone can do them. It's recommended that
11  a supervisor, but sometimes the supervisor is not
12  always available.
13    Q.  When you are working on Housing Unit 1, do
14  you typically conduct such interviews?
15    A.  I do them, the sergeant does them, the OIC
16  does them.
17    Q.  How long does it usually take between when
18  you receive one of these complaints and when you
19  conduct the interview?
20    A.  The next available moment that I get. If
21  I get something that says somebody is in danger, I

Page 35

1  handle it when I get it. I have come whenever I get
2  it.
3    Q.  Now, in something that you filed in this
4  case, you stated that you received about 40 such
5  requests a day, up to 40 requests a day?
6    A.  Sometimes, yes.
7    Q.  Do you conduct interviews for each of
8  those 40?
9    A.  No.
10    Q.  When is an interview conducted?
11    A.  You referring to what, on what, the
12  interrogatories or something, I answered?
13    Q.  Yeah. I can show you the interrogatory
14  responses, if you would like to see them. Why don't
15  we mark this as Exhibit 6.
16      (Exhibit No. 6
17      marked for identification.)
18    BY MR. CAIOLA:
19    Q.  I believe it's Answer to Interrogatory No.
20  3, Lieutenant?
21    A.  Uh-huh.

Page 36

1    Q.  You have a moment to review that response.
2    A.  I have reviewed it.
3    Q.  I believe you testified that you receive
4  as few as 8 or as many as 40 requests?
5    A.  Correct.
6    Q.  For cell change per day?
7    A.  Correct.
8    Q.  My question is whether, with respect to
9  each of those requests, you conduct an interview?
10    A.  No.
11    Q.  When, under what circumstances?
12    A.  Some of these can be verbal.
13    Q.  Do you conduct an interview only when you
14  receive a written request?
15    A.  No.
16    Q.  Under what circumstances do you conduct an
17  interview?
18    A.  If there appears to be a problem. If I
19  have time to do the actual interviews. I have, you
20  walk through the compound, and inmates will pull you
21  up and say, Can I get a cell move? Or, can I move to

Page 37

1  your unit? It's just a general, but they are cell
2  change requests. Not all of them are written.
3    Q.  And those oral ones are often not recorded
4  anywhere. Is that right?
5    A.  Correct.
6    Q.  When would an oral cell change request
7  result in an interview?
8    A.  If it was a problem, it was deemed to be a
9  problem, a security problem, or a threat problem,
10  then there would be an interview conducted.
11    Q.  If you hear of an oral request for a cell
12  change that you believe warrants further
13  investigation, then you will conduct an interview?
14    A.  Correct.
15    Q.  Do you have any standards or policies that
16  govern what you need to see in order for an interview
17  to be triggered under that circumstance?
18    A.  It's all up to the inmate. If he feels
19  like he is having serious problems, then something
20  needs to be done.
21    Q.  So, under those circumstances, if you feel

10 (Pages 34 to 37)

c3032e16-1756-4a07-a1d0-432ad32faea2

Page 38

1 that the inmate is sufficiently alarmed or worried,
2 then you conduct an interview?
3    A.   Correct.
4    Q.   How long do these interviews typically
5 take? Is there a standard length?
6    A.   No.
7    Q.   A range?
8    A.   No.
9    Q.   Where do they take place?
10   A.   Wherever you have the opportunity, could
11 be anywhere in the institution.
12   Q.   Would you remove the inmate from his or
13 her, I guess in his instance, his cell before?
14   A.   If it was on the compound and it happened
15 at the kitchen, you wouldn't take them back to the
16 cell, if it was a threat, because then you would be
17 putting them in harm's way.
18   Q.   So did you have a -- if you have an
19 inmate who is complaining about a threat, and they
20 are currently in their cell with their cellmate,
21 would you have a procedure to remove them?

Page 39

1    A.   Remove them immediately.
2    Q.   In order to conduct the interview, I am
3 saying. Because sometimes you conduct the interview
4 and you determine there is no threat. Correct?
5    A.   Correct.
6    Q.   Where are the interviews in those
7 instances conducted?
8    A.   In the office of the housing unit.
9    Q.   Where is the office located in the housing
10 unit?
11   A.   Along side the control center.
12   Q.   So you would typically then, take the
13 inmate from wherever he is, take him to the office,
14 conduct the interview. If you believe that there are
15 sufficient grounds to remove him, you do so
16 immediately. If you don't, then you return him to
17 wherever he was before the interview?
18   A.   Correct.
19   Q.   Do you have a practice with respect to
20 whether you interview both cell residents when there
21 is a complaint of this sort?

Page 40

1    A.   Correct.
2    Q.   What is the practice?
3    A.   Most of the time I do interview both of
4 them.
5    Q.   Do you have a procedure for when you
6 interview both, and when you don't?
7    A.   No.
8    Q.   What triggers your decision to interview
9 both cell residents?
10   A.   Just experience, I guess.
11   Q.   So do you fill out, when you interview
12 both, do you fill out interview forms for both?
13   A.   Correct.
14   Q.   So maybe that one of the inmates is
15 actually requesting the cell change, but you would
16 fill out the interview form with respect, the same
17 interview form with respect to both. Is that the way
18 it works?
19   A.   I don't understand that.
20   Q.   Is there a different form you have for the
21 non-complaining inmate?

Page 41

1    A.   No, sir.
2    Q.   You use the same form?
3    A.   Yes, sir.
4    Q.   I believe the form states something like
5 "Inmate," leaves a blank for the name, "requests a
6 cell change."
7    A.   Correct.
8    Q.   So in certain instances, that inmate that
9 is actually being interviewed, did not request a cell
10 change. It could be the cellmate?
11   A.   It could be me. I could pull you up and
12 say, Hey, I think you're having problems. Or I get
13 a, someone tells me someone is having problems, or
14 whatever.
15   Q.   So that the form doesn't really permit for
16 you to explain all that, but you just use the same
17 form?
18   A.   Correct.
19   Q.   If an inmate is threatened by his cellmate
20 and reports the threat, whose responsibility is it to
21 conduct the interview?

GORE REPORTING COMPANY
410-269-0308

Page 42

1    A.   Whoever he reports it to, or to get
2  someone that helps to do it.
3    Q.   Would you typically be informed about such
4  a request?
5    A.   If the request is done in writing, if it
6  goes in the mailbox, it may be several days before it
7  reaches the destination.
8    Q.   So several days could pass between when
9  the cell change request is actually submitted and
10 when it's responded to?
11   A.   If it is written on a request slip and
12 dropped in the mailbox, then it has to go through the
13 mail, so it goes through the mail. They're sealed.
14 It goes through the mail. And then whenever it gets
15 back, it goes in another box. If it is addressed to
16 me, if I am on vacation or whatever, it may not be
17 handled for a period of time.
18   Q.   If it's not mailed, what other way would
19 an inmate have other --
20   A.   Lots of them slide them under the office
21 door.

Page 43

1    Q.   How do they get access to the office door,
2  just walking around the compound?
3    A.   When they come through the control center,
4  they will just slide them under the door. Some of
5  them hand them to officers to put on the desk.
6    Q.   And so sometimes they are addressed
7  specifically to you?
8    A.   Yes.
9    Q.   Are your subordinate officers instructed
10 to tell inmates to address them to you?
11   A.   No, not by me, but I guess it's just
12 practice.
13   Q.   It's what?
14   A.   The sergeant gets them, the OIC gets them
15 at times. Whoever the OIC, if I am not there, could
16 get them.
17   Q.   But if you are there, would they come to
18 you?
19   A.   Most of the time. Sometimes it will go to
20 the sergeant. Sometimes they write them to whoever
21 they are most comfortable with.

Page 44

1    Q.   Would it surprise you to learn that
2  officers in the housing units are instructing inmates
3  that if they want a cell change because of some sort
4  of threat, they should submit something in writing to
5  you?
6    A.   I think if they told one of the officers
7  in the unit that their life was in danger, they would
8  act upon it immediately.
9    Q.   My question is whether upon receiving a
10 threat from an inmate, maybe less than a life
11 threatening threat, but a threat nonetheless, you
12 would be surprised to learn that the officers in the
13 housing units are instructing inmates to submit
14 something in writing to you?
15   A.   Yeah, I would be surprised, yes.
16   Q.   You would be surprised?
17   A.   Yes.
18   Q.   Would you agree that when a threat is
19 received, you really can't tell whether it's serious
20 unless you do conduct an interview?
21      MR. PICKUS: I am going to object. I

Page 45

1  would ask you, that you don't lead the witness. I
2  understand you're trying to do some of this to try
3  and move us along at one point. But I ask that you
4  don't lead him.
5       MR. CAIOLA: Are you going to instruct
6  your witness not to answer, your client not to
7  answer? Or do you think he can answer that question
8  anyway?
9       MR. PICKUS: Well, can you rephrase the
10 question?
11      BY MR. CAIOLA:
12   Q.   How do you tell when there is, how can you
13 tell as lieutenant, when a threat is real and when it
14 is not?
15   A.   What do you mean by threat?
16   Q.   Well, a threat by one inmate on another,
17 on his cellmate. So when one inmate threatens his
18 cellmate, and the inmate that received the threat
19 submits a request for a cell change, how can you tell
20 whether the threat is real?
21   A.   If I interview them, I use the: Are you

12 (Pages 42 to 45)

Page 46

1  in fear for your life?  Have you been threatened?  Do
2  you want P-C?  If they answer yes to any of the
3  questions, they're automatically removed from the
4  situation.  So I don't answer that question, they do.
5      Q.   So your point is, though, that you have to
6  conduct the interview and ask the questions in order
7  to know whether the threat is real?
8          MR. PICKUS:  I object to the form of that
9  question.
10         MR. CAIOLA:  I am trying to understand his
11 point.
12         BY MR. CAIOLA:
13     Q.   Is that right?  Am I correct in --
14         MR. PICKUS:  I will instruct the witness
15 not to answer, Mr. Caiola.  You're suggesting an
16 answer with your questions.
17         MR. CAIOLA:  Well he, it is, I am just
18 trying to understand his response.  His response was:
19 If I interview him.  And my question -- All right,
20 let me ask an open ended question.
21         MR. PICKUS:  I think his response was:  If

Page 47

1  he interviews.
2          BY MR. CAIOLA:
3      Q.   If you don't interview them, how can you
4  tell whether the threat is serious?
5      A.   If I don't interview them, then I don't
6  know anything about it.
7      Q.   If you receive a written request for a
8  cell change that alleges a threat, and you don't
9  interview them, how can you tell whether the threat
10 is serious?
11     A.   If I receive that, then I will see them.
12     Q.   So is it fair to say, then, the only way
13 you can assess how serious that threat is, is to
14 conduct an interview?
15     A.   I think we're trying to beat around the
16 bush here.  I really don't understand where this is
17 going, so, can we go back?
18         MR. CAIOLA:  Would you repeat my question,
19 please?
20         (Record read.)
21         THE WITNESS:  The threat to what?

Page 48

1          BY MR. CAIOLA:
2      Q.   The threat on one inmate to another?
3      A.   As in what?  As in, I am not going to play
4  cards with you anymore?  I mean, I need some
5  specifics.
6      Q.   So, you receive a request for a cell
7  change, and the inmate alleges a threat to his
8  personal safety.  Is there any way for you to assess
9  the seriousness of that threat without interviewing
10 that inmate?
11     A.   Sometimes they are not interviewed.  They
12 are automatically removed out of the situation.
13     Q.   Based on the written request?
14     A.   Correct.
15         THE WITNESS:  Can we take a break for a
16 minute, please?
17         MR. CAIOLA:  Sure.  Lieutenant, I ask that
18 during the break you not discuss this matter with
19 your attorney.
20         (Recess)
21         MR. PICKUS:  Before you start, maybe we

Page 49

1  can move this along faster.  I understand where
2  you're trying to go.  When you say request, because
3  we have established that he sometimes gets oral
4  requests and sometimes written requests.
5          MR. CAIOLA:  Written requests, I am
6  referring to now.  This whole line of questions deals
7  with written requests.
8          MR. PICKUS:  Okay.  I think that's what
9  Lt. Ward may not have necessarily understood.
10         BY MR. CAIOLA:
11     Q.   Okay.  So when you receive a written
12 request for a cell change, you said sometimes the
13 threat is apparent and you don't need to interview
14 that person in order to assess whether the threat is
15 serious.  You just would remove them immediately,
16 based on what you see in writing, correct?
17     A.   I might not even see the request.
18     Q.   If the request is submitted to you, let's
19 assume for all of these questions, the request is
20 submitted to you.
21     A.   If I receive a request that says they're

13 (Pages 46 to 49)

Page 50

1  having a threat, I will see the inmate.
2     Q.  And do you agree that there is no other
3  way that you can assess the threat, or that you can
4  rule out a threat, other than by seeing the inmate
5  and interviewing the inmate?
6     A.  Might not have that opportunity to see the
7  inmate.
8     Q.  What do you mean?
9     A.  Someone in the unit, they might, you might
10  walk it up and give it to her and say, Here. And
11  that officer may say, Oh, we need to do something
12  right away. So they deal with it right on the spot.
13  Then I am notified later.
14     Q.  Okay. This whole line of questions deals
15  with the circumstance where you receive a written
16  request. You, personally, receive a written request.
17  You have testified that in some instances, the threat
18  is apparent and you need not interview the inmate.
19  And my question is, taking --
20     A.  That's, what I was, on that just is, I may
21  not be able to be right there to do it. That's what

Page 51

1  I mean. This --
2     Q.  Someone else would do it?
3     A.  Someone else would be there, and they
4  would do it. And they say, This is what has
5  happened. And I say, Okay, authorize it and do it.
6     Q.  But if you are the person who receives the
7  request?
8     A.  If you put that request in my hand, that
9  says you're having problems, and it's a threat, then
10  I will see you right at that very moment.
11     Q.  Okay. Now in this instance, the request
12  for a cell change was submitted on December 28, 2001?
13     A.  Right.
14     Q.  Do you know when it was received by your
15  office?
16     A.  No, because I weren't here.
17     Q.  Now, I would like to take you back to
18  Exhibit 4 for a moment.
19     MR. PICKUS: That's the duty roster?
20     BY MR. CAIOLA:
21     Q.  Yeah. You showed me how the time records

Page 52

1  indicate you weren't here for that, the 28th, 29th,
2  et cetera. I would just like to look at those same
3  dates on the duty roster. If you go to -- let me
4  have one moment here.
5     (Recess)
6     MR. CAIOLA: Back on the record. Please
7  mark this as the next exhibit, Madame Court Reporter.
8  This is Exhibit 7.
9     (Exhibit No. 7
10     marked for identification.)
11     BY MR. CAIOLA:
12     Q.  Can you identify what this document is,
13  Lieutenant?
14     A.  Yes. Custody and Security, 110-5.
15     Q.  This is an ECI directive, correct?
16     A.  That's what it says.
17     Q.  Before we get into this document, let me
18  note for the record that this document was supplied
19  in response to a request which sought policies at ECI
20  that address cell change requests and protective
21  custody.

Page 53

1     A.  Uh-huh.
2     Q.  It appears to me, this is a statement for
3  the record, as well, that this notice is rescinded
4  and is no longer, was not in force at the time of the
5  incident in question. And I believe that there was a
6  second set of Division of Correction directives that
7  was received by us in discovery that dealt with the
8  time period after.
9     But I think we may be missing the
10  directives that address this issue during the time
11  period in question. So having said all that, because
12  I don't want to mislead you in any way, is this a
13  policy that is still being followed today, despite
14  the fact it was rescinded?
15     A.  The form is still being used, yes.
16     Q.  The form is still being used, I recognize
17  that. Is this policy still being used, as well?
18     A.  Protective custody?
19     Q.  No, this particular policy we are looking
20  at here, ECI directive 110-5-1?
21     A.  We don't actually have protective custody

14 (Pages 50 to 53)

c3032e16-1756-4a07-a1d0-432ad32faea2

Page 54

1    here at ECI.
2        Q.    You don't have protective custody?
3        A.    No, not as the state sees it, no.  Do you
4    mean protective custody for a day?  Long term
5    protective custody?  I mean --
6        Q.    I mean protective custody that is
7    addressed in this particular directive.  Why don't
8    you have a moment and look the at the directive, and
9    then we can talk about it.
10        (Recess.)
11        BY MR. CAIOLA:
12        Q.    Back on the record.  You said you don't
13    have protective custody here at ECI.  What term do
14    you use?
15        A.    Administrative segregation.
16        Q.    And what is that?  When do you
17    administratively segregate an inmate?
18        A.    For safety, for their safety, for one.
19    For protection from others, under threat.
20        Q.    Where does an inmate go when they are
21    administratively segregated?

Page 55

1        A.    Right now, we have two cells in each G-P
2    unit, which is general population.  Or they could go
3    to Housing Unit 4.  Depends upon bed space.
4        Q.    What about just moving to a different
5    cell?
6        A.    No.
7        Q.    That wouldn't be considered administrative
8    segregation?
9        A.    No, you're still there.  When you
10    segregate someone from somebody --
11        MR. PICKUS:  Can we go off record for a
12    second?
13        (Recess)
14        BY MR. CAIOLA:
15        Q.    Turning to Exhibit 7, this ECI Directive
16    110-5-1.  You don't use the term protective custody
17    here at ECI?
18        A.    No.
19        Q.    But is this policy, in terms of what it
20    provides, substantively something that you follow
21    here at ECI?

Page 56

1        A.    We use the administrative seg policy, but
2    we use the cell change interview sheet.
3        Q.    So you --
4        A.    Basically as the tool.
5        Q.    What is the tool?
6        A.    The cell change interview sheet.
7        Q.    In the administrative seg policy, which
8    one are you referring to?
9        A.    I don't know what the number is, right off
10    the bat.
11        Q.    Is administrative segregation, in an
12    instance whether the inmate is not posing a threat,
13    the inmate is being segregated is not posing the
14    threat, is that limited to a certain number of days?
15        A.    It's 120 hours.  They will be seen by case
16    management in 120 hours.
17        Q.    During those 120 hours, when they are in
18    administrative segregation, is that like solitary
19    confinement?  What is that like?
20        A.    They're in a cell where they have limited
21    access.  They are taken away from the general

Page 57

1    population, actually.
2        Q.    My understanding is that these policies,
3    these protective policies, provide that if an inmate
4    is not doing something wrong, they're under threat,
5    but they themselves have not been, acted up, that
6    they are supposed to be afforded the same freedom,
7    access to various areas as the other general
8    population?
9        A.    We don't have a protective custody unit
10    here.  We have an administrative segregation we use.
11    They still get a shower.  They still get their phone
12    call.  It's a separate policy.
13        Q.    So in an instance where someone is being
14    threatened, you would not just move them to another
15    tier, away from the enemy that is threatening them?
16        A.    I wouldn't.
17        Q.    As far as administrative segregation?
18        A.    No, I wouldn't.
19        Q.    Why not?
20        A.    Because we, they will still go to eat
21    together.  They will still rec together, so moving

15 (Pages 54 to 57)

Page 58

1  them from one tier to another, one cell to another,
2  but not separating them from the problem, they still
3  have direct access to them.
4    Q.   So who is it that eats together, the
5  entire facility? And recs together?
6    A.   The whole housing unit recs together and
7  eats together.
8    Q.   So could an inmate be moved to a different
9  housing unit?
10   A.   Yes, they could. But half of House Unit 2
11 eats with House Unit 1. The other half of House Unit
12 2 eats with Unit 3. Plus, if they are going to the
13 store, or going to a religious activity, or other
14 activity, they still would have access to them.
15   Q.   Could you move the inmate to the east wing
16 instead of the west wing? Would that solve the
17 problem?
18   A.   That would be case management team's
19 decision. We do the administrative part and they
20 handle the classification issue.
21   Q.   Now are there circumstances where there an

Page 59

1  inmate may be under threat, but the threat is really
2  because of their status sharing the cell with the
3  inmate threatening them, as opposed to being in the
4  general population with that person?
5    A.   I don't understand the question.
6    Q.   Do you commonly see inmates who are
7  threatened by their cellmates because of their living
8  circumstance, who might be safe if they were just
9  removed from that cell?
10   A.   Repeat it one more time.
11   Q.   Let me give you the specifics of the cell
12 change request from Mr. Queen. His written cell
13 change request form states that his roommate has
14 stated that he is going, there is going to be trouble
15 if he doesn't get out of the cell.
16       Under that circumstance, and now I am
17 moving to a hypothetical, but if you were to
18 interview Mr. Queen, and you say, Do you feel under
19 threat, and he says, explains that yes, I feel under
20 threat, because my cellmate has told me if I don't
21 leave this cell, there it's going to be trouble.

Page 60

1      What would you conclude from that?
2    A.   That's a hypothetical question. You have
3  to understand here that these guys, when a guy tells
4  me he is having the problem, and I deem it's going to
5  be a problem, and they bring it to me it's going to
6  be a problem, cell change interview sheet, check,
7  check, check, yes to either one of them, they go.
8    Q.   They go to administrative segregation?
9    A.   Because if I take the chance and move him
10 four doors down, and they still have this problem,
11 then I haven't solved anything.
12   Q.   Okay. Is it your understanding of your
13 policy, that if there is animosity, that you conclude
14 exists between the inmates, that one of them should
15 be moved out of the cell?
16   A.   Animosity as in?
17   Q.   Well, if one has threatened the other?
18   A.   If one has threatened the other, somebody
19 will leave, yes.
20       MR. CAIOLA: Let's mark this as Exhibit 8.
21       (Exhibit No. 8

Page 61

1        marked for identification.)
2        BY MR. CAIOLA:
3    Q.   Can you identify what this Department of
4  Correction directive relates to?
5    A.   Protective custody again.
6    Q.   Yes. There is a policy, I believe, that
7  was issued in December of 2002. I guess, your
8  testimony that you have just provided regarding
9  administrative segregation would apply to this as
10 well, that you don't follow particular policy?
11   A.   This says "Case Management Staff and
12 Wardens" under Section E.
13   Q.   What is your point?
14   A.   My point is I'll will put them on
15 administrative seg, and the case management will make
16 this decision for where they think they should go.
17 If they make this decision to put them in a different
18 house unit on a different tier, then that is their
19 decision. My decision will be to alleviate the
20 problem.
21   Q.   Would you take a look at Subsection 3,

16 (Pages 58 to 61)

c3032e16-1756-4a07-a1d0-432ad32faea2

Page 62

1   it's on page 2, I, please?  Does this --
2       A.   Now, I will say again, we don't have
3   protective custody here.
4       Q.   So this Paragraph I is not something that
5   you --
6       A.   We don't have protective custody at ECI.
7       Q.   Do you, under the Subsection 1 of this
8   policy, it says that the policy is applicable to all
9   institutions except MCAC and CHDU.  Do you know what
10  MCAC is?
11      A.   No.
12      Q.   How about CHDU?  Do you know what that is?
13      A.   I was, it would be a speculation.  Do you
14  want my best guess.
15      Q.   Best guess.
16      A.   Maryland Correctional Adjustment Center.
17  And, I don't know what the other one is.
18      Q.   Okay.  Neither of those is ECI, is that
19  right?
20      A.   No.
21          MR. CAIOLA:  Mark this as Exhibit 9.

Page 63

1          (Exhibit No. 9
2          marked for identification.)
3          BY MR. CAIOLA:
4       Q.   I think may only have one question on this
5   policy.  This is another policy, Department of
6   Correction directive 100-143, it deals with placement
7   in protective custody.
8       A.   You're assuming that I would have placed
9   him on protective custody.  I wouldn't have.  I would
10  have placed him on administrative segregation.
11  Administrative segregation would rule out all these
12  protective custody documents.  I would have placed
13  him on administrative segregation.  There is a
14  difference.
15          MR. PICKUS:  Wait for the question.
16          BY MR. CAIOLA:
17      Q.   If you place an inmate on administrative
18  segregation who has done nothing wrong, other than to
19  be threatened, would you conduct an investigation
20  within 96 hours, as it would be consistent with this
21  policy 100-143?

Page 64

1       A.   Would I conduct the investigation within
2   96 hours?
3       Q.   Would an investigation be conducted within
4   96 hours?
5       A.   That's not what it, I don't believe, you
6   need to read the directive or let me read it for you.
7       Q.   This directive 100-143?  Or an
8   administrative segregation directive?
9       A.   The administrative segregation directive.
10          MR. CAIOLA:  Why don't I mark as Exhibit
11  10, I only have one copy of these.  I wasn't actually
12  preparing to introduce them.  So we will mark these
13  three.  Let's mark as Exhibits 10, 11, and 12
14  respectively, Department of Correction Directives
15  100-131, 100-132, and 100-133.
16          (Exhibit Nos. 10, 11, & 12
17          marked for identification.)
18          BY MR. CAIOLA:
19      Q.   When you have had a chance to review these
20  policies, why don't you walk me through your
21  administrative segregation process, with reference,

Page 65

1   if you can, to the policies.
2       A.   Do you have a specific question?
3       Q.   I would like for you to describe your
4   administrative segregation policies here at ECI.
5       A.   If I deem somebody is in a threat, then I
6   will administrative seg them.
7       Q.   So in the instance where you get a cell
8   change request when an inmate has received a threat?
9       A.   Correct.
10      Q.   Who would go on administrative
11  segregation, the inmate making the threat or the
12  inmate receiving the threat?
13      A.   Could be both.
14      Q.   In an instance where Inmate A has
15  requested a cell change, and you have done an
16  interview, and you have checked off yes, who is it
17  that you typically would remove?
18      A.   The one who said that he was in fear for
19  his life.  He is the one.
20      Q.   So when you were just describing your
21  policy for administrative segregation, I thought I

17 (Pages 62 to 65)

QUEEN V. WARD                                                                                          H. D. WARD  8/19/04

Page 66

1  heard you say that when you deem someone to be a
2  threat, you remove them?
3      A.   Be a threat or somebody is being
4  threatened, I will remove them also.
5      Q.   So you remove them and you put them in, I
6  think you testified, a separate cell that is
7  designated for administrative segregation?
8      A.   Correct.
9      Q.   They have limited access for whatever
10 period they're in that cell from the general
11 population?
12     A.   Correct.
13     Q.   I believe you also testified that then
14 within, was it 120 hours an investigation occurs?
15     A.   I didn't say the investigation. I said
16 they will be seen by the case management team within
17 that time.
18     Q.   Is there a timeframe for a decision to be
19 made about to what is to happen with that inmate?
20     A.   Not really.
21     Q.   Is there any difference between the way

Page 67

1  you would treat an inmate who has been threatened and
2  an inmate who has created a problem themselves?
3      A.   Repeat that question.
4      Q.   Do you treat an inmate who has been
5  threatened the same way you would treat an inmate who
6  has caused a problem, with respect to administrative
7  segregation?
8      A.   I treat everybody the same.
9      Q.   So when those two different groups of
10 inmates, an inmate who has been threatened, and an
11 inmate who has caused a problem, are put in
12 administrative segregation, they are treated the same
13 way in the administrative segregation?
14     A.   What do you mean by causing a problem?
15     Q.   Well, I thought you said when you deemed
16 an inmate a threat, you would put him in
17 administrative segregation. That's what I was
18 referring to as causing a problem.
19     A.   Yes.
20     Q.   So when you have made a decision to put an
21 inmate into administrative segregation because they

Page 68

1  have caused a threat, is that inmate treated the
2  same?
3      A.   They don't have to be the cause of a
4  threat, they could be in danger.
5      Q.   Okay. So in either event, they are put in
6  administrative segregation. Are those inmates
7  treated the same way once in administrative
8  segregation? Same privileges, et cetera?
9      A.   As who?
10     Q.   Both sets of inmates. You have your set
11 of inmates who has been threatened, and your inmate
12 who has caused a problem, or threatened someone, or
13 in some way has lead you to conclude that they need
14 to be moved.
15     A.   If they are placed on ad seg, everybody on
16 ad seg is treated the same.
17     Q.   Now, what happens to this cell change
18 interview form, once it's completed? Where does it
19 go?
20     A.   A copy is made. It goes up front to case
21 management to go in the file, and then I keep a copy.

Page 69

1      Q.   Go in what file?
2      A.   Inmate's base file, supposedly.
3      Q.   So you send a copy. Let me break it down
4  into two scenarios. One scenario where you are going
5  to order administrative segregation?
6      A.   Correct.
7      Q.   Because the answers to those questions are
8  yes. At least the answer to some of those questions
9  is yes. In that circumstance, what happens to the
10 cell change interview form?
11     A.   I file them.
12     Q.   You file it where?
13     A.   In my office.
14     Q.   Anywhere else? Do you make any copies and
15 send it to anyone?
16     A.   I make a copy sometimes and put in a base
17 file, but not always, it's according to my schedule.
18 Not all the time.
19     Q.   So sometimes it's in the base file,
20 sometimes it's not?
21     A.   Correct.

18 (Pages 66 to 69)

QUEEN V. WARD                                                                                          H. D. WARD  8/19/04

Page 70

1    Q.   Is there a policy that governs whether it
2  should be in a base file?
3    A.   I have no idea.
4    Q.   In a circumstance where you have concluded
5  that administrative segregation is not warranted, the
6  answers to the questions are No --
7    A.   Correct.
8    Q.   What happens to that interview form?
9    A.   I just hold on to it.
10   Q.   Do you send it up to the base file in that
11  circumstance?
12   A.   Most of the time, if I think of it, I make
13  a copy of it and send it up. I can't say that it
14  always happens because nothing is an absolute.
15   Q.   But your general policy is to send a copy
16  up and to put one in your office file?
17   A.   I put one in their mailbox. What happens
18  to it after that, I have no clue.
19   Q.   Who is their, when you said their mailbox?
20   A.   Case management.
21   Q.   So you send it to case management, and

Page 71

1  then you keep a copy?
2    A.   Right.
3    Q.   What do you do with the copy you keep?
4    A.   File in the filing cabinet.
5    Q.   What filing cabinet is that?
6    A.   In the office that I have.
7    Q.   You have a separate file for interview
8  forms?
9    A.   Correct.
10   Q.   I believe we requested, and you copied for
11  us, the interview forms that were in that file?
12   A.   Some of them, yes.
13   Q.   For a certain period of time?
14   A.   Correct.
15       MR. CAIOLA: Mark this as a next exhibit.
16       (Exhibit No. 13
17       marked for identification.)
18       BY MR. CAIOLA:
19   Q.   Would you identify what that exhibit is.
20   A.   Cell Change Interviews.
21   Q.   Did you provide this form to your attorney

Page 72

1  to forward to us?
2    A.   Correct, I guess. No, I gave it to
3  Mr. Miller.
4    Q.   Did you give it to Mr. Miller?
5    A.   Yes.
6    Q.   Is this in some file your office, the copy
7  of this same --
8    A.   I think I give him the only copy I had.
9    Q.   And --
10   A.   I think.
11       MR. PICKUS: I think there is confusion.
12  I think he is referring to a blank form, not the form
13  used in Mr. Queen's case.
14       BY MR. CAIOLA:
15   Q.   Have you been using this blank form for
16  cell change interviews since 1995, as far as you
17  know?
18   A.   Been using them ever since I can remember.
19   Q.   Now it appears that there is a line about
20  two-thirds down the page, the line across the page.
21  What is that, if you know? Is that a --

Page 73

1    A.   Looks like a bad copy.
2    Q.   Okay. At the top of the page it says:
3  Appendix A to ECI Directive 110-235-1, small a, big
4  R. I think we have looked at that directive
5  110-235-1. Do you know what the "a" and the "R"
6  stands for?
7    A.   Distribution, I think.
8    Q.   What do you mean?
9    A.   How the forms are distributed. I really
10  don't know. So that would be a guess.
11   Q.   At the bottom of the page it indicates,
12  the very bottom of the page, that the form in
13  parentheses says 1095. I believe that that, well,
14  let me ask you. Does that mean the form began being
15  used in October 9?
16   A.   I have no idea.
17   Q.   Right above it says cc, and has Inmate
18  Base File, and file.
19   A.   Right.
20   Q.   Inmate base file has been crossed through.
21   A.   Right.

19 (Pages 70 to 73)

Page 74

1   Q.   Do you know why that is?
2   A.   No.
3   Q.   Did there come a time when these forms did
4   not any longer get copied to inmates' base files so
5   that was crossed through?
6   A.   I have no idea.
7   Q.   Where it says, in a line below inmate base
8   file, where it says file, do you know what that
9   means?
10   A.   Just says file.  Just file there.
11   Q.   What file is that referring to?
12   A.   Doesn't say.
13   Q.   Would that typically be your own file?  Is
14   that the way you read it?
15   A.   I just file them.
16   Q.   You complete them.  You have explained you
17   file them in your cabinet?
18   A.   Correct.
19   Q.   Do you refer to this document as a waiver
20   form?
21   A.   No.

Page 75

1   Q.   What do you refer to it as?
2   A.   Cell change interview.
3   Q.   Do you have a requirement here at ECI that
4   this form be completed when you receive a written
5   change --
6   A.   No.
7   Q.   Cell form.
8   A.   No.
9   Q.   No?  Where is this form kept?
10   A.   I keep them in my office.
11   Q.   Could you clarify?  Do you mean before
12   it's filled out?
13   Q.   Before it's filled out, the blank forms?
14   A.   In the office.
15   Q.   Are they in a cabinet?
16   A.   They're on a shelf.
17   Q.   Do other officers have access to the
18   office?
19   A.   Yes.
20   Q.   And do they come in and take these forms
21   and use them whenever they want to, whenever they

Page 76

1   need to use one?  Or would they seek permission from
2   you?
3   A.   There's three things asked.  Which one is
4   it?
5   Q.   Let me ask, do officers who are on shift
6   have access to this form?
7   A.   Yes.
8   Q.   Are they permitted to use the form?
9   A.   If necessary; yes.
10   Q.   Just so I am clear.  Despite the fact
11   inmate base file is crossed out, it's still your
12   practice typically to send a copy to the base file?
13   A.   I said nothing is absolute.  I do some,
14   some.  Just according to how busy I am, what goes on
15   in the jail.  I don't put them in the file.  We put
16   them in the mailbox.  What happens to them after that
17   --
18   Q.   In the base file?
19   A.   We don't handle them.
20   Q.   You put them in a mailbox to case
21   management?

Page 77

1   A.   Correct.
2   Q.   They keep the base files?
3   A.   Yes.
4   Q.   Do you have access to the base file?
5   A.   Yes.
6   Q.   How do you get access to the base file?
7   A.   See the case manager and look at the
8   files.
9   Q.   Where is the case manager and where are
10   the base files?
11   A.   Operations area.
12   Q.   You go to the operations area and ask for
13   a file, and they provide it to you?
14   A.   Yes.
15   Q.   But you don't go to the, though to that
16   area to look at the base file for the purpose of
17   putting in the completed interview form?
18   A.   I don't fool with it.  I don't have time
19   in my day.  They file everything that goes in a base
20   file, the case manager.
21       MR. CAIOLA:  Mark this is as the next

20 (Pages 74 to 77)

c3032e16-1756-4a07-a1d0-432ad32faea2

Page 78

1  exhibit, No. 14.
2              (Exhibit No. 14
3              marked for identification.)
4      BY MR. CAIOLA:
5      Q.  Do you recognize this policy?
6      A.  I can't say that I have ever read it; no,
7  sir.
8      Q.  This is a Department of Correction
9  directive, 100-203. It deals with base files, and
10  how base files should be kept, and what should be
11  kept in the base file, and the order of filing a base
12  file. Would you just take a moment and review it?
13  Have you had a chance to look at it?
14      A.  Yes.
15      Q.  Do you comply with this directive as
16  written, Lt. Ward?
17      A.  That's the first time I've seen this
18  directive, sir, so -- What part of this directive
19  are you referring to?
20      Q.  I was hoping that you would take a moment
21  and review it, and then tell me whether you comply

Page 79

1  with it in the way you conduct your responsibilities.
2      A.  It says For Case Managers. Is it anything
3  particular in here directing the custody?
4      Q.  Well, many of the documents that are
5  supposed to be kept in the base file originate in
6  custody; correct?
7      MR. PICKUS:  I am going to have to object
8  to this. We have not established that this directive
9  applies to Lt. Ward.
10      MR. CAIOLA:  I believe that the directive,
11  I am not sure I have to establish that. I mean, if
12  it doesn't apply to him, he can testify to that.
13      MR. PICKUS:  All right.
14      MR. CAIOLA:  It says applicable to all
15  institutions.
16      MR. PICKUS:  Well, you haven't asked him
17  that question yet.
18      MR. CAIOLA:  I think the document speaks
19  for itself. I don't have to ask him that question.
20  The document says on its face that it applies to all
21  institutions. ECI is an institution, so --

Page 80

1      MR. PICKUS:  Right, but if the file --
2      BY MR. CAIOLA:
3      Q.  Do you have any understanding as to
4  whether this base file directive applies to you?
5      A.  It's a case management directive. It's
6  not something we're issued.
7      Q.  What do you mean, it's a case management
8  directive?
9      A.  Case management services. This is what
10  they to, their job.
11      Q.  Is to maintain a base file?
12      A.  Correct.
13      Q.  So what you're saying is, that this is not
14  in your, do you have access to the Department of
15  Correction directives?
16      A.  Yes, but it's not --
17      Q.  In custody? Do you have a set of
18  directives?
19      A.  I'm not, I don't think that we get this
20  particular directive. It's not something that we, we
21  might. I am not going to say that we didn't. But --

Page 81

1      Q.  So, well, since we don't know whether you
2  have the directive or not, but it clearly applies to
3  ECI, and whether it says program case management
4  services or not --
5      MR. PICKUS:  I object to your testifying
6  now. And whether it applies to ECI, you are
7  testifying.
8      BY MR. CAIOLA:
9      Q.  My question is a simple one. I would like
10  Lt. Ward just to review what the requirements of the
11  base file are, and let me know in the way he
12  operates, the way he conducts his business as a
13  lieutenant, does he submit to the base file the
14  documents that this --
15      A.  I put nothing in a base file.
16      Q.  Do you send to the folks who do put in the
17  base file the documents that this form says are
18  required to be in the base file?
19      MR. CAIOLA:  That's my question. And I
20  think he can answer that.
21      MR. PICKUS:  I agree. That question you

21 (Pages 78 to 81)

Page 82

1   can answer.
2         THE WITNESS: If, for the most part, I
3   submit stuff to them to go in the mailbox, that goes
4   in the base file. I can't say it's an absolute that
5   everything always gets there, no.
6         BY MR. CAIOLA:
7   Q.   Okay.
8   A.   Unless I put it in the mailbox. Once I
9   put it in a mailbox --
10  Q.   What do you put in the log book? What
11  types of information do you enter in a log book?
12  A.   I don't have a log book.
13  Q.   Is there a log book in the control room?
14  A.   It's kept by the sergeant.
15  Q.   Do you make entries into it, as well?
16  A.   Just saying I have been on post that day,
17  if there was any problems during that time.
18  Q.   Are you familiar with the ECI policies
19  regarding what information gets entered into the log
20  book?
21  A.   Yes.

Page 83

1   Q.   What information? Tell me what.
2   A.   Pertinent information for the day, times,
3   informal counts, counts, anything that happened
4   during the day out of the ordinary.
5   Q.   If you conduct cell change interviews, do
6   you put that information in the log book?
7   A.   No, sir.
8   Q.   Is it your understanding that it's not
9   expected that you would put that in the log book?
10  A.   Something that I do, if I do it in my
11  office, no, it doesn't go in the control center log
12  book. The control center log book is what happened
13  in the control center for the day. Tier log book is
14  what happened on the tier during the day.
15  Q.   Would the interview typically take place
16  in the tier? Or in the control room?
17  A.   I would hope we didn't have inmates in the
18  control center running the institution.
19  Q.   So it would be in the tier, if you were to
20  do it?
21  A.   It would be in the office.

Page 84

1   Q.   Is there an office log book, too?
2   A.   No.
3   Q.   So if you conduct an interview in the
4   office, have you ever written down in a log book,
5   either in the control room or on the tier that you
6   conducted the interview?
7   A.   No.
8   Q.   How about if you moved somebody into
9   administrative seg, would that go in a log book?
10  A.   No. But what should go in the control
11  center log book if they went on administrative seg.
12  Should, but that doesn't mean it does.
13  Q.   Would you be the officer that would enter
14  that?
15  A.   No.
16  Q.   So you might make the determination to
17  move them to administrative seg, but if there were
18  going to be an entry in the log book, that would be
19  done by someone else?
20  A.   Correct. That is if they even knew it
21  happened.

Page 85

1   Q.   So they wouldn't necessarily know?
2   A.   No.
3   Q.   When you conduct an interview and you move
4   an inmate from someplace on the tier, like a cell, to
5   an office to conduct an interview, would that be
6   reflected in a log book?
7   A.   No.
8   Q.   In the log book on the tier?
9   A.   No.
10  Q.   Would it be reflected in the control room?
11  A.   No.
12  Q.   Is, other movements of inmates, are they
13  reflected in a log book?
14  A.   No.
15  Q.   So what does get put in the log book?
16  A.   Rounds. Counts, chow, rec.
17  Q.   What was that third one you mentioned,
18  chow?
19  A.   Chow line, recreation, when they go eat.
20  Q.   The fact that inmates all were taken to
21  the lunch room, would that factor be reflected?

22 (Pages 82 to 85)

Page 86

1    A.    It means chow.
2        MR. CAIOLA: Okay. Let's mark this as the
3    next exhibit.
4            (Exhibit No. 15
5            marked for identification.)
6        BY MR. CAIOLA:
7    Q.    Do you recognize this directive?
8    A.    Yes.
9    Q.    The procedure under 6-A states that all
10   officers assigned to posts which require log book
11   entries are responsible for thorough and complete
12   records of all activities during their tours of duty.
13   A.    Where are you reading that?
14   Q.    That is under VI-A, halfway down the first
15   page. Under A. Roman VI-A.
16   A.    Okay.
17   Q.    What do you take that procedure to mean?
18   A.    Did you read on to Section E?
19   Q.    So you take A to mean what is listed in E?
20   A.    It says: Where possible, entries in log
21   books should include, but not limited to --

Page 87

1    Q.    Under E-6, it mentions activities, and I
2    think you were mentioning some of those before?
3    A.    Uh-huh.
4    Q.    It specifically mentions administrative
5    segregation --
6    A.    Correct.
7    Q.    And protective custody.
8    A.    And segregation.
9    Q.    And segregation.
10   A.    Correct.
11   Q.    And I think you testified that those are
12   sometimes in the log books and sometimes they are
13   not?
14   A.    We don't do segregation recs. There,
15   segregation is a separate unit. Administrative seg
16   recs are done on 412.
17   Q.    Administrative seg recs, what does that
18   mean?
19   A.    Recreation.
20   Q.    Oh.
21       MR. PICKUS: I think he misunderstands

Page 88

1    your question. He means the movement to segregation
2    itself. I believe that's what he means.
3        THE WITNESS: That's not what it says.
4    "Conducting activities for segregation,
5    administrative seg." You were talking about, this is
6    referring to activities?
7        BY MR. CAIOLA:
8    Q.    Yeah. Recreation, library, religious
9    programs, et cetera is what would be reflected. And
10   then it says parenthetically: The time, the name,
11   the number, the officer conducting the activity for
12   those different groups. So that, if an inmate,
13   you're saying if an inmate in protective custody were
14   to go to a library, that would be reflected in a log
15   book?
16   A.    We don't have protective custody.
17   Q.    Sorry. Administrative segregation, that
18   would be reflected in the log book.
19   A.    They don't go to the library.
20   Q.    Okay. So it would be, the activities
21   might be inapplicable with respect to administrative

Page 89

1    segregation. How about, moving down to 16. It says
2    Log entries must include the name of each officer
3    listing specific activity of each as they conduct or
4    supervise inmates.
5        What do you think, what do you take
6    conduct or supervise inmates to mean?
7    A.    What are you asking?
8    Q.    Do you have an understanding of what this
9    16 means?
10   A.    Say that: All log entries must include
11   the name of each officer, listing the specific
12   activity each as they conduct or supervise the
13   inmates.
14   Q.    What does that mean?
15   A.    Recreation, library, going to the gym,
16   going to eat.
17   Q.    Now there are some others here. Number 8
18   says Unusual Activities. Would --
19   A.    What is unusual activity?
20   Q.    That's my question to you.
21   A.    That's my question. What is an unusual

GORE REPORTING COMPANY
410-269-0308

Page 90

1  activity?
2      Q.   You don't have any understanding of what
3  that means?
4      A.   I am asking you, what do you consider
5  unusual?
6      Q.   Lieutenant, I have no idea what that
7  means.
8      A.   This is for a tier officer. This is a
9  tier officer's log book.
10      Q.   I am not sure it applies only to tier
11  officers. It says --
12      A.   It says: Log book entries.
13      Q.   Right, but there is one in the control
14  room, as well, right?
15      A.   Right. The control center, correct.
16      Q.   If you don't have any understanding of
17  what unusual activities is intended to mean, then
18  just say that you don't.
19      A.   I don't know exactly what unusual
20  activities are. I guess what, and that would be a
21  guess. Speculation.

Page 91

1      Q.   Number 9 says: Observation of inmates.
2  Any notion what that means?
3      A.   I guess you observe inmates.
4      Q.   So when you observe inmates, that's
5  supposed to be logged?
6      A.   Well, when you're making rounds, when you
7  make rounds, you note in the log book rounds are
8  made. You're observing inmates.
9      Q.   When did you first learn about Mr. Queen's
10  cell change request form?
11      A.   The day that I did the interview.
12      Q.   How do you know that that was the day you
13  first learned of it?
14      A.   Because that's the day I received it.
15      Q.   How do you know that is day that you
16  received it? Is this based on your independent
17  recollection of when you received it, or is it based
18  on some other document that tells you that's the day
19  you received it?
20      A.   I wasn't here in the unit.
21      Q.   Until what day?

Page 92

1      A.   That's when I got all my request slips
2  together that day, to do the interviews.
3      Q.   You were working on January 2nd, and 3rd,
4  and 4th?
5      A.   Correct.
6      Q.   A cell change request was submitted on
7  December 28?
8      A.   Correct.
9      Q.   So my question is, what is the basis for
10  your belief that you didn't receive the request until
11  the 4th?
12      A.   Because I would have handled it prior to.
13      Q.   So it's your general practice that you're
14  basing that on? Do you have an independent
15  recollection of receiving it on the 4th?
16      A.   No.
17      Q.   So what are you basing that testimony on?
18      A.   I would have handled that request slip
19  immediately.
20      Q.   So your understanding of the way you
21  operate is that if you received it on the 2nd, if it

Page 93

1  was in your office, you would have handled it on the
2  2nd?
3      A.   I didn't say it could have been in the
4  office. I had been off for quite a bit of time, I
5  had quite a few request slips.
6      Q.   Now in your absence, what is the typical
7  procedure for handling these request slips? You said
8  you had a bunch, you had been off for a while. What,
9  what would the, the why wouldn't they have been handled
10  by someone else?
11      A.   I have no idea.
12      Q.   I believe you testified in your Answers to
13  Interrogatories that your primary assignment was
14  housing manager of Housing Unit 1. But you were
15  often responsible for cell change requests from other
16  units?
17      A.   Correct.
18      Q.   Why is that?
19      A.   Because if you looked at the rosters
20  earlier, if I had Housing Unit 2, and I was given a
21  request, I would be responsible for that that day

Page 94

1  also.
2   Q.  Do you have any explanation for why these
3  requests would have been held for you, as opposed to
4  just being handled by another officer?
5   **A.  If it was addressed to me, then it would**
6  **have been left for me, most likely.**
7   Q.  Do you recall whether these were addressed
8  to you?
9   **A.  No.**
10   Q.  Do you recall the interview of Mr. Queen,
11  other than by looking at the interview form? Do you
12  have any independent memory?
13   **A.  I remember talking to Mr. Queen. I**
14  **remember the incident, yes.**
15   Q.  The incident, what incident?
16   **A.  I remember the day, yes.**
17   Q.  Which day? What day do you remember?
18   **A.  The 12th.**
19   Q.  That's the day that Mr. Queen was
20  assaulted?
21   **A.  Correct.**

Page 95

1   Q.  I believe that we're focusing on the
2  interview.
3   **A.  Okay.**
4   Q.  So do you recall the interview of
5  Mr. Queen that was conducted on January 4th?
6   **A.  Yes.**
7   Q.  What do you remember about it?
8   **A.  I remember him coming off of C Tier and**
9  **talking with him.**
10   Q.  Where did this meeting take place?
11   **A.  In the office to the right of the control**
12  **center.**
13   Q.  Do you --
14   **A.  Right in front of the tier.**
15   Q.  Do you recall what time of day it was?
16   **A.  No.**
17   Q.  Do you recall whether you spoke to
18  Mr. Barnes?
19   **A.  Kevin Barnes? Yes, I spoke to Kevin**
20  **Barnes, too.**
21   Q.  Did you complete an interview form for

Page 96

1  Mr. Barnes?
2   **A.  Pretty positive.**
3   Q.  Did you speak to Mr. Barnes on the 4th, as
4  well?
5   **A.  Yes.**
6   Q.  As is your practice to speak to both
7  inmates?
8   **A.  Not always, but sometimes, yes.**
9   Q.  In this instance, do you recall speaking
10  to Mr. Barnes?
11   **A.  I am pretty positive that I talked to him.**
12   Q.  Do you recall what Mr. Barnes said?
13   **A.  He said he wasn't in fear. He didn't have**
14  **any problems.**
15   Q.  Now, that he wasn't in fear? Mr. Queen
16  wasn't in fear? Or that Mr. Barnes wasn't?
17   **A.  No, neither one of them.**
18   Q.  Do you recall who was there with you when
19  you interviewed Mr. Queen?
20   **A.  Sgt. Thomas.**
21   Q.  She was there for the whole interview?

Page 97

1   **A.  She come in right after I started talking**
2  **to him.**
3   Q.  Is that your normal practice, to have more
4  than one officer there for an interview?
5   **A.  Not always. She just happened to come in.**
6  **Because I had been off and we were going to do some**
7  **talking about some things going on in the housing**
8  **unit.**
9   Q.  Sergeant Thomas came in on her own? Did
10  she knock?
11   **A.  No, I called for her.**
12   Q.  Why?
13   **A.  Because I wanted to talk to her.**
14   Q.  About Mr. Queen?
15   **A.  No, nothing to do with him. I had been**
16  **off, and I was trying to get caught up on things**
17  **going on in the unit.**
18   Q.  So this office, is it right next to the
19  control center?
20   **A.  Yes.**
21   Q.  How did you call for her?

25 (Pages 94 to 97)

c3032e16-1756-4a07-a1d0-432ad32faea2

Page 98

1    A.    Telephone.
2    Q.    So you dial out to the control center and
3    ask her to come in?
4    A.    Right.
5    Q.    I am sorry, I may have asked you this.
6    What time of day was that?
7    A.    I don't remember.
8    Q.    Your shift that day, do you recall what
9    hours you were working?
10    A.    8 to 4.
11    Q.    Do you recall whether it was toward the
12    beginning or toward the end of the shift?
13    A.    I would say it was before lunch.
14    Q.    Do you recall how long the interview with
15    Mr. Queen lasted?
16    A.    Several minutes.
17    Q.    Can you describe for me what happened?
18    A.    No, not exactly.  No, sir.
19    Q.    What do you remember about this interview?
20    A.    Just that he was, wanted to move.  I
21    think, I am not positive, I think it was cell 45 and

Page 99

1    he wanted to move down there with a friend.  And we,
2    just wasn't going to happen that day.  He didn't meet
3    requirements for a move.  Then he got a little loud,
4    and so I did the cell change interview sheet.
5    Q.    Do you recall whether he told you he
6    wanted to move with a friend?  Or whether you're
7    basing that on -- his request?
8    A.    No, he told me he wanted to move with a
9    friend.
10    Q.    Let me finish the question.  Do you recall
11    whether you're basing that recollection on
12    Mr. Queen's cell change request where he asked to be
13    moved to cell 45?
14    A.    I don't remember the cell change, what was
15    on the, what did you say?
16    Q.    Do you have an independent recollection of
17    him telling you he wanted to move to cell 45?
18    A.    I think it was 45.  I am not positive.
19    Q.    My question is, what are you basing that
20    statement on?  Are you basing it on something you
21    read recently?

Page 100

1    A.    No.
2    Q.    You are basing it on your actual memory of
3    that interview on the 4th?
4    A.    He wanted to move.  I don't remember what
5    exact cell.  It was right down the hall, and he
6    wanted to move in with a friend is what he told me.
7    Q.    What else did he tell you?
8    A.    That was it.  When he found out he wasn't
9    going to get a cell move, as happens quite often,
10    they get a little upset.  And so --
11    Q.    Did he tell you anything about Mr. Barnes
12    threatening him or telling him there was going to be
13    trouble if he didn't move out?
14    A.    No.
15    Q.    Did you ask him about that?
16    A.    Yes.  I asked him the right questions.
17    Q.    Do you recall reading his cell change
18    request form where he said that --
19    A.    I don't remember what was on the request.
20    Q.    So what direct questions did you ask him?
21    A.    What was on the sheet.  We talked, as I

Page 101

1    normally do.  I will talk with the guys.  And then,
2    at that point, I will do the cell change interview
3    sheet, if I think it is going to be any kind of
4    problem.
5    Q.    And so you concluded there was going a
6    problem in this incidence?
7    A.    Not between the two inmates, no.
8    Q.    Why did you conduct a cell change
9    interview in that case?
10    A.    Because he was pretty adamant about
11    wanting to move with a friend.  And he wasn't
12    eligible for this move.
13    Q.    Wasn't eligible because it was for the
14    purpose of moving in with a friend, not because he
15    was being threatened.  Is that your point?
16    A.    In my interview, he never said he was
17    being threatened.  The cell change interview reflects
18    that he hadn't been threatened.
19    Q.    And my question to you is whether you
20    specifically remember that, or whether you are
21    relying on your cell change interview form as the

26 (Pages 98 to 101)

Page 102

1  basis for your testimony?

2      A.  I remember talking to Queen that day,

3  yeah.

4      Q.  And you remember, specifically remember

5  him, what his answers were that day?

6      A.  I don't remember what his answers were,

7  no. But I remember him telling me he wanted to go in

8  with a friend.

9      Q.  Okay. Do you recall whether you sent a

10  copy of the cell change or the interview form up to

11  the base file?

12      A.  I don't remember, but probably not that

13  particular day, because it was a busy day. If I

14  remember correctly, I got out of work probably after

15  5 o'clock that day.

16      Q.  What are your normal hours?

17      A.  8 to 4.

18      Q.  And the extra half hour, where is that?

19  Is that before 8 or after 4?

20      A.  It was after 4.

21      Q.  Typically, you arrive at 8?

Page 103

1      A.  I get there at 7:30, leave at 4, 4:01,

2  4:02.

3      Q.  If we just take a look at Exhibit 3 for a

4  moment, if you take a look at Exhibit 3, the time

5  sheet.

6      A.  You're talking about on the 4th?

7      Q.  Yeah, on the 4th.

8      A.  No, I think I got there on that time that

9  day. I thought you were talking about the day of the

10  altercation.

11      Q.  So you would have gotten out, what time?

12      A.  Probably got out a few minutes after that

13  day.

14      Q.  So does this refresh your recollection as

15  to how busy you were that day, and whether you would

16  have sent this interview form up to Mr. Queen's base

17  file?

18      A.  I had off, if I remember correctly, that

19  day I was fairly busy. I probably did not make it up

20  to the base file. But I don't know that.

21      Q.  You don't have any independent

Page 104

1  recollection one way or the other?

2      A.  No, one way or the other.

3      Q.  Now you have testified that there were 40,

4  as many as 40, and as few as 8 cell change requests

5  per day. Limiting the cell change requests to only

6  written requests, how many do you receive?

7      A.  It varies. I get quite a few because of

8  my particular unit. So I get quite a few. I get

9  some guys writing me every day of my life.

10      Q.  You get some that, you get some, you said,

11  that write you every day? And do you conduct

12  interviews for those?

13      A.  No.

14      Q.  And when do you conduct an interview in

15  that case?

16      A.  When I think it's going to be a problem,

17  when they relate to me it's going to be a problem.

18  If they just say, Hey, I want to move down in your

19  housing unit, then I am not going to get out and

20  handle it.

21      Q.  So when there is an indication of a threat

Page 105

1  on this, how would you do that?

2      A.  Or a problem, yes.

3      Q.  Can you estimate how many of these written

4  requests you get in an average week or month?

5      A.  No. As I said, it varies.

6      Q.  Are the written requests kept?

7      A.  Some. Send some of them back.

8      Q.  Back to where?

9      A.  Answer them and send them back.

10      Q.  Without conducting an interview?

11      A.  Correct.

12      Q.  What do you mean, you answer them and send

13  them back?

14      A.  Using the move. You are not eligible for

15  a move. You know. You don't meet the criteria. And

16  send them back.

17      Q.  What do you normally do, how is the inmate

18  informed?

19      A.  Send the request back to them.

20      Q.  Do you write anything on the request slip?

21      A.  Yeah, I write that they are not eligible.

27 (Pages 102 to 105)

Page 106

1    Q.    Do you say why?
2    A.    Yeah, if they have not been there long
3    enough, infractions whatever it is.
4    Q.    So in those instances, you will just send
5    the request back to the inmate with something written
6    on it?
7    A.    Correct.
8    Q.    And without conducting interview?
9    A.    Right.
10    Q.    Do you make a copy for the base file?
11    A.    No.
12    Q.    Do you make copy of --
13    A.    No.
14    Q.    Now, the instances where you conduct an
15    interview, do you keep the cell change request form
16    in that instance?
17    A.    If I do a cell change interview, I keep
18    the form.
19    Q.    What do you do with that, with the cell
20    change request after you conduct the interview?
21    A.    I don't keep it.

Page 107

1    Q.    So you don't keep the request?
2    A.    No.
3    Q.    If someone has answered the questions yes,
4    and you're going to put them in administrative seg,
5    what do you do with their request form in that
6    instance, their cell change request form?
7    A.    Put it in the drawer.
8    Q.    So you keep it in that circumstance?
9    A.    Once I do, throw it in the drawer,
10    then I do my paperwork, and then I send it off. It's
11    up to the case management team at that point.
12    Q.    So you send it off to case management for
13    inclusion in the base file?
14    A.    No, just throw it in a drawer.
15    Q.    You have a drawer full?
16    A.    I keep them a while and then I get rid of
17    them.
18    Q.    When you say you get rid of them, do you
19    throw them away?
20    A.    Shred them.
21    Q.    Shred them? And if you, the answer is no

Page 108

1    to the interview questions, what do you do with the
2    cell change request form in that instance?
3    A.    Just hold onto it, and make a copy of it
4    when I get a chance and stick it in a box.
5    Q.    In what box?
6    A.    In the case management box they file.
7    Q.    In the base file?
8    A.    I don't put things in the base files.
9    Q.    Well, when you say to be filed, you mean
10    to be filed --
11    A.    I guess whatever they do with them.
12    Q.    So, what you're saying is if you have
13    granted administrative segregation, then in that
14    case, the request for cell change goes in a drawer.
15    And if you have denied administrative segregation,
16    and the answer has been no, in that case, the cell
17    change request goes to the case management team?
18    A.    For the most part, I try to make a copy of
19    them and put them all up there for them to handle.
20    I can't say absolutely that they all get up there.
21    Q.    So you mentioned if you don't conduct an

Page 109

1    interview at all, you would write something on the
2    form and you would return it to the inmate?
3    A.    On the request slip, not on the cell
4    change interview form.
5    Q.    Right, on the request slip, and return it
6    to the inmate.
7    A.    Right.
8    Q.    In the case where you do conduct an
9    interview, what, do you still, you mentioned that you
10    send it up?
11    A.    I send the cell change interview slip up,
12    not the request slip.
13    Q.    What do you do with the request slip?
14    A.    Put it in a drawer.
15    Q.    If you conducted an interview, do you
16    still fill out, write an answer on the cell change
17    request?
18    A.    Not normally.
19    Q.    Not normally?
20    A.    Not normally. Normally, if I see the guy,
21    I just throw it away, because at that point, once I

28 (Pages 106 to 109)

Page 110

1  have sat down with, and interviewed the guy, the
2  request, so far as I'm concerned, is done.
3      Q.  I believe you sent me your cell change
4  interview forms from the period May 31, '01 to
5  January 21, '03. I counted them up and they came to
6  99 cell change interview forms.
7          MR. PICKUS:  Are you asking a question,
8  Mr. Caiola?
9          MR. CAIOLA:  Yes.
10         MR. PICKUS:  Or are you testifying?
11         MR. CAIOLA:  No, I'm asking a question.
12     BY MR. CAIOLA:
13     Q.  Does that sound right to you?
14     A.  I don't know, I didn't count them.
15     Q.  Did you provide Mr. Miller with all of the
16 cell change interview forms in your file for that
17 period?
18     A.  All that I could find.
19     Q.  Do you have any cell change interview
20 forms from the period of January 21, '03 to the
21 present?

Page 111

1      A.  Probably.
2          MR. PICKUS:  Off the record.
3          (Recess)
4          MR. CAIOLA:  Mark this as the next
5  exhibit.
6              (Exhibit No. 16
7              marked for identification.)
8      BY MR. CAIOLA:
9      Q.  Does this look like what you provided to
10 Mr. Miller to be provided to Mr. Pickus?
11     A.  I just made copies of what was there and
12 sent on. I give him the copies. He made copies, I
13 guess.
14     Q.  Would you be able to access today the
15 copies or the cell change interview records that you
16 have in this file for the period from January '03 to
17 the present? Is that a difficult thing to access?
18     A.  You would have to pull all the base files,
19 yes.
20     Q.  I thought you said you keep these records
21 in your file?

Page 112

1      A.  These were, whatever it was I give him,
2  this was it.
3      Q.  That was everything in the file?
4      A.  Yes, that was everything I had in the
5  file.
6      Q.  Did your practice change after January of
7  '03, because I couldn't find any?
8      A.  I may have some more since then, since he
9  has gotten these.
10     Q.  No, but, well, this was recently supplied
11 in the middle of '04.
12     A.  Right.
13     Q.  The last one I have in here was from
14 January.
15     A.  I give him what he asked for.
16     Q.  Right. I think he didn't ask for up to
17 the current time. That is my point. So my question
18 is whether there is another pile of these that is
19 more current?
20     A.  If I have some, yes. I still have copies.
21         MR. CAIOLA:  Would you be able to provide

Page 113

1  do I need to provide a written, a specific request
2  for that? Could you get that?
3          MR. PICKUS:  No. We can get them and will
4  try to do it today.
5          MR. CAIOLA:  Great. Would you, I think
6  it's going to be, I have a few questions about a few
7  of these in here. And I guess I have to, maybe I
8  will just give you my copy.
9          MR. PICKUS:  Just tell me who it is and I
10 will find them.
11         MR. CAIOLA:  One is Tony Laney.
12         THE WITNESS:  About how far is it back?
13     BY MR. CAIOLA:
14     Q.  Before you do that, let me ask you a few
15 just general questions. Do you, in the case of
16 Mr. Queen, you testified that Sgt. Thomas was there
17 for the interview?
18     A.  Right.
19     Q.  And I believe she signed the interview
20 form?
21     A.  Yes.

29 (Pages 110 to 113)

Page 114

1  Q.  Why did she sign the interview form?
2  A.  If somebody refuses to sign, we, two
3  people sign.
4  Q.  Is there a policy to that effect?
5  A.  Just something we have always done here.
6  With everything we do here, if they refuse to sign,
7  two people just sign the form.
8  Q.  That, is it your recollection that that's
9  why Sgt. Thomas signed Mr. Queen's form?
10  A.  That is correct.
11  Q.  If you will just find Tony Laney. It is
12  about 20 sheets in. Why don't I just give you my
13  copy?
14  A.  Just let me look at it.
15  Q.  That's fine.
16  A.  Okay. Right.
17  Q.  This form appears to be an instance where
18  --
19  A.  Two people didn't sign.
20  Q.  Two people didn't sign.
21  A.  Yes.

Page 115

1  Q.  Is that your, it says "Refused to sign,
2  D.W."
3  A.  Correct.
4  Q.  Would that being your initials?
5  A.  Yeah.
6  Q.  Is that your handwriting?
7  A.  Yes.
8  Q.  So in this case, Mr. Laney refused to
9  sign, and you just signed, you signed your name. And
10  then just wrote "refused to sign" and put your own
11  initials?
12  A.  Right.
13  Q.  Now about 10 pages beyond that is a, I
14  can't make out the name. It looks like a Sansone
15  Faronze. Let me show you the form.
16  A.  Terence ---
17  Q.  Have you got it?
18  A.  Yeah.
19  Q.  What do you make of that? It seems to be
20  --
21  A.  Yeah, Tommy Mann initialed it, it was T.M.

Page 116

1  on that.
2  Q.  Who is that?
3  A.  Tommy Mann, he is an officer on midnight
4  shift.
5  Q.  How do you spell his last name?
6  A.  M-A-N-N.
7  Q.  He is on the midnight shift?
8  A.  Yeah.
9  Q.  So would this have been a late night
10  interview?
11  A.  No, he was on day shift at the time.
12  Q.  Now, there are a series of interviews.
13  You mentioned there was build up on January 4th,
14  2002, because you had been on vacation?
15  A.  Right.
16  Q.  I think right after, in fact, it's a
17  Terrance, right after that one, there are series of
18  January 4, 2002, interview forms. Do you recall any
19  of these interviews specifically?
20  A.  Well, Carl Hammond.
21  Q.  Let me just, I think we start with David

Page 117

1  Pettiford, Jason Bell.
2  A.  Jason Bell? Which one do you want to
3  start with?
4  Q.  Let's start with David Pettiford.
5  A.  He was on B-2.
6  Q.  So I assume, looking back, that you may
7  have had responsibility, I think, for both tiers that
8  day?
9  A.  The whole unit. Not just both tiers, the
10  whole housing unit.
11  Q.  Right. Two housing units.
12  A.  Right. This was Housing Unit 2, was Jason
13  Bell. Sgt. Balderson did that one.
14  Q.  Would that have been someone who was
15  working under your supervision that day?
16  A.  He was in Housing Unit 2.
17  Q.  How do you know that, from the --
18  A.  Because that's where he is assigned at
19  permanently.
20  Q.  Oh, so you're basing that on where Sgt.
21  Balderson is assigned?

30 (Pages 114 to 117)

Page 118

1    A.    Right.
2    Q.    That would be Housing Unit 2. How about
3  David Pettiford, what did you say about him?
4    A.    Him and, if I remember correctly, him and
5  his cell buddy, too, were interviewed that day.
6  Donnel Alonzo, I believe they were cell buddies that
7  day.
8    Q.    Are you basing that on your memory or on
9  these numbers written at the top?
10    A.    The numbers are written on there. They
11  were cell buddies, so they were arguing.
12    Q.    So that's the, do you recall whether you
13  received a written request for a cell change from
14  these two?
15    A.    That's January 4th is the day I went down,
16  that I had a chance to get in the unit, and that's
17  the day I did all of these interviews. I seen the
18  people that had written that they had problems.
19    Q.    So one of these, or both of these guys had
20  written?
21    A.    One or the other, yes.

Page 119

1    Q.    Probably not both, or it could have been
2  both?
3    A.    It could have been both.
4    Q.    All right. Then Clarence James is the
5  next one, and it looks like that was done by a Lt.
6  West?
7    A.    Yeah. He was on the 4 to 12 shift at that
8  time.
9    Q.    What does that mean at the top where it
10  says: 1-B, 29-A to 1-B, 1-A?
11    A.    1-B, 1-A is an ad seg cell.
12    Q.    Then the next is Carl Hammond and Elwood
13  Morris, follows that. It looks like they might have
14  been cellmates, as well?
15    A.    Right.
16    Q.    Based on the numbers at the top of the
17  page next to Cell Change Interview Record. Is that,
18  would you agree with that?
19    A.    Correct.
20    Q.    Do you recall which of these individuals
21  was the one who submitted a cell change request? I

Page 120

1  think that's it for the January 4, 2002. Do you know
2  why Mr. Queen's interview form is not in this group?
3    A.    Because it was given to Mike Miller.
4    Q.    At the same time or at some other time?
5    A.    Earlier.
6    Q.    I see. So it would have been pulled out
7  of this file and that's why it wouldn't have been in
8  the file at this point?
9    A.    Correct.
10    Q.    How about Mr. Barnes'?
11    A.    He has never been asked for, to my
12  knowledge. Or I give it to Mike Miller and he didn't
13  get it or what. I don't know. I can look. I can't
14  answer. I will have to look and see.
15    Q.    All right.
16          MR. PICKUS: Do you want to go off the
17  record for a second?
18          THE WITNESS: I would have to look over --
19          MR. CAIOLA: That's fine. No, we don't
20  need to go off the record. What number was that
21  exhibit?

Page 121

1          THE WITNESS: 19. No, 16. I should have
2  put my glasses on first.
3          BY MR. CAIOLA:
4    Q.    There is a, if you go to, I am not really
5  sure where this is, but it looks like --
6    A.    Lamont Dupree?
7    Q.    Lamont Dupree. It looks like it's
8  two-thirds of the way through Exhibit 16.
9    A.    What date was it?
10    Q.    I am not really sure. That's my question.
11  It looks like, it comes right after one that is
12  5-31-02 for Mark Dupree. Did you find Dupree?
13    A.    Yeah, Lamont Dupree.
14    Q.    What date is that next to your signature?
15    A.    Looks like, good question. Is that 5-31
16  or 8-31?
17    Q.    5-31-02?
18    A.    Either that or an 8. I would say it's
19  pretty terrible handwriting is what I would say.
20    Q.    There is a, I don't know if it helps you
21  to put it in the context of the ones that come before

31 (Pages 118 to 121)

c3032e16-1756-4a07-a1d0-432ad32faea2

Page 122

1   it and the ones that come after it, but certainly,
2   this is the order they came to us.
3      A.   Right.
4         MR. PICKUS:  Is there a pending question?
5         MR. CAIOLA:  I am asking if he can tell
6   what date that is.
7         THE WITNESS:  Not really.
8         MR. PICKUS:  That's on Lamont Dupree?  Is
9   that who you're referring to?
10        MR. CAIOLA:  Yes.
11        THE WITNESS:  Yes.  301057?
12        MR. CAIOLA:  Mark this as the next
13   exhibit, No. 17.  I only have two copies.
14        (Exhibit No. 17
15        marked for identification.)
16   BY MR. CAIOLA:
17      Q.   Have you had a chance to look at this?
18      A.   Yes, sir.
19      Q.   Now, what is this document?
20      A.   This is Darius Queen versus Department of
21   Public Safety and Correction Services.

Page 123

1      Q.   Is this a declaration you have previously
2   signed in this litigation?
3      A.   Yes.
4      Q.   Is that your signature on the third page?
5      A.   Yes.
6      Q.   Exhibit 1 to the Declaration, can you tell
7   us what that is?
8      A.   Request slip.
9      Q.   Do you recognize that document?
10      A.   Yes.  Recognize my signature on it, yes.
11      Q.   On the next page, the Cell Change
12   Interview Record, Exhibit 2.
13      A.   Yes, I see it.
14      Q.   Do you recognize this document?
15      A.   Yes.
16      Q.   Is that your signature on it?
17      A.   Yes.
18      Q.   Is that where it says "Refused to sign,
19   H.D. Ward," is that your writing?
20      A.   It's a D. Ward, I don't see a, it says
21   lieutenant, Lt. D. Ward.

Page 124

1      Q.   Oh, Lt. D. Ward.  Is that your writing,
2   the "Refused to sign, Lt. D. Ward"?
3      A.   Yes, sir.
4      Q.   Now, below, where Inmate Base File is
5   crossed out, it says "File Forward," slash, and then
6   the word "office" is written.  Is that your writing?
7      A.   It looks like it.
8      Q.   Do you know what that means or why you
9   wrote that?
10      A.   No, I don't remember even doing it.
11        MR. PICKUS:  Can I clarify?  Are you
12   referring to the cc?
13        MR. CAIOLA:  Yes.
14        MR. PICKUS:  That's the same cc on the
15   blank form.
16        MR. CAIOLA:  No, the, well, the Inmate
17   Base File pieces, I was talking about the slash,
18   "office."  Let me, I can restate the question.
19   BY MR. CAIOLA:
20      Q.   The part where it says "File Forward,
21   slash, office," is that your writing?

Page 125

1      A.   The "office," yes, sir.  But --
2      Q.   And I think you testified you don't
3   remember writing that, and you don't know why you
4   would have written that.
5         MR. PICKUS:  Did you answer that?  Did you
6   get an answer?
7         THE WITNESS:  Well, the line, what are you
8   talking about, the line through base file?  I think
9   it is through all the copies.
10        BY MR. CAIOLA:
11      Q.   I'm talking about the line before it, the
12   line below that.
13      A.   Yeah, this is my handwriting, so I put it
14   there.  I don't know --
15      Q.   Okay.  I don't have any further questions
16   on that document.
17        Your response to our Request for
18   Production of Documents, now, I don't know whether
19   this is in your attorney's words or your words, but
20   would you take a look?
21        And I am not going to mark this yet,

32 (Pages 122 to 125)

Page 126

1 because I don't have a fresh copy of it yet.
2     MR. PICKUS: Can I see that?
3     MR. CAIOLA: Yeah, you can have a look.
4     MR. PICKUS: Note for the record the
5 witness has not signed this document. --
6     MR. CAIOLA: I think I may have just said
7 that.
8     MR. PICKUS: Oh, I'm sorry.
9     BY MR. CAIOLA:
10    Q.   If you would just review Request 6 and
11 Response 6.
12    A.   What am I reading, 6?
13    Q.   Yeah.
14    A.   So what is the question? You want me to
15 read it?
16    Q.   Sure.
17    A.   All documents relating to the number of
18 written and oral cell change requests --
19    Q.   That's request.
20    A.   -- of cell change requests submitted
21 during last year through your knowledge.

Page 127

1      You're talking about the request slips
2 itself? You're talking about --
3     MR. PICKUS: I don't know what he is
4 talking about. Wait for a question.
5     BY MR. CAIOLA:
6    Q.   Right. The number of written or oral cell
7 change requests was what we asked.
8    A.   Right.
9    Q.   And your response was: "No such
10 document," indicating that, you say no such documents
11 exist. The only time a cell change request is
12 written is if it involves a safety issue. And these
13 documents are placed in individual inmate base files.
14    MR. PICKUS: I am going to object. This
15 is not signed by him. This is my response. He had
16 nothing to do with preparing this. I am going to
17 instruct him not to answer this question.
18    MR. CAIOLA: Okay.
19    MR. PICKUS: If you want ask him if any
20 such documents exist, I think that is fair game. But
21 I don't think it is fair to ask him questions about a

Page 128

1 document --
2     MR. CAIOLA: Well, I was just going to ask
3 him if this was information he supplied to you or
4 not. You answered that, I think.
5     MR. PICKUS: That is a fair question.
6     BY MR. CAIOLA:
7    Q.   Is this information about the cell change
8 requests being in the individual inmate base files,
9 is that information you supplied to your attorney, or
10 to Mr. Miller?
11    A.   We talking about actual request slips?
12 Are we talking about this form, or --
13    Q.   Well, our question was getting at, was
14 trying to get at the number of such requests, so it
15 really doesn't specify.
16    A.   There is no number, no. I don't know how
17 you would, the number of request slips that I get, if
18 that is what you're asking. If --
19    Q.   I think that, sorry. I'll let you finish.
20    A.   If you're asking about a number of these
21 that we receive, I don't know how you would get a

Page 129

1 number.
2    Q.   Then your response indicates that the
3 request, I believe that the request forms are located
4 in the base file. And my question is, is that
5 something that you told your attorney, that these
6 request forms are located in the base file? Or is
7 that something --
8    A.   Not the request form, no.
9    Q.   That's my only question. All right, I
10 would like to take a look at Exhibit 6, which is
11 Answers to Interrogatories, briefly. Now, I am
12 looking at Answer to Interrogatory No. 1, where you
13 list other individuals with knowledge of this
14 incident.
15    A.   Okay.
16    Q.   My question is whether you have discussed
17 this incident with those individuals?
18    A.   As in?
19    Q.   Well, I guess let's go through them
20 individually, one by one. Have you discussed this
21 incident with Mr. Miller?

33 (Pages 126 to 129)

c3032e16-1756-4a07-a1d0-432ad32faea2

Page 130

1    A.   On the handling of the case, not the
2    actual, it's according to what you're asking. He is
3    the liaison for the institution, so he has to be
4    aware of the case.
5        Q.   Do you believe he has relevant knowledge
6    that, about, you stated in particular the following
7    people have relevant knowledge. And then you list
8    Mr. Miller. And my question is, is there any basis
9    for your belief that he has relevant knowledge about
10   this case?
11       A.   What do you mean by relevant knowledge?
12       Q.   Personal knowledge. Was he at, do you
13   know whether he was at, was involved with any of the
14   original things that occurred in December and January
15   of '01 and '02?
16       A.   Except for handling the documents?
17       Q.   So you are talking about, he was involved
18   in the litigation recently?
19       A.   He is the coordinator here.
20       Q.   So, right. So do you know whether he has
21   independent knowledge of any of the incidents, is the

Page 131

1    question here.
2        A.   No, no.
3            MR. PICKUS: Let's take a break for a few
4    minutes.
5            MR. CAIOLA: Okay. Let's take a few
6    minutes and I can finish up. I'm not sure if you
7    want me to hold up or continue on.
8            Okay, let's take five, then.
9            (Recess)
10           MR. CAIOLA: Just note for the record that
11   Mr. Queen is out of the room for the moment, and I
12   understand that he will be back momentarily and has
13   indicated that we can go forward without him here.
14           BY MR. CAIOLA:
15       Q.   Sgt. Sandra Thomas, I believe you
16   testified previously that she witnessed the interview
17   with Mr. Queen?
18       A.   Right.
19       Q.   This Answer to Interrogatory indicates
20   only that she witnessed the execution of the cell
21   change interview record. Does this refresh your

Page 132

1    recollection as to whether Sgt. Thomas was there for
2    the interview?
3        A.   Where are you at now?
4        Q.   Same answer. Answer to Interrogatory
5    No. 1. I am down at Sgt. Thomas. We have left
6    Mr. Miller.
7        A.   Right. Well, I think this is --
8            MR. PICKUS: The record should reflect
9    Mr. Queen is back.
10           THE WITNESS: You know, before, she was
11   there for part of it. I think this is, I am not
12   supposed to give opinions.
13           BY MR. CAIOLA:
14       Q.   What's that?
15       A.   I said, she was there for part of it.
16       Q.   Do you recall specifically, as we sit here
17   today, whether she was there for the interview or
18   just for the execution of the --
19       A.   She was there for part of the whole thing.
20       Q.   Okay.
21       A.   If my recollection serves.

Page 133

1        Q.   Next is Officer Kenneth Pedersen. Have
2    you had any conversations with Mr. Pedersen about
3    this case?
4        A.   No.
5        Q.   Is Pedersen spelled correctly there?
6        A.   That's the way we spell it. I am not
7    positive that's how he spells it.
8        Q.   I am sorry. Returning to Sgt. Thomas,
9    have you had any discussions with her about this
10   case?
11       A.   No.
12       Q.   Officer Edward Sholfort?
13       A.   That is not spelled correctly.
14       Q.   How do you pronounce that name?
15       A.   Schaufert, and I think it's spelled with
16   an E. S-C-H-A-U-F-E-R-T, I think.
17       Q.   Have you had any discussions with Officer
18   Schaufert about this incident?
19       A.   No.
20       Q.   About this case? Lt. Jean Howell. Any
21   conversations with Mr. Howell?

34 (Pages 130 to 133)

Page 134

1  A.  That's a she.
2  Q.  Ms. Howell, Lt. Howell?
3  A.  No.
4  Q.  Next, Hearing Officer Sandstrum?
5  A.  No.
6  Q.  Any conversations with the hearing
7  officer?
8  A.  No.
9  Q.  Have you had conversations with
10  Sgt. Gregory Ward about this case?
11  A.  No.
12  Q.  With Tanya Sample?
13  A.  No.
14  Q.  Have you had conversations with
15  Captain George Chester?
16  A.  Clear up conversations, because he knows I
17  am here today for this litigation here.
18  Q.  You have discussed the fact that you're
19  being deposed.  Have you discussed the underlying
20  facts of the case with him?
21  A.  No.

Page 135

1  Q.  Have you discussed the case with
2  Major Robert Hankey?
3  A.  No.
4  Q.  Have I pronounced that name correctly?
5  A.  That's correct.
6  Q.  Have you discussed the case with
7  Lt. Anthony Fonti?
8  A.  No.
9  Q.  Are there any other colleagues of yours
10  here at ECI, that are not listed, who you have
11  discussed the case with?
12  A.  Not facts of the case, no.
13  Q.  I have one more document for you.
14      (Exhibit No. 18
15      marked for identification.)
16  Can you tell me what this document is?
17  A.  Offender Traffic History.
18  Q.  What does that mean?
19  A.  It is where he has been housed at since
20  his time in the Division of Correction.
21  Q.  Now, what this is, this, turning to the

Page 136

1  dates in question here, December '01, what does this
2  document reflect?
3  A.  Where you at now?
4  Q.  December '01.
5  A.  I don't see a December '01.
6  Q.  I believe you go to Page 2, down, about
7  three-quarters down the page.  The dates are in
8  reverse order, so the 6th, the 5th line up from the
9  bottom is December 3rd, '01.
10  A.  I see December 3rd, '01, yes.
11  Q.  And then going up page from there, it
12  reflects where he was housed during the period in
13  question here.
14  A.  Correct.
15  Q.  On December 3rd, '01, would you please
16  tell me where Mr. Queen was housed?
17  A.  Housing Unit 5.
18  Q.  Tier C?
19  A.  17 A.
20  Q.  It looks like, before that, where was he
21  before?

Page 137

1  A.  The reception center, Baltimore.
2  Q.  In Baltimore?  So he was then assigned to
3  ECI and arrived at ECI on December 3rd, is that what
4  this reflects?
5  A.  That's what it looks like to me.
6  Q.  Then he was at Housing Unit 5, Tier C, for
7  just, at least in cell 17-A for one day, and then he
8  moved to 27-A?
9  A.  Correct.
10  Q.  Do you know why he would have been moved
11  after one day?  Is this typical?
12  A.  Housing Unit 5 is an orientation tier.
13  Q.  Okay.  So he is in an orientation tier for
14  one day, and then he stays in a different cell for
15  one more day in the orientation tier.  Is that right?
16  A.  That's what it appears.  It is on this
17  compound.  I don't know how they work their, I know
18  they come in for orientation, and then they're seen,
19  then they jockey them around according to bed space,
20  and then they disburse them out through the
21  institution.

35 (Pages 134 to 137)

Page 138

1   Q.   Then he moved to Tier B?
2   A.   Yes.
3   Q.   In Housing Unit --
4   A.   2.
5   Q.   2?
6   A.   Yes.
7   Q.   Where he stayed for about 18 days?
8   A.   Correct.
9   Q.   Then on the 23rd of December, it appears
10  that he moved into Housing Unit 1, into Cell 38?
11  A.   That's correct.
12  Q.   Is it typical that inmates would be moved
13  after a short stay of about a few weeks?
14  A.   Not usually. Unless he was, speculation,
15  I couldn't tell you why he was moved from Tier 1.
16  Q.   In any event, Mr. Queen arrived in Housing
17  Unit 1, where this incident took place?
18  A.   Correct.
19  Q.   On the 23rd of December?
20  A.   Correct.
21  Q.   And five days later he submitted the cell

Page 139

1   change request?
2   A.   Correct.
3   Q.   Your recollection?
4   A.   So his slip says. If I can find that
5   again. Where's that at? That's what the request
6   slip states, according to the inmate.
7   Q.   Your testimony is that you recall
8   Mr. Queen telling you that he wanted to move in with
9   a buddy in a different cell?
10  A.   Correct.
11  Q.   Does this document refresh your
12  recollection in that regard in any way?
13  A.   Why would this document reflect, other
14  than where he was housed? This is a housing
15  document.
16  Q.   In view of the fact that he was only on
17  that unit for a few days at the time he submitted the
18  request, does that refresh your recollection as to
19  whether he had a buddy in Cell 45?
20  A.   It doesn't. It could have been a buddy
21  from up town.

Page 140

1   Q.   Do you know, is there any way of finding
2   out who was in Cell 45 at that time?
3   A.   Nope, I have no way to determine.
4   Q.   Is there any way that I could determine?
5   I know we have made some efforts to.
6   A.   I don't think so.
7   Q.   Do you happen to remember who was in Cell
8   45 at that time?
9   A.   No, I don't.
10  Q.   Do you happen to remember whether there
11  was even an opening in Cell 45?
12  A.   I don't remember.
13  MR. CAIOLA: If I could have one minute
14  off the record to consult with my client, I may be
15  done.
16  (Recess)
17  BY MR. CAIOLA:
18  Q.   Lt. Ward, I just have a few more
19  questions. You have testified that when you get a
20  written cell change request form, that if the form
21  indicates a threat, you will interview the inmate?

Page 141

1   A.   Correct.
2   Q.   If you were to fail to interview an
3   inmate, there would be a possibility that that inmate
4   would get assaulted?
5   A.   You answered your own question.
6   Q.   Is that right?
7   A.   We have the, no, I wouldn't say.
8   Q.   Isn't that why you interview them, because
9   you want to avoid them getting assaulted by their
10  cellmate?
11  A.   Not necessarily assaulted. You're saying
12  that everybody is going to fight, not necessarily
13  assaulted. You're assuming there's a fight.
14  Q.   If some inmate believes that they are
15  threatened, and they submit a written request to you
16  that they're in danger, you have testified that you
17  would go the same day and interview them, because --
18  A.   Right. If they said that they were in
19  danger.
20  Q.   And the reason you do that, I think you
21  have testified, is that you want to protect the

36 (Pages 138 to 141)

Page 142

1  inmate, protect their safety?
2      A.  Right.
3      Q.  So my question to you is, if you just
4  decided, Forget it, I am not conducting interviews
5  anymore, that would increase the risk to the inmate
6  who has been threatened, wouldn't it?
7      A.  Yes.
8      Q.  And you recognize that, and that's why, in
9  fact, you do conduct the interviews as soon as you
10  get these written requests?
11      A.  Yes.
12          MR. CAIOLA:  I have no further questions.
13          EXAMINATION BY COUNSEL FOR DEFENDANT
14          BY MR. PICKUS:
15      Q.  I just have one question, just to be
16  clear.  Housing Unit 1, Cell 38, is where he was when
17  this occurred?
18      A.  Yes, that's according to that sheet.
19      Q.  And you kept saying he wanted to move into
20  Cell 45?
21      A.  Correct.

Page 143

1      Q.  Just so we're clear, is that Housing Unit
2  1, Cell 45?
3      A.  Correct.  Same tier.  You want a
4  clarification on where they would be at in
5  conjunction with each other?
6      Q.  No.  I don't need it.
7          MR. PICKUS:  Unless you do?
8          MR. CAIOLA:  Why don't you tell us.
9          MR. PICKUS:  Go ahead.
10          EXAMINATION BY COUNSEL FOR PLAINTIFF
11          BY MR. CAIOLA:
12      Q.  Where is 38 in Housing Unit 1, Tier C, as
13  compared to 45?
14      A.  It's 25 through 38, this is 39 through 48.
15  So it would be, you're talking --
16      Q.  How many feet?  How far is that?
17      A.  Well, if he --
18      Q.  Could those two, could an inmate in 38 and
19  an inmate in 45 converse?
20      A.  Absolutely.
21      Q.  Would they have to scream to converse?

Page 144

1      A.  No.
2      Q.  Is it 30 feet from the bars on the one
3  cell to the bars on the other?
4      A.  We have doors.
5      Q.  Doors?  So it's a solid wall with a door?
6      A.  They have openings.  That's what they talk
7  through.
8      Q.  So they wouldn't be able to see each
9  other?
10      A.  It's a possibility through the windows.  I
11  can't answer that entirely.
12      Q.  Where are the windows located?
13      A.  In the doors.
14      Q.  I see, so you couldn't, but for the hole,
15  you wouldn't be able to hear someone, but they can
16  talk through the hole and they can see through the
17  window?  Is that the way it works?
18      A.  Right.  Plus 38 would have to walk by Cell
19  45 every day, so --
20      Q.  Can you estimate how far the holes, the
21  hole in Cell 38 is from the hole on 45?

Page 145

1      A.  No, I have no idea.
2          MR. CAIOLA:  Okay.  I have nothing
3  further.
4          MR. PICKUS:  I have nothing further.
5
6          (Whereupon, the deposition was concluded.)
7
8
9
10          _____
11          Lt. H. D. Ward
12
13
14
15
16
17
18
19
20
21

37 (Pages 142 to 145)

c3032e16-1756-4a07-a1d0-432ad32faea2

                                                    Page 146

1
2                  INDEX
3       Deposition of Lt. H. D. WARD
4             August 19, 2004
5
6    Examination by:                Page
7    Mr. Caiola ........................................ 2
8    Mr. Pickus ..................................... 141
9    Mr. Caiola ..................................... 142
10
11
12   Exhibit No.                    Marked
13   Exhibit No. 1 ................................... 11
14   Exhibit No. 2 ................................... 16
15   Exhibit No. 3 ................................... 18
16   Exhibit No. 4 ................................... 24
17   Exhibit No. 4-remarked .......................... 28
18   Exhibit No. 5 ................................... 30
19   Exhibit No. 6 ................................... 34
20   Exhibit No. 7 ................................... 51
21   Exhibit No. 8 ................................... 59

                                                    Page 147

1    Exhibit No. 9 ................................... 61
2    Exhibit Nos. 10, 11, & 12 ....................... 63
3    Exhibit No. 13 .................................. 70
4    Exhibit No. 14 .................................. 77
5    Exhibit No. 15 .................................. 85
6    Exhibit No. 16 ................................. 110
7    Exhibit No. 17 ................................. 121
8    Exhibit No. 18 ................................. 134
9
10
11
12
13
14
15
16
17
18
19
20
21

                                                    Page 148

1    STATE OF MARYLAND
2    COUNTY OF DORCHESTER, SS:
3        I, Connie E. Bennett, a Notary Public of
4    the State of Maryland, County of Dorchester, do
5    hereby certify that the within named witness
6    personally appeared before me at the time and place
7    herein set out, and after having been duly sworn by
8    me according to law, was examined by counsel.
9        I further certify that the examination was
10   recorded stenographically by me and this transcript
11   is a true record of the proceedings.
12       I further certify that I am not of counsel
13   to any of the parties, nor in any way interested in
14   the outcome of this action.
15       As Witness, my hand and notarial seal this
16   19th day of August, 2004.
17                ----------------------
18              Connie E. Bennett,
19                 Notary Public
20   My Commission Expires:
21   October 1, 2007

GORE REPORTING COMPANY
410-269-0308