IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **DARIUS F. QUEEN, #305-181** | * |
| **Plaintiff** | * |
| v. | *   Civil Action No. 1:02-cv-03885-WDQ |
| **H. D. WARD** | * |
| **Defendant** | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

Plaintiff, Darius F. Queen, through his undersigned counsel, pursuant to an Order of this Court dated June 13, 2005, hereby submits the following proposed findings of fact and conclusions of law:

**FINDINGS OF FACT**

After being convicted of burglary in Prince George's County, Maryland, in November 2001, Mr. Queen was sentenced to serve time at the Eastern Correctional Institution ("ECI") on Maryland's Eastern Shore. See Trial Transcript ("Trans.") at 11, attached hereto as **Exhibit 1**. When Mr. Queen arrived at ECI, he was initially housed in Housing Unit #5. Id. at 12. He resided there for approximately three weeks, at which time he was transferred to Housing Unit #2. Id. at 12-13. Approximately three weeks later, on December 23, 2001, Mr. Queen was transferred to Housing Unit #1 and was assigned to share cell C38 with inmate Kevin Barnes ("Barnes"). Id. at 13-14. Mr. Queen did not know Barnes prior to that time. Id. at 14.

Immediately upon Mr. Queen's transfer to cell C38, Barnes began threatening him. Id. at 14. Even before Mr. Queen entered the cell, Barnes acted in a hostile manner towards Mr. Queen, demanding that Mr. Queen take his shoes off before entering the cell. Id. at 14-15. Mr. Queen informed Correctional Officer Kenneth Pederson and Sergeant Sandra Thomas of Barnes's confrontational behavior. Id. at 15. In response, Sgt. Thomas told Mr. Queen that he would be placed on administrative segregation and given a citation for refusing housing if he did not enter the cell with Barnes. Id. at 15-16. Because Mr. Queen did not want to receive a citation for refusing housing or be placed on administrative segregation, he entered the cell. Id. at 16.

Following Mr. Queen's initial confrontation with Barnes, Barnes continued to be hostile towards him and made it clear that he did not want Mr. Queen living in the same cell. Id. at 16. After a few days of sharing the same cell, Barnes began threatening Mr. Queen. Id. at 17. Specifically, Barnes threatened, on a consistent basis, that if Mr. Queen did not "move out" of the cell, that there would be "trouble." Id. On many occasions, Mr. Queen told Off. Pederson that Barnes was threatening him. Id. at 18. Fearing that Barnes would act on his threats, Mr. Queen also asked Off. Pederson to transfer him to another cell. See Id. In response, Off. Pederson told Mr. Queen to submit a written request to Lt. Ward if he wished to be transferred to another cell. Id.

On December 28, 2001, five days after Mr. Queen first moved into cell C38 with Barnes, Mr. Queen submitted a cell change request form to Lt. Ward, describing the threats posed by Barnes:

> I am in [cell] 38 and would like to move to [cell] 45 because me and my celly are not getting along from the time I moved in. He has told me that there will be trouble unless I move out.

Plaintiff's Trial Exhibit ("Exhibit") 14; Trans. at 18-19.

Mr. Queen requested cell 45 because a fellow inmate, Ellis Hickman, informed Mr. Queen that there was an open bed in that cell. Trans. at 19. Contrary to Lt. Ward's assertions, Mr. Queen did not request to be transferred to cell 45 so that he could share a cell with a friend. Id. In fact, at the time he submitted his cell change request, Mr. Queen did not even know the inmate who resided in cell 45. Id. at 20. Moreover, as Mr. Queen testified, he was not concerned with which cell he was moved to as long as he was transferred out of the cell with Barnes. Id. at 21.

The day after Mr. Queen submitted his written request to transfer cells, Lt. Ward denied the request without ever conducting an interview of Mr. Queen or Barnes. Id. at 22-23. Lt. Ward simply wrote "NO!" on Mr. Queen's request form and returned the form back to Mr. Queen on December 29, 2001. Id. at 23; Exhibit 14.

Thereafter, acting on his threats, on January 12, 2002, Barnes, along with two other inmates, attacked and seriously injured Mr. Queen. Trans. at 25. Barnes approached Mr. Queen from the side and struck him in the head with a metal object believed to be a padlock, while Mr. Queen was playing cards in the recreation room. Id. The other two inmates each struck Mr. Queen in the head and jaw. Id. at 25-26.

Following the assault, Mr. Queen sought to exit the recreation room. Id. at 26. Bleeding from the head, he walked down the stairs and approached Off. Pederson, who

was on the other side of a locked door.  Id. at 26-27.  Mr. Queen told Off. Pederson that he fell in the shower.  Id. at 27.  At that time, Mr. Queen did not want to inform Off. Pederson that he had been attacked since Mr. Queen was still locked in the recreation room with his attackers.  Id.  Off. Pederson responded by saying, "no, I know what happened. It's between you and your celly, ain't it?"  Id.  When Off. Pederson let Mr. Queen out of the recreation room, Mr. Queen confirmed that Barnes and the other two inmates assaulted him.  Id. at 28.  Off. Pederson then escorted Mr. Queen to the medical facilities.  Id.  Following the assault, Barnes was found guilty of violating ECI Rule 102 (Assault) at his adjustment hearing on January 16, 2002.  See Exhibit 7.

As a result of the assault, Mr. Queen suffered several facial lacerations and a fractured jaw.  In order to treat Mr. Queen's fracture, his jaw was wired shut for nearly two months. [1]  Trans. at 28-29; see also Exhibit 11.

After being assaulted by Barnes, Mr. Queen filed this § 1983 claim against Lt. Ward alleging that Lt. Ward failed to protect Mr. Queen in the face of a known danger. In his defense, Lt. Ward asserts that he interviewed Mr. Queen after Mr. Queen submitted his request to transfer cells; and that Mr. Queen told Lt. Ward that he was not being threatened by Barnes and that he only wanted to transfer cells so that he could share a cell with a friend.  Id. at 130-132.  To support this contention, Lt. Ward relies upon the

---

[1]  Following his initial admission to the medical facilities, after Barnes's vicious assault on January 12, 2002, Mr. Queen was discharged without being diagnosed with a fractured jaw. Thereafter, Mr. Queen was forced to repeatedly request medical attention to address the persistent pain around his jaw and ear.  See Exhibit 10 (several sick-call requests submitted by Mr. Queen).  Mr. Queen was finally diagnosed with a fractured jaw on February 2, 2002, more than three weeks after the assault.

trial testimony of Sgt. Thomas[2] and an interview form which purports to indicate that Lt. Ward interviewed Mr. Queen on January 4, 2002 (one week prior to the assault). When viewed objectively, however, the evidence demonstrates that no such interview ever took place; and that Lt. Ward falsified the interview form after the fact to cover up his non-action and make it appear as if he interviewed Mr. Queen.

Mr. Queen has presented ample evidence to support his contention that no interview took place. First, Mr. Queen testified not only that Lt. Ward did not interview him on January 4, but that he never even met Lt. Ward until after Barnes assaulted him. Id. at 30.

Second, Lt. Ward admitted during cross examination that generally when he provides an inmate with a written response denying a cell change request, that there would be no need to interview that inmate. Id. at 147. In this case, it is undisputed that Lt. Ward denied Mr. Queen's request in writing. Lt. Ward admits that he wrote "No!" on Mr. Queen's request slip, but says that he did so during the interview with Mr. Queen, although he cannot seem to recall the sequence of events. Initially, Lt. Ward claimed that he wrote "No!" on the slip before he conducted the interview with Mr. Queen. See id. at 134. However, during cross-examination, Lt. Ward changed his story and testified that he wrote on the request form "[a]fter the interview." Id. at 155-156. Still later, Lt. Ward

---

[2] Although Sgt. Thomas testified at trial that she was present for the entire interview that allegedly took place between Lt. Ward and Mr. Queen on January 4, 2002, during her pre-trial deposition in this case, Sgt. Thomas testified that she was not present when the Defendant asked Mr. Queen whether he had ever been threatened. See Deposition Trans. of Sgt. Thomas at 46, attached hereto as **Exhibit 2**. When asked about this prior testimony during the trial, Sgt. Thomas testified that she didn't recall her deposition testimony. This impeachment evidence, coupled with Sgt. Thomas's close relationship with Lt. Ward and her position as his inferior officer, discounts the credibility of her testimony. See Trans. at 92-93.

reverted back to his direct testimony and agreed that he wrote on the request slip before the interview with Mr. Queen. Id. at 156. Either way, Lt. Ward's contention that he both interviewed Mr. Queen and denied his request in writing, makes no sense. There would be no reason for Lt. Ward to deny Mr. Queen's request in writing if he had already denied it orally while conducting an interview with Mr. Queen. Likewise, Lt. Ward, by his own admission, would have no reason to conduct an interview with Mr. Queen if he had already denied the request in writing.[3]

Third, the fraudulent interview form itself, which was never signed by Mr. Queen, evidences Lt. Ward's cover-up. See Exhibit 2. The phrase "Inmate Basefile" is crossed out on the bottom of the form allegedly used to conduct the interview of Mr. Queen on January 4, 2002. Id. Interestingly, none of the other 129 other interview forms used by ECI guards to conduct interviews from July 2001 through July 2004 (including 7 other forms from January 4, 2002) had the phrase "Inmate Basefile" crossed out at the bottom. See Exhibit 4. However, as testified to by both Lt. Ward and Sgt. Thomas, the current interview form used at ECI has "Inmate Basefile" crossed out at the bottom. Trans. at 94-95; 142. This evidence establishes that Lt. Ward fabricated the interview form sometime after the form was changed to have the cross-out at the bottom of the page –

---

[3] The simple fact that Mr. Queen had possession of the denied request slip further supports Mr. Queen's contention that Lt. Ward returned the denied request slip to him on December 29, 2002, the day after it was submitted. Lt. Ward claims that he never returned the written denial back to Mr. Queen. Trans. at 149-150. However, when confronted with how Mr. Queen obtained a copy of the denied request slip if, as Lt. Ward claims, he never returned the request slip to him, Lt. Ward could only guess: "At the time the inmate clerk had access to the things sitting on the desk in the office." Id. at 150. However, there is no evidence that a clerk delivered the request slip back to Mr. Queen after the alleged interview took place.

which we know was sometime after Mr. Queen was assaulted by Barnes (and most likely after this litigation ensued).

Lt. Ward fabricated the interview form to make it appear as if he interviewed Mr. Queen prior to the assault by Barnes.[4]  Unfortunately for Lt. Ward, he falsified a form that wasn't even used at the prison during the time frame that he alleges the interview took place.  When confronted with this evidence, Lt. Ward could only respond, "It's whatever I ended up with. Just one of the odd ball in the—I have no idea. Maybe I crossed it out. Maybe I didn't." Trans. at 162-163.  He later stated, "It just happened to be that way. I can't give you any explanation for that." Id. at 163.

Finally, to believe Lt. Ward's version of the facts, one would have to believe that Mr. Queen submitted a written cell change request based on Barnes' threats of trouble, but when asked by Lt. Ward whether he had ever been threatened, Mr. Queen responded "no, I just want to move in with a friend."  Common sense dictates, and Mr. Queen's testimony confirms, that this did not happen; and that Lt. Ward's story is a fabrication concocted to insulate himself from liability in this case.

## CONCLUSIONS OF LAW

The Eighth Amendment's prohibition against "cruel and unusual punishment" imposes upon correctional officers the obligation to protect inmates from harm by other

---

[4]  In addition to the above evidence, Lt. Ward had motive to fabricate the interview form. By his own admission, had Lt. Ward not conducted an investigation after viewing Mr. Queen's cell change request slip, it would have reflected negatively on his job performance. Trans. at 144.  Additionally, had Lt. Ward not interviewed Mr. Queen after receiving the request, he knew that Mr. Queen's safety could be put at risk. Id. at 142-144.

inmates.  See Farmer v. Brennan, 511 U.S. 825, 832-33 (1994).  As the Supreme Court has stated:

> '[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment.'

Helling v. McKinney, 509 U.S. 25, 32 (1993) (quoting DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989)) (internal quotation marks omitted) (emphasis added).  To establish a prima facie case of failure to protect under the Eighth Amendment, a plaintiff must show that: (1) the harm he suffered was objectively, sufficiently serious; and (2) the defendant acted with "deliberate indifference" to plaintiff's safety.  See Farmer, 511 U.S. at 832-33; Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir. 1991).

Here, Mr. Queen's injuries, including his several facial lacerations and fractured jaw, were sufficiently serious to meet the first prong of the Farmer test.  In addition, Lt. Ward acted with deliberate indifference to Mr. Queen's safety when he flatly denied Mr. Queen's request to transfer to a safer cell in the face of Barnes's direct threats.  Lt. Ward was further deliberately indifferent when he failed to even interview Mr. Queen to ascertain the risk of leaving Mr. Queen in close confines with an openly hostile and threatening cellmate.

**A.   Mr. Queen's Facial Lacerations and Broken Jaw Were Sufficiently Serious Injuries Under <u>Farmer</u>**

In a failure to protect claim, a prisoner must first show that the harm he suffered was objectively serious. <u>Farmer</u>, 511 U.S. at 834; <u>Brice v. Virginia Beach Corr. Ctr.</u>, 58 F.3d 101, 104 (4th Cir. 1995). The Fourth Circuit has previously found broken bones to be sufficiently serious to satisfy the first <u>Farmer</u> prong. <u>See</u>, <u>e.g.</u>, <u>Loe v. Armistead</u>, 582 F.2d 1291, 1296 (4th Cir. 1978). More specifically, in <u>Brice</u>, the Fourth Circuit held that an inmate's broken jaw was sufficiently serious to meet the objective component of the <u>Farmer</u> test. 58 F.3d at 104.

Like the plaintiff in <u>Brice</u>, Mr. Queen's medical records indicate that as a result of the blunt trauma to his face, he suffered a fractured jaw. <u>See</u> Exhibit 11A (Physician's Order - 2/11/05). The evidence is also clear that Mr. Queen's injuries caused him significant pain and discomfort. <u>See</u> Exhibit 10. As a result of the fracture to Mr. Queen's face, his jaw was wired shut for nearly two months. <u>See</u> Exhibit 11A. Mr. Queen's fractured jaw, facial lacerations and severe pain—exacerbated by long-delayed medical treatment—were sufficiently serious to meet the objective inquiry required under <u>Farmer</u>. <u>See</u> <u>Brice</u>, 58 F.3d at 104; <u>see also</u> <u>Farmer</u>, 511 U.S. at 832-33.

**B.   Lt. Ward Acted With Deliberate Indifference When He Refused to Transfer Mr. Queen to a Safe Cell After Becoming Aware that Barnes Posed a Serious Threat**

In addition to proving that the harm suffered was sufficiently serious, Mr. Queen must also prove that Lt. Ward acted with "deliberate indifference" to his safety. <u>See</u> <u>Farmer</u>, 511 U.S. at 832-33. In <u>Farmer</u>, the Supreme Court defined "deliberate

indifference" in the context of a failure to protect claim to mean that the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  511 U.S. at 837.  The Farmer court equated "deliberate indifference" to subjective recklessness.  Id. at 839-40.  Under the Farmer test, a "claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  Id. at 842.

### 1.  Lt. Ward Was Subjectively Aware of the Substantial Risk to Mr. Queen's Safety

As Mr. Queen's testimony indicates, it is clear that ECI guards were made aware that Barnes posed a serious threat to Mr. Queen.  Indeed, upon Barnes's initial antagonistic demand that Mr. Queen remove his shoes, Mr. Queen immediately notified Off. Pederson and Sgt. Thomas.  Trans. at 15.  Later, faced with Barnes's consistent threats that if Mr. Queen did not "move out" of the cell there would be "trouble," Mr. Queen responsibly alerted prison authorities to such threats on several occasions.  Id. at 18.

In addition, it is undisputed that Mr. Queen submitted to Lt. Ward a written request to transfer out of the cell with Barnes, citing Barnes's continued threats of "trouble" as the basis for his request.  Although Lt. Ward attempts to scrub all negative connotations from the word  "trouble" in order to argue that prison authorities were not made aware of any threat to Mr. Queen's well-being, he fails in this endeavor.  Trans. at

128.  As this Court duly noted, "A reasonable person would presumably understand that trouble is something that has some negative significance…trouble is most likely a threat, is it not?"  Id. at 75-76.  Because Mr. Queen specifically referenced Barnes's threat on his cell change request form, and because Lt. Ward by his own admission reviewed said form, Lt. Ward clearly had knowledge that Mr. Queen's safety was at risk.  See Farmer, 511 U.S. at 842 ("fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

Along with Barnes's frequent threats of "trouble," Barnes's violent prison history should have put Lt. Ward on notice that the risk of harm to Mr. Queen was serious.  On at least two occasions prior to his assault upon Mr. Queen (and additional occasions since), Barnes assaulted other inmates at ECI.  See Exhibit 9.  Thus, it is quite reasonable to infer that Lt. Ward knew that if Barnes was threatening Mr. Queen with "trouble," that there was a substantial risk to Mr. Queen's safety.  However, despite knowledge of Barnes's threats to Mr. Queen's safety and Barnes's history of violent behavior at ECI, Lt. Ward nonetheless deliberately and summarily rejected Mr. Queen's cell change request with a hastily scrawled  "No!" and neglected to even conduct an interview of Mr. Queen.  See Exhibit 14; Trans. at 22-23.

Lt. Ward offers two additional attempts to deny awareness that Mr. Queen was in danger.  While creative, Lt. Ward's claim that Mr. Queen requested a cell transfer in order to be housed with a friend is unconvincing.  As Mr. Queen's testimony indicates, and as the cell change request spells out, Mr. Queen simply wanted to be removed from the dangerous environment of his cell. Trans. at 21; Exhibit 14.  Moreover, Lt. Ward's

argument that he was not aware that Mr. Queen's safety was at risk because Mr. Queen did not request to be transferred off the tier is absurd. Barnes's hostility towards Mr. Queen was clearly tied to his presence in the cell, as evidenced by the numerous references to Mr. Queen moving out. As such, it was completely reasonable for Mr. Queen to believe that he would no longer be in danger as long as he was simply moved out of that particular cell. Trans. at 30.

Finally, despite Lt. Ward's assertion that there was no inference drawn that Mr. Queen was in danger, he acknowledges reviewing Mr. Queen's request form that described Barnes's threat. Lt. Ward also admits that it is important to interview inmates who request a cell change based on a threat immediately, otherwise, as Lt. Ward is aware, there would be a heightened risk to that inmate's safety. Trans. at 142-144. Thus, Lt. Ward's argument—that he never drew the necessary inference to the risk posed to Mr. Queen—rings hollow.

### 2. Lt. Ward Disregarded the Excessive Risk to Mr. Queen's Safety When He Summarily Rejected Mr. Queen's Request to Transfer to a Safer Cell

In addition to being subjectively aware of the excessive risk to Mr. Queen's safety, Lt. Ward also disregarded the risk when he failed to transfer Mr. Queen to another cell or to at least interview Mr. Queen.

Despite the fact that Mr. Queen expressed in his cell change request form that he and Barnes were not getting along and that Barnes threatened his safety, Lt. Ward took absolutely no action. Instead, he simply left Mr. Queen in the cell with a hostile and violent cellmate with full knowledge of the likely outcome. Such inaction constitutes

deliberate indifference under <u>Farmer</u>, as it demonstrates Lt. Ward's utter failure to take action to protect Mr. Queen in the face of an "excessive risk" to Mr. Queen's safety. <u>See</u> <u>Farmer</u>, 511 U.S. at 837.

Moreover, Lt. Ward's failure to even conduct an interview with Mr. Queen further evidences his blatant disregard for Mr. Queen's safety. Lt. Ward himself admitted that failing to interview an inmate who had been threatened by his cellmate increases the risk of harm to that inmate. Trans. at 142-144.

Furthermore, Lt. Ward's egregious decision to falsify a cell change interview form further evidences his understanding that he <u>should have</u> interviewed Mr. Queen, and that his failure to do so placed Mr. Queen in "substantial risk of serious harm." <u>See</u> <u>Farmer</u>, 511 U.S. at 837. Such conduct clearly constitutes subjective recklessness or "deliberate indifference" under <u>Farmer</u>. <u>Id</u>.

## **CONCLUSION**

Based on the evidence presented, it is clear that Mr. Queen has satisfied both the objective and the subjective components of a failure to protect claim under <u>Farmer</u>. His fractured jaw, facial lacerations and accompanying pain and suffering clearly constitute sufficiently serious harm. Furthermore, the evidence shows that Lt. Ward was deliberately indifferent as defined by <u>Farmer</u>. Lt. Ward was made aware that Mr. Queen faced an excessive risk to his safety through Mr. Queen's cell change request slip and Barnes's violent prison history. Nevertheless, Lt. Ward egregiously disregarded the excessive risk to Mr. Queen's safety when he refused Mr. Queen's cell transfer request

without even interviewing Mr. Queen. Finally, Lt. Ward's fabrication of the interview form evidences his subjective understanding of the safety risk to Mr. Queen.

WHEREFORE, Plaintiff respectfully requests that this Court find the Defendant liable to Mr. Queen as a result of his non-action in the face of a known danger, and award Mr. Queen damages in an amount to be determined by the Court.

Respectfully submitted,

_____/s/_____ Kevin P. Sullivan_____
Paul S. Caiola
Kevin P. Sullivan
Gallagher Evelius & Jones LLC
218 N. Charles Street, Suite 400
Baltimore, Maryland 21201
(410) 727-7702

*Attorneys for Plaintiff Darius F. Queen, #305-181*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of July, 2005, a copy of the foregoing Findings of Fact and Conclusions of Law was electronically sent to:

Phillip M. Pickus, Esq.
Office of the Attorney General
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202

_____/s/_____
Kevin P. Sullivan