1
2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

3    DARIUS QUEEN,                    Civil No. WDQ-02-3885

4          Plaintiff

5                                     Baltimore, Maryland

6          v.                        June 13, 2005

7    LIEUTENANT DENNIS WARD,    9:30 a.m.

8          Defendant.

9    -------------------------------------------------------/

10                    TRANSCRIPT OF TRIAL
     BEFORE THE HONORABLE WILLIAM D. QUARLES
11        UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13       For the Plaintiff:    Gallagher Evelius and Jones LLP
                               By:  KEVIN P. SULLIVAN, ESQUIRE
14                             218 N. Charles Street
                               Suite 400
15                             Baltimore, Maryland 21201

16

17       For the Defendant:    Office of the Attorney General
                               By:   PHILIP M. PICKUS, ESQUIRE
18                             200 Saint Paul Place
                               19th Floor
19                             Baltimore, Maryland 21202

20

21       Court Reporter        Lisa K. Bankins RMR
                               101 West Lombard Street
22                             Room 5012
                               Baltimore, Maryland 21201

23

24   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.

25

EXHIBIT
1
tabbies®

1      Q.    -- for intake?

2      A.    Yeah.  First, I went to MRDCC and then from there, I

3  went to ECI.

4      Q.    Do you recall how long you spent at MRDCC?

5      A.    Approximately 30 days.

6      Q.    While you were there, did you have any problems with

7  other inmates?

8      A.    No.

9      Q.    Any of the guards?

10     A.    No.

11     Q.    And from there, you went to ECI?

12     A.    Yes.

13     Q.    Do you recall when that was?

14     A.    Roughly around November.

15     Q.    November of what year, sir?

16     A.    2001.

17     Q.    And you are at ECI from November of 2001 through when

18  you moved to Jessup?

19     A.    Right.

20     Q.    And when were you transferred to Jessup Pre-release

21  Unit?

22     A.    January of 2005.

23     Q.    Other than the circumstances that we're here for today,

24  have you ever had any problems with any inmates while at ECI?

25     A.    No.

1    Q.    With any guards while at ECI?

2    A.    No.

3    Q.    How about since you've been at Jessup?

4    A.    No.

5    Q.    No problems with any inmates or guards?

6    A.    No.

7    Q.    When you were first sent to ECI in November of 2001,

8    Mr. Queen, do you remember where you were housed?

9    A.    I was housed in the intake I believe Housing Unit 5.

10   Q.    And that was really an orientation type --

11   A.    Orientation.

12   Q.    -- housing unit?

13   A.    Yes.

14   Q.    Do you know how many different units there are at ECI?

15   A.    Seven.  I believe seven.  Seven or eight.

16   Q.    Seven or eight?

17   A.    Right.

18   Q.    And there's different tiers on each housing unit.  Is

19   that right?

20   A.    That's correct.  Yes.

21   Q.    So do you recall how long you were in Housing Unit 5

22   for when you first got to ECI?

23   A.    Approximately 30 days.

24   Q.    And when you left there, do you recall which housing

25   unit you were sent to live in?

1    A.    From 5, I was transferred to Housing Unit 2.

2    Q.    And do you recall how long you were there for?

3    A.    About three weeks, two weeks.

4    Q.    Couple of weeks?

5    A.    Couple of weeks.

6    Q.    And then you were transferred to Housing Unit 1. Is

7    that correct?

8    A.    That's correct.

9    Q.    Not because of any problems you were having in Housing

10   Unit 2?

11   A.    No. Not no problems I was having.

12   Q.    You weren't being punished for anything?

13   A.    No.

14         MR. PICKUS:  I'm going to object to the form of the

15   question, Your Honor.

16         THE COURT:  Okay. Overruled.

17   Q.    Do you recall what day you were transferred to Housing

18   Unit Number 1?

19   A.    I believe it would have been around December the 22nd,

20   3rd, somewhere around there of 2001.

21   Q.    And do you recall which cell you were sent to live in?

22   A.    What, in Housing Unit 1?

23   Q.    In Housing Unit 1. Yes.

24   A.    C-38 I believe.

25   Q.    So you were transferred from Housing Unit 2 to Cell

1    C-38 in Housing Unit 1?

2    A.    Right.

3    Q.    Was there an inmate already living in Cell 38 in

4    Housing Unit 1 when you were transferred there?

5    A.    Yes, it was.

6    Q.    And who was that?

7    A.    Kevin Burns -- Barnes.

8    Q.    Kevin Barnes?

9    A.    Yes, sir.

10    Q.    Did you know Mr. Barnes before you were assigned to

11    share a cell with him?

12    A.    No.

13    Q.    You never met him before?

14    A.    No.

15    Q.    Can you tell the Court what happened on December 23rd

16    when you first attempted to move into the cell with Mr. Barnes?

17    A.    When I took my belongings up to the cell, attempted to

18    move in, he said you can't come in the room with your shoes on.

19    Q.    Mr. Barnes gave you a hard time about coming into the

20    cell with your shoes on?

21    A.    Right.

22    Q.    Are there any rules at ECI that require you to take

23    your shoes off before you enter the cell?

24    A.    No.

25    Q.    Was Mr. Barnes acting hostile towards you on that first

14

1    day?

2        A.    Yes.

3        Q.    What did you do when he told you you couldn't enter the

4    cell with your shoes on?

5        A.    I went to the officer that was in charge and told him

6    about the situation.  I let him know that it was going to be,

7    you know, I ain't going to be go in the cell because the guy

8    said I can't come in with my shoes on.  So I let him know the

9    situation.

10       Q.    And do you recall the name of that officer?

11       A.    Officer Pedersen.  Pedersen.

12       Q.    And what did Officer Pedersen say to you if anything?

13       A.    He said he was going to call the sergeant and she came

14   and talked to me.  He was going to call the sergeant, inform

15   her about what was going on.

16       Q.    And then did you tell the sergeant or did you advise

17   the sergeant of the situation?

18       A.    The sergeant, she then walked me back down to the cell

19   and asked what the problem was.  I said that the guy said he

20   don't want me in the cell with my shoes on and she said well,

21   either you going to go in the cell or you going to have to go

22   to Housing Unit 4.

23       Q.    What is Housing Unit 4?

24       A.    It's lockdown.  It's a, you know, lockdown unit.

25       Q.    Would any other adverse action been taken against you

1    if you didn't go into the cell?

2        A.    I would have been given a ticket for refusing housing.

3        Q.    So your options were to go into the cell or to be put

4    in lockdown and get a ticket for refusing housing?

5        A.    Right.

6        Q.    And what did you choose to do at that point?

7        A.    I went in the cell.

8        Q.    Because you didn't want to start any trouble?

9        A.    Right.

10        Q.    Why did you choose to go into the cell instead of going

11    into lockdown?

12        A.    I didn't want to go, receive a ticket for being

13    punished, you know, go to lockdown for no reason, being

14    punished.  So I ain't need the trouble.  I didn't need a

15    ticket.  So I went in the cell.

16            THE COURT:  Did you take your shoes off?

17            THE WITNESS:  No.

18        Q.    After you moved into Cell 38 on December 23rd, how did

19    Mr. Barnes act towards you from that day going forward?

20        A.    From that day going forward, it was just -- it wasn't

21    really no kind of talking or communicating.  It was just, you

22    know, that I could basically tell that he didn't want me there.

23    It would be little comments, little statements being made.

24        Q.    What did he say that made you think that he didn't want

25    you there?

1    A.    When he told me that it was going to be some trouble if

2    I didn't move out the cell.

3    THE COURT:  Mr. Queen, had you ever met Mr. Barnes

4    before?

5    THE WITNESS:  No.  Not until that day.

6    THE COURT:  Okay.

7    Q.    When did Mr. Barnes first tell you that there was going

8    to be trouble if you didn't move out of the cell?

9    A.    Maybe a day or two after I moved in.  A couple of days

10   after.

11   Q.    And did he say this on just one occasion in passing or

12   was it a continued threat?

13   A.    It was on a few occasions.

14   Q.    Did you ever tell anybody at ECI about what Barnes said

15   to you?

16   A.    I told Officer Pedersen about the situation.  He was

17   already aware of it.

18   Q.    He was already aware of it because of the first day --

19   A.    Right.

20   Q.    -- the problems that you had?  And then you told him

21   after that about what Barnes had said to you?

22   A.    Right.  Yes.

23   Q.    About how there would be trouble if you didn't move out

24   of the cell?

25   A.    Yes.

1    Q.    What did you take that to mean when Barnes said there

2    will be trouble if you don't move out of the cell?

3    A.    I took it to mean that something would, something would

4    happen.  That to watch myself.  To, you know, be careful.

5    Q.    Watch your back?

6    A.    Right.

7    Q.    You took it as a threat?

8    A.    Yes.

9    Q.    How many times did you tell Officer Pedersen about

10    Barnes threatening you?

11    A.    Oh, a few occasions.  More than, more than three times

12    or so.

13    Q.    And do you recall what Officer Pedersen's response was?

14    A.    He told me if I wanted to move, the only way that I

15    could move out was to write to the lieutenant, Lieutenant Ward.

16    Q.    He told you to write to Lieutenant Ward asking for a

17    cell change?

18    A.    Right.  On a request slip.

19    Q.    And did you in fact do that?

20    A.    Yes.

21    MR. SULLIVAN:  Your Honor, may I approach the witness?

22    THE COURT:  Yes, you may.

23    Q.    Mr. Queen, I'm showing you what's been admitted into

24    evidence as Plaintiff's Exhibit 14.  Do you recognize that

25    document, sir?

1    A.    Yes.

2    Q.    Is this the request slip that you submitted to

3    Lieutenant Ward asking for a cell change?

4    A.    Yes.

5    Q.    And in this request slip, you tell the lieutenant that

6    you would like to transfer from Cell 38 to Cell 45 because you

7    and Mr. Barnes were not getting along from the time you moved

8    in and that Barnes told you that there would be trouble if you

9    do not move out.  Correct?

10    A.    Yes, sir.

11    Q.    First, Mr. Queen, why did you specifically request Cell

12    45 in this request form?

13    A.    Because of a guy I was going to church with, he was

14    familiar with the cells and people I guess already.  So he

15    advised me that it was a cell open and that's the number he

16    told me.

17    Q.    So you put Cell 45 in this request slip because someone

18    had told you that there was an open bed in Cell 45?

19    A.    Right.  Exactly.

20    Q.    Was that another inmate at ECI?

21    A.    Yes.

22    Q.    Do you recall that inmate's name?

23    A.    Mr. Hickman.  Hickman.

24    Q.    And how did you know Mr. Hickman?

25    A.    Through church.

1    Q.    You went to church with him?

2    A.    Yes, sir.

3    Q.    Were you friends with him outside of church?

4    A.    Yeah.  I mean back in the unit, right, we would watch

5    television or talk.  I met him when I moved over there.

6    Q.    Was there a friend of yours that was housed in Cell 45

7    at the time?

8    A.    No.  I didn't know who was in there.

9    Q.    You didn't know who was in there at all?

10   A.    No, sir.

11   Q.    So you didn't request to move to Cell 45 so you could

12   live with a friend, did you?

13         MR. PICKUS:  I'm going to object --

14         THE COURT:  Sustained.  Sustained.  We don't really

15   need the testimony from you, Mr. Sullivan.

16         MR. SULLIVAN:  Thank you.

17   Q.    Did you tell Mr. Hickman at the time about Barnes

18   threatening you?

19   A.    Yes.  He was aware of it, too.

20   Q.    And did he give you any advice?

21   A.    He the one that gave me the advice to move --

22         MR. PICKUS:  Objection.  Hearsay.

23   A.    -- to move in the cell --

24         THE COURT:  Overruled.  He advised me to move in the

25   cell.  That's just conduct.  I'm sorry.  What else did you say?

20

1          THE WITNESS:  In that particular cell --

2          THE COURT:  Okay.  Keep your voice up, please.  You're

3    trailing off at the end of your --

4          THE WITNESS:  No.  I only said because it was a cell

5    available.

6          THE COURT:  Okay.

7     Q.    Mr. Queen, did you care one way or the other which cell

8    you were transferred to?

9     A.    No.

10    Q.    Where is Cell 45 in relation to where you were in Cell

11   38?

12    A.    My cell is at, would have been at one end of the hall

13   and it would have been at the top part of the hall, somewhere

14   around in that area.

15    Q.    It would have been in the same tier?

16    A.    Yes.  Yes.

17    Q.    So you still would have had to eat and recreate with

18   Mr. Barnes even if you were transferred?

19    A.    Yes.  Yes.

20    Q.    If you were threatened by Mr. Barnes, why wouldn't you

21   ask for a transfer to a whole different housing unit or a

22   different tier?

23    A.    Because that wasn't the issue.  The issue was about me

24   being in that cell.  It was that he wanted me out of his cell

25   like it belonged to him.  It was his cell.  That was the whole

1    issue.

2         Q.    The only threat that you received from Mr. Barnes

3    related to the two of you sharing a cell together?

4         A.    Right.

5              MR. PICKUS:  Objection.

6              THE COURT:  Sustained.

7         Q.    When did you submit this request slip to Lieutenant

8    Ward?

9         A.    Around December the 28th or so.

10        Q.    If you'd look at the request slip?

11        A.    Yeah.  December the 28th.

12        Q.    At that point you were living in the cell with Barnes

13   for five days?

14        A.    Right.  I moved in the 23rd.  Right.  About five days.

15        Q.    How did you get this request slip to Lieutenant Ward?

16        A.    I believe I gave it to the clerk.  The clerk or he

17   would have sent it to the lieutenant office or something.

18        Q.    And you gave it to the clerk to hand to the lieutenant

19   or put it on his desk?

20        A.    Yes, sir.

21        Q.    Why did you do that?

22        A.    That's the way I was told to do it.  Officer Pedersen

23   in the evening, he said give it to the clerk or someone and

24   they'll place it in his office.

25        Q.    Did there come a time when you received this request

1    slip back?

2        A.    Yes.

3        Q.    And when was that?

4        A.    The 29th. The next day.

5        Q.    Was there anything written on the request slip when you

6    received it back that was not on it when you submitted it?

7        A.    It was no.

8        Q.    Are you referring to the handwriting on the bottom half

9    of the request slip that says no with an exclamation point and

10   circled?

11       A.    Exactly.

12       Q.    That's not your handwriting?

13       A.    No.

14       Q.    You received that back the next day?

15       A.    Yes. Yes, sir. Yes, sir.

16       Q.    And what did you take that to mean?

17       A.    Took it to mean that, no, I couldn't move. That's it.

18   I went to the lieutenant like I was informed to. So he was the

19   housing unit supervisor. So it meant no.

20       Q.    Before receiving this request slip back the next day,

21   had you ever spoken to Lieutenant Ward?

22       A.    No.

23       Q.    Do you know if Lieutenant Ward ever spoke with

24   Mr. Barnes before he received this request slip back?

25       A.    Not to my knowledge. No.

1    January 12, 2002.  Can you tell the Court what happened on that

2    day?

3         A.     January 12th, I came in -- I went out the rec out in

4    the yard and came back in, sat in the rec hall playing

5    Pinochle, playing cards, me and like three other guys and the

6    next thing I know, I got struck to the side of my face with a

7    object.

8         Q.     Do you know who hit you in the face?

9         A.     Yes.

10        Q.     Who was it?

11        A.     Kevin Barnes.

12        Q.     And did he hit you, did he come at you from the front,

13    from the back?

14        A.     Right on the side.

15        Q.     He came at you from the side?

16        A.     I didn't see him come up, but I saw him standing there

17    after he hit me.

18        Q.     And do you know what he hit you with?

19        A.     After I realized, it was a padlock or something.

20        Q.     And what else happened during the altercation?

21        A.     I got up to go towards him and then another guy hit me

22    in the face.

23        Q.     And anything else?

24        A.     Then I slip and fell, got up to walk away and that's

25    when another guy struck me.

1    Q.    So you got hit in the face a total of three times?

2    A.    Yes.

3    Q.    Once by Mr. Barnes with the padlock --

4    A.    Right.

5    Q.    -- and by two other inmates?

6    A.    Yes.

7    Q.    Were those inmates to your knowledge friends with

8    Mr. Barnes?

9    A.    I would assume. Yeah.

10    Q.    You didn't throw any punches during the altercation,

11    did you?

12    A.    No.

13    Q.    Did anyone intervene on your behalf?

14    A.    No.

15    Q.    What happened immediately after you were assaulted by

16    Mr. Barnes and his friends?

17    A.    I walked down the stairs to get out of the recreation

18    area. I went to the shower to wipe my face off. And then

19    after I wiped my face and stuff off, I went to the grill and

20    called Officer Pedersen over and asked him to let me out the

21    unit, out of the rec part and he said what's the problem? He

22    started questioning me while I was still there in the unit.

23    Q.    So you were still locked in the recreation area --

24    A.    I was still locked. Right.

25    Q.    -- with the inmates that had just assaulted you?

26

1    A.    Right.

2    Q.    And Officer Pedersen was outside the bars?

3    A.    Yeah.  He outside the bars started questioning me.  So

4    I said -- I got a little frustrated, I said man, just let me

5    out, you know, I fell or something and then he said no, I know

6    what happened.  It's between you and your cell buddy, ain't it?

7    And I said yeah.  And then he finally hit the door and let me

8    out.

9    Q.    Were you bleeding at the time?

10    A.    Yes.

11    Q.    In the face?

12    A.    Yes.

13    Q.    And why did you first tell Officer Pedersen that you

14    had fallen in the shower?

15    A.    Because I was being questioned in front of everybody,

16    basically in front of the other inmates and stuff and he made

17    me I'm telling on the guys right in front of other people.  So

18    that's pretty much the reason why.

19    Q.    You didn't want to snitch the inmates out?

20    MR. PICKUS:  Objection.  Form.

21    THE COURT:  Sustained.  Again, Mr. Sullivan, you're the

22    lawyer.  He's the witness.  You ask the questions.  He does the

23    testifying.  It also makes it move much quicker if you don't

24    add to the testimony.  Do you understand?

25    MR. SULLIVAN:  Yes, Your Honor.

1          THE COURT:  Thank you.  You'll have argument later.

2   You can explain to me what these things mean through your

3   argument later.  You don't have to augment it during your

4   examination.

5          MR. SULLIVAN:  Thank you, Your Honor.

6      Q.    Mr. Queen, you didn't fall in the shower, did you?

7      A.    No, sir.

8      Q.    What happened after Officer Pedersen let you out of the

9   rec room?

10     A.    He escorted me up to my cell, told me to change my

11  shirt and stuff and walked me up to medical.

12     Q.    Was your shirt, did you have blood on your shirt?

13     A.    Yes, sir.

14     Q.    What happened when you first went to the medical

15  facilities?

16     A.    When I first went there, they wiped the cuts and stuff

17  down and told, I explained to them that something was wrong

18  with my jaw.  I couldn't bite down or chew and it feel like

19  something was wrong with it and they said they put me down for

20  an x-ray.

21     Q.    And did they diagnose you with a broken jaw?

22     A.    Eventually.  Not right then and there.

23     Q.    So the first time you went to the medical facilities,

24  did they diagnose you with a broken jaw?

25     A.    The first time I went, they said it was nothing wrong

1  with my jaw.

2      Q.    And what happened next?

3      A.    Then I waited, kept writing complaints telling them

4  that I can't eat or I know something wrong with my jaw because

5  I got a big lump under it and I can't chew and they took

6  another x-ray and determined --

7          THE COURT:  Are the medical claims still in the case,

8  Mr. Sullivan?

9          MR. SULLIVAN:  They're not, Your Honor.

10         THE COURT:  Perhaps we can move on.

11     Q.    How was your broken jaw treated?

12     A.    It was wired up.

13     Q.    How long was it wired shut for?

14     A.    Like two months.  Approximately two months or so.

15     Q.    Mr. Queen, did you suffer any other injuries as a

16  result of the attack from Mr. Barnes?

17     A.    I had some kind of lump on my shoulder.  Just the cuts

18  around my mouth and my jaw.

19     Q.    Do you know whether Mr. Barnes was punished as a result

20  of the attack?

21     A.    Yes.

22     Q.    Was there an infraction hearing held?

23     A.    Yes.

24     Q.    And what was the decision made by the hearing officer?

25     A.    Guilty.

1       Q.    Do you think that Mr. Barnes would have assaulted you

2   even if you were transferred out of the cell?

3                   MR. PICKUS:  Objection.

4                   THE COURT:  Overruled.

5       A.    No.

6       Q.    Mr. Queen, between the time that you submitted the

7   request slip, what you have in front of you as Plaintiff's

8   Exhibit 14 and the time you were assaulted on January 12th, did

9   Lieutenant Ward ever come to talk to you about Mr. Barnes'

10  threats?

11      A.    No.

12      Q.    Have you ever even met Lieutenant Ward prior to your

13  being assaulted by Kevin Barnes on January 12th?

14      A.    Not until the adjustment hearing.  The adjustment

15  hearing was the first day I ever met or saw Lieutenant Ward.

16      Q.    To your knowledge, did Lieutenant Ward ever speak to

17  Kevin Barnes prior to him assaulting you on January 12th?

18      A.    No.

19      Q.    If Lieutenant Ward had come to you and asked whether

20  you had ever been threatened by Kevin Barnes, what would you

21  have said?

22                  MR. PICKUS:  Objection.  Speculation.

23                  THE COURT:  Overruled.

24      A.    Yes.

25                  MR. SULLIVAN:  May I approach, Your Honor?

1      THE COURT:  Well, he I assume understood that didn't

2    mean that Mr. Barnes was going to throw him a surprise party.

3      MR. PICKUS:  Well, Your Honor, trouble could mean --

4      THE COURT:  Probably not a good thing, Mr. Pickus,

5    isn't it, if someone says there's going to be trouble?

6      MR. PICKUS:  Right.  But, Your Honor, we're dealing --

7      THE COURT:  A reasonable person would presumably

8    understand that trouble is something that has some negative

9    significance.

10      MR. PICKUS:  Negative.  But not necessarily a threat of

11    harm or a threat of safety.  And that coupled with the fact

12    that in the same request form --

13      THE COURT:  But there might be some form of good

14    trouble heading his way?

15      MR. PICKUS:  Trouble could mean I don't want to watch

16    the same T.V. with you or it could mean you have to take your

17    shoes off.

18      THE COURT:  Viewed in the light most favorable to the

19    plaintiff, which I believe is the position I take at this point

20    in the trial, it's a threat, isn't it?

21      MR. PICKUS:  I beg your pardon?

22      THE COURT:  Viewed in the light most favorable to the

23    plaintiff, which I believe is the light that I have to use at

24    this stage in the trial --

25      MR. PICKUS:  Yes, sir.

75

1        THE COURT:  -- trouble is most likely a threat, is it

2    not?

3        MR. PICKUS:  Well, I'm certainly --

4        THE COURT:  In the light most favorable to the

5    plaintiff.

6        MR. PICKUS:  Trouble could possibly mean something bad

7    happening to the plaintiff.  But I think when you --

8        THE COURT:  Some nonthreat bad thing.

9        MR. PICKUS:  There are nonthreat bad things.  Yes, sir.

10   But I think the important thing is it's not just the word

11   "trouble".  He says in the same form that he wants to go to

12   Cell 45 on the same tier.  So a reasonable correctional officer

13   looking at that, actually seeing a threat spelled out and the

14   fact that he wants to remain on the same tier would not believe

15   that there was an actual risk of harm.  The standard in the

16   Fourth Circuit --

17       THE COURT:  That certainly is a reasonable

18   interpretation.  However, it's not the one that I'm required to

19   take at this point, is it?

20       MR. PICKUS:  No, sir.  I submit on the motion.

21       THE COURT:  No.  You were going to tell me about the

22   Fourth Circuit.

23       MR. PICKUS:  Well --

24       THE COURT:  I'm always delighted to hear about them.

25       MR. PICKUS:  As you know, the Fourth Circuit's standard

1       A.      Yes, sir.

2       Q.      Could you please turn to Tab 4 in that notebook in

3    front of you, sergeant?  I'm showing you what's been admitted

4    into evidence as Plaintiff's Exhibit 4.  Is this the form that

5    you currently use?

6       A.      Yes, sir.

7       Q.      Do you see, sergeant, at the bottom of that form,

8    inmate base file has a slash through it?

9       A.      Yes, sir.

10      Q.      Do you see that?

11      A.      Yes sir.

12      Q.      Do you know when that slash was put through that

13   phrase?

14      A.      No, sir.  No, sir, I don't.

15      Q.      But the form that's currently in use is this one with

16   the inmate base file slash through it?

17              THE COURT:  You're talking about Plaintiff's 1 --

18              MR. SULLIVAN:  I'm sorry, Your Honor.

19              THE COURT:  -- as opposed to Plaintiff's 4?

20              MR. SULLIVAN:  Plaintiffs 4.

21              THE COURT:  Well, there's no slash on the one I'm

22   looking at, Plaintiff's 4.  Brian Chamberlain form?

23              MR. SULLIVAN:  Plaintiff's 4, Your Honor, should be

24   just a blank interview form.

25              THE COURT:  I have my Plaintiff's 4 is a stack of

1    interview records and my quick glance shows that none of them

2    has inmate base file line through.

3           MR. SULLIVAN:  Your Honor, what is your -- I'm sorry.

4    Plaintiff's 3 should have been -- there could have been a

5    switch.  Plaintiff's 3 should have been the stack of inmates --

6           THE COURT:  Plaintiff's 3 is also a stack of cell

7    change interview records.

8           MR. SULLIVAN:  May I provide the Court with my

9    Plaintiff's 4?

10          THE COURT:  Yes, you may.

11          MR. SULLIVAN:  I apologize, Your Honor.

12          THE COURT:  Thank you.

13          MR. SULLIVAN:  The witness does have the document that

14   I just submitted to the Court, the empty form with base file

15   struck through it.

16          THE COURT:  Okay.

17     Q.    And I believe the pending question, sergeant, was

18   whether this is the form that is currently in use at ECI?

19     A.    Yes, sir.

20     Q.    And you testified that you are authorized to conduct

21   these types of interviews?

22     A.    Yes, sir.

23     Q.    And if you are conducting one of these interviews and

24   an inmate tells you that he fears for his safety or he's been

25   threatened, you would transfer that inmate out of the cell.

1    that stack of requests?

2        A.    The requests that are placed on my desk are not

3    problems -- if any time they were directed even verbally to one

4    of the officers, they would have immediately been removed from

5    the situation.

6        Q.    Are you looking at Plaintiff's 14 right now?

7        A.    Yes, sir.

8        Q.    Could you read what Mr. Queen wrote on that request

9    real fast, please?  Not out loud.  Just to yourself.

10       A.    Yes, sir.

11       Q.    What does the language of that request mean to you?

12       A.    It just means he was having trouble according to the

13   request.  It doesn't mean that he was having threatening

14   problems.  Just means he was having cell buddy troubles.

15       Q.    What does trouble mean to you?

16       A.    It could be anything.  Having trouble with one snoring.

17   One guy's working a different shift than another guy.  One guy

18   doesn't like to go out into the rec hall and give the other guy

19   some privacy in the cell.  It was any numerous reasons that

20   they could be causing trouble.  It doesn't mean it's

21   threatening trouble.  It just means there's trouble as far as

22   the two of them in the cell.

23       Q.    Does the fact that Mr. Queen requested that he move to

24   Cell 45 on the same tier have any significance to you?

25       A.    Yes, sir.  If it was having serious problems, you

128

1    A.    Well, I had been off and there would have been some

2    problems in the unit and I was trying to talk to some of the

3    inmates.  If you're in the lieutenant's office and you call

4    guys in to talk to them, a lot of time automatically they think

5    if you're talking to the lieutenant, you're telling.  So you

6    can use the request slips and different things as a tool to get

7    to talk to guys without leading to any suspicion that they're

8    telling or giving you any information.

9    Q.    So did you actually interview Mr. Queen that day?

10    A.    Yes, sir.

11    Q.    Do you recall where in the --

12    A.    Right next to the C Tier slider.  It was the clerk, the

13    lieutenant and his clerk's office.  As soon as you walk through

14    the door, my desk, then you had another desk, a coffee pot.

15    Q.    How many people had you interviewed prior to seeing

16    Mr. Queen if you recall?

17    A.    I'm not positive.

18    Q.    Was Mr. Queen first or last?

19    A.    No.

20    Q.    Who was present for the interview?

21    A.    If my memory serves me, when I start with Mr. Queen, I

22    called for Sergeant Thomas on the telephone in the control

23    center because like I said, I had been off for a while and I

24    needed her insight on some things that were going on in the

25    housing unit and I was trying to get some information from her

1    so I called for her to come down.

2    Q.    Did she come in while Mr. Queen was there?

3    A.    She come in right after Mr. Queen come in the office.

4    Q.    And was she present for the interview?

5    A.    Yes.

6    Q.    Was anyone else present other than you, Sergeant Thomas

7    and Mr. Queen?

8    A.    No, sir.

9    Q.    Was this a private conference?

10    A.    Yes, sir.

11    Q.    Could you please tell His Honor about what took place

12    during the interview?

13    A.    Yes.  When I was talking to Mr. Queen about his cell

14    moving, he related to me that he wanted to move in with a

15    friend that slept in 45 and as we continued to talk, he got a

16    little bit loud and verbal and I told him no, he wasn't going

17    to get the cell moved.  He didn't meet the criterior.  So

18    Mr. Queen continued to get loud.  So I did the cell change

19    interview form on him.  Then he refused to sign the interview.

20    Sergeant Thomas was there.  It's a standard operating procedure

21    there, if somebody refuses to sign, just have two officers, two

22    personnel to do it.  It doesn't always get done because it's

23    not always somebody available.  But for the most part, it does

24    get done.  Two people will sign it.

25    Q.    Why didn't you grant Mr. Queen's cell change request?

131

1    A.    He didn't have no grounds for a move.  He had only been

2    in the unit a couple of weeks and he wanted to move in with a

3    friend and so therefore, I didn't deem it necessary to move at

4    the time.

5    Q.    Did you read the three questions on the form to

6    Mr. Queen?

7    A.    Yes, sir.

8    Q.    And what were his responses --

9    A.    No to all questions.

10    Q.    Did he say anything else that gave you the impression

11    that he was in fear for his safety?

12    A.    No, sir.

13    Q.    What was your overall impression after talking to

14    Mr. Queen about whether or not he was in fear for safety?

15    A.    He didn't give me no inkling that he was in fear for

16    his safety or anything.  If he had, he would have been removed

17    from the unit immediately.

18    Q.    And what was Mr. Queen's response when you denied the

19    cell change request?

20    A.    He was agitated.

21    Q.    Did you ask him to sign the form?

22    A.    Yes.

23    Q.    And what was his response?

24    A.    He wasn't going to sign it.

25    Q.    Who signed the form?

1    and go down to Housing Unit 4.

2         Q.    Could you take a look at Plaintiff's 14 again?

3         A.    Yes, sir.

4         Q.    The writing under Mr. Queen's writing says no and it

5    looks like a signature?

6         A.    Yes, sir.

7         Q.    Do you know who wrote that?

8         A.    Yes, sir, I did.

9         Q.    Is that your signature?

10        A.    Yes, sir.

11        Q.    What did you do with that form?

12        A.    Left it on my desk.

13        Q.    Was it ever sent to Mr. Queen?

14        A.    No.

15        Q.    Do you know how Mr. Queen obtained the form?

16        A.    No.

17        Q.    If you had the cell change request form, why did you

18    also do this form?

19        A.    This form?  Mr. Queen was pretty adamant about moving

20    in with a friend.  He at no time said he was being threatened

21    or he was in fear for his life.  He never even give any reasons

22    on why.  He would just wanted to move in with a friend.  And as

23    I tried to explain to him he didn't meet the criterior, he even

24    got agitated.  So I wrote no on the form.  I stuck it on my

25    desk and then as he got louder, then I just went ahead and did

134

1      Q.     So whether it's you or someone under your control, once

2   you hear that an inmate is being threatened, you would have

3   someone take care of that immediately?

4      A.     Correct.

5      Q.     And sit down with that inmate and discuss the

6   situation.  Correct?

7      A.     Correct.

8      Q.     And if that inmate said at any point that he was in

9   danger or if he was threatened or was in fear, you would handle

10   it right away.  Correct?

11      A.     Correct.

12      Q.     When you sit down with the inmate, you typically use

13   what we've been calling the cell change interview form?

14      A.     Correct.

15      Q.     Which if you refer to Plaintiff's Exhibit 4 in the

16   book, is that the form that you use?

17      A.     Yes.

18      Q.     And that's the form that you use today when you

19   interview inmates?

20      A.     Yes.

21      Q.     And if when you're conducting the cell change

22   interview, an inmate tells you that he's been threatened,

23   you're going to remove him immediately.  Correct?

24      A.     Correct.

25      Q.     If you did not remove an inmate after he complained

1  that he was being threatened, would that inmate's safety be at

2  risk?

3      A.    It's a possibility.  Yes.

4      Q.    And you recognize that and that's why you would move

5  him immediately.  Correct?

6      A.    Correct.

7      Q.    So as not to put the inmate at risk?

8      A.    Right.

9      Q.    Obviously, if you never conducted an interview, you

10  could never tell the severity of the threat.  Is that true?

11      A.    If it's a threat made, yes.

12      Q.    Someone says I'm being threatened and then you never

13  conduct an interview, you'll never know the severity of that

14  threat.  Correct?

15      A.    If somebody says they have been threatened, you might

16  not have -- you might not do the interview.  You might ad seg

17  them immediately and do the interview within 120 hours.

18      Q.    So when someone says they're being threatened, you

19  really have one or two choices.  You would either interview

20  them to determine the severity of the threat.  Correct?

21      A.    Correct.

22      Q.    Or you would just remove them immediately.

23      A.    Correct.

24      Q.    So if you didn't do either of those things, if you did

25  not remove the inmate that said he was being threatened

1    immediately or you did not interview him to determine the

2    severity of the threat, would you agree that that inmate's

3    safety would be at risk?

4        A.    It's a possibility.  Yes.

5        Q.    Now if you did not properly investigate a threat to an

6    inmate in a timely, legal and thorough manner, would that

7    reflect poorly on your job performance?

8        A.    Could you repeat the question?

9        Q.    If you did not properly investigate a threat to an

10   inmate in a timely, legal or thorough manner, would that

11   reflect poorly on your job performance?

12       A.    Yes.

13       Q.    You're evaluated at least in part, aren't you, about

14   how thorough and quickly you investigate threats?

15       A.    We have a MS-22.  It's an evaluation form that's used

16   by our, which is our housing detail.

17       Q.    And one of the questions on there, one of the

18   evaluation sections is whether or not you conduct these

19   investigations --

20       A.    I have no idea what exactly the questions are.  They

21   fill it out.  I don't.

22       Q.    When an inmate complains to you that his cell mate is

23   threatening him, it's your general practice to interview both

24   subjects.  Correct?

25       A.    Not always.

144

1    A.    Correct.

2    Q.    Now as you testified, sometimes you receive written

3    requests to transfer cells and you don't interview those

4    inmates.  Correct?

5    A.    Correct.

6    Q.    And in those situations, you simply write no on the

7    request slip and give it back to the inmate?

8    A.    Sometimes I write on there not eligible for 60 days,

9    whatever and just hand them back to the inmate.

10    Q.    Okay.  So you write something on the request form in

11    some way denying their request and then you just hand it back

12    to the inmate?

13    A.    Correct.

14    Q.    And in those situations, there would be no need to

15    interview the inmate.  Correct?

16    A.    Correct.

17    Q.    Because you already know that you're going to deny the

18    request.  And that's how you handle certain requests?

19    A.    Excuse me?

20    Q.    That's how you handle requests that you define as

21    not-safety like?

22    A.    It's a solid time factor.  Yes.

23    Q.    And in the instances where you do decide to conduct the

24    cell change interview, you normally have no need to write on

25    the inmate's request slip anymore.  Correct?

1    A.    That's when I first saw the slip.  Yes.

2    Q.    You don't actually have a specific recollection of

3    receiving the slip on January 4th, do you?

4    A.    No, sir.  That's the day I was handling slips in my

5    unit and that's the day I interviewed Mr. Queen.

6    Q.    You don't remember first -- you don't have any

7    recollection of picking up this slip on January 4th, do you?

8    A.    It was in my office.

9    Q.    You're only basing that answer on the fact that's the

10   day you interviewed Mr. Queen?

11   A.    That's the day I did the interviews, January 4th.  That

12   would have been the day.  I would have no other knowledge of

13   Mr. Queen even being in the housing unit if it hadn't been for

14   this request slip.

15   Q.    Okay.  So my question is the only basis for your answer

16   that you received this request slip on January 4th is the only

17   basis of that answer is the fact that you interviewed Mr. Queen

18   on that date?

19   A.    I never knew Mr. Queen was in the unit.

20   Q.    Now you heard Mr. Queen testify that he received a copy

21   of the request slip back from you the next day with no with an

22   exclamation point written on it.  Correct?  You heard his

23   testimony?

24   A.    That's what he said.  Yes, sir.

25   Q.    And it's your testimony that you never gave this slip

1    back to Mr. Queen?

2        A.    That's correct.

3        Q.    How do you think he got it?

4        A.    At the time, it's changed now.  At the time the inmate

5    clerk had access to the things sitting on the desk in the

6    office.

7        Q.    Is it possible that the inmate clerk returned this slip

8    to Mr. Queen?

9        A.    It's a possibility.

10       Q.    Is it possible that the inmate clerk returned this slip

11   to Mr. Queen the day after he submitted it on December 29th?

12       A.    If he did, he'd had to forge my name and that's my

13   signature.

14       Q.    So you were working on December 29th, weren't you?

15       A.    I come in.  Yes, sir.

16       Q.    And that was the day after Mr. Queen submitted this

17   request slip?

18       A.    That's when he alleges he submitted this slip.  I

19   worked three hours on the 29th according to my time sheet.

20   Yes, sir.

21       Q.    Okay.  And the date on this request slip is the 28th?

22       A.    Yes.  But it's not stamped anywhere.  So he didn't send

23   it through the mail.  So there's no way of knowing when it was

24   actually dated.

25       Q.    Okay.  Now if the clerk delivered this request form to

1    better T.V. reception, does it?

2        A.    No.

3        Q.    Okay.  It doesn't say that he wants to move cells

4    because the weather is better on the other side of the housing

5    unit, does it?

6        A.    No.

7        Q.    It's a safety issue, isn't it?

8        A.    No.

9        Q.    That's not a safety issue?

10       A.    No.

11       Q.    Why did you interview Mr. Queen immediately after

12   receiving this request if it wasn't a safety issue?

13       A.    I didn't interview him until after I was going through

14   my stack.  I had no idea who Mr. Queen was.  I was

15   interviewing, going through my stack of requests that I had on

16   the desk and I was interviewing people as I went.

17       Q.    When did write no on this request slip with an

18   exclamation point?

19       A.    The day that I interviewed him, on January 4th.

20       Q.    Before or after the interview?

21       A.    After the interview.

22       Q.    Why did you do that if you just testified a moment ago

23   there would be no reason to write no on the interview slip

24   after you conducted the interview?

25       A.    Mr. Queen was being real adamant about moving and he

1    was getting loud and I kept, I told him no and no and no, he

2    wasn't going to move. He didn't qualify. I explained to him

3    why and the procedures and finally, I just wrote it on there.

4    No.

5        Q.    Okay. So first you filled out the interview form?

6        A.    No.

7        Q.    No?

8        A.    No.

9        Q.    When did you fill out the interview form.

10       A.    After he got loud and boisterous. The first thing I

11   did was talk to Mr. Queen.

12       Q.    Okay. You talked with him and then you wrote no on

13   this slip.

14       A.    At the end when we were getting towards the end and

15   then he got up and he got real loud and that's when I did the

16   interview.

17       Q.    Okay. Before you did the interview, did you write no

18   on this slip?

19       A.    Yes.

20       Q.    And you just put it on your desk?

21       A.    Yes.

22       Q.    Okay. And then Mr. Queen you're testifying got louder?

23       A.    Yes.

24       Q.    And then you decided to do an interview?

25       A.    Correct.

1    those forms, is it?

2        A.    No, sir.

3        Q.    Because this isn't the form that you were using on

4    January 4, 2002, is it?

5        A.    I took whatever I had copies of and used.

6        Q.    So you have copies of this form in your office.

7    Correct?

8        A.    Correct.

9        Q.    And you picked them up and you interviewed these

10   inmates on January 4, 2002.

11       A.    Correct.

12       Q.    Using that form?

13       A.    I don't understand what you're saying.

14       Q.    Okay.  Let's take a look at those five forms all dated

15   January 4, 2002.

16       A.    Correct.

17       Q.    This is the form that you were using on January 4, 2002

18   --

19       A.    Correct.

20       Q.    -- to interview inmates.  Correct?

21       A.    Correct.

22       Q.    It's a different form than Mr. Queen's alleged

23   interview form.  Why?

24       A.    It's whatever I ended up with.  Just one of the odd

25   ball in the -- I have no idea.  Maybe I crossed it out.  Maybe

                                                              162

1    I didn't.  I don't remember doing it.

2        Q.    It's not on any of these other 129 interview forms.

3    But it happens to be --

4        A.    I can't give you an explanation for that, sir.

5        Q.    It happens to be on the interview form that you're

6    currently using today and it just happens to be on Mr. Queen's

7    interview form that allegedly took place three years ago when

8    you weren't using that type of form.

9        A.    It just happened to be that way.  I can't give you any

10   explanation for that.

11       Q.    All right.  Mr. Queen did not sign the interview form.

12   Correct?

13       A.    Correct.

14       Q.    Do you know whether a copy of this form was in

15   Mr. Queen's base file?

16       A.    I have no idea.  I had no reason to look.

17       Q.    And this form was never produced during any

18   administrative hearings that you went to dealing with this

19   case?

20       A.    I can't remember ever being involved in any

21   administrative hearings.

22       Q.    The interview that you're testifying took place on

23   January 4th.  Is that the first time you had ever met Mr.

24   Queen?

25       A.    Correct.

163

1   I, LISA K. BANKINS, certify that the foregoing is
    a correct transcript from the record of
2   proceedings in the above-entitled matter.

3

4   _____          6-20-05
    Signature of Court Reporter/          _____
5   Transcriber                              Date

6

7   _____
    Typed or Printed Name

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25